**2015-1275, -1325**

# United States Court of Appeals
# for the Federal Circuit

LUMEN VIEW TECHNOLOGY LLC,

*Plaintiff - Appellant,*

*v.*

FINDTHEBEST.COM, INC,

*Defendant - Appellee.*

*Appeals from the United States District Court for the Southern District of New York in 1:13-cv-03599-DLC, Senior Judge Denise Cote.*

## BRIEF FOR PLAINTIFF-APPELLANT

Damian Wasserbauer
Wasserbauer Law LLC
220 Albany Turnpike, Suite 112
Canton, CT 06019
(860) 266-1779
damian@wasserbauerlaw.com

*Counsel for Plaintiff-Appellant*

April 13, 2015

## <u>CERTIFICATE OF INTEREST</u>

Counsel for the Appellant LUMEN VIEW TECHNOLOGY LLC, Damian Wasserbauer, certifies the following:

1.  The full name of every party or amicus represented by me is: Lumen View Technology LLC.

2.  The entity named above is the real party in interest.

3.  No parent corporation or publicly held companies own 10 percent or more of the stock of Lumen View Technology LLC.

4.  The names of all law firms and the partners or associates that appeared for Lumen View Technology LLC in the trial court or are expected to appear in this court are:

On this appeal:

Damian Wasserbauer (DW3507)
*Attorney for Plaintiff Lumen View Technology LLC*
Wasserbauer Law LLC
Collinsville, CT 06022
(860) 266-1779

In the trial court:

Damian Wasserbauer (DW3507)
*Attorney for Plaintiff Lumen View Technology LLC*
Wasserbauer Law LLC
Collinsville, CT 06022
(860) 266-1779

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF AUTHORITIES ................................................................. iv

STATEMENT OF RELATED CASES ................................................. ix

STATEMENT OF JURISDICTION.................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ......................................2

STATEMENT OF THE CASE.................................................2

     The '073 Patent History................................................. 7

     Investigation of Infringement by Lumen Prior to Litigation...................... 10

     The '073 Patent Litigation ................................................. 18

     The Related RICO Litigation and FTB's Own Frivolous and
          Unreasonable Misconduct................................................. 23

     October 23, 2014 Memorandum and Decision........................................... 24

I.     SUMMARY OF THE ARGUMENT.................................................25

II.    STANDARD OF REVIEW .................................................26

III.   ARGUMENT.................................................26

     A.     Presumption of Validity of Patents ................................................. 26

     B.     Standard for Awarding Fees Under Section 285 ............................. 29

     C.     The District Court Award of Fees Under Section 285 Was An
            Abuse of Discretion ................................................. 30

          1.  *The District Court Finding of Exceptionality Was Based
             Upon An Improper Finding of Non-Infringement*........................ 30

          2.  *The District Court Finding of Exceptionality Was Made
             Without Claim Construction* ................................................. 36

3.  *The District Court Finding of Non-Infringement Was An Issue for A Jury* .......................................................................... 40

4.  *The Underlying Decision Was Based on Error Because of Unsupported Underlying Factual Findings* ................................ 42

D.    The Enhancement of Attorneys' Fees Was An Abuse of Discretion ...................................................................................... 45

1.  *The Octane Factors Are Used for the Exceptionality Analysis, and Not Enhancement* .................................................... 47

2.  *There is No Specificity to Justify an Enhanced Fee* ..................... 49

3.  *Punitive Awards Are Inappropriate* ............................................. 51

IV.    CONCLUSION AND STATEMENT OF RELIEF SOUGHT ..................... 53

ADDENDUM ...................................................................................................... A1

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

# TABLE OF AUTHORITIES

## Case Law

*Aldrich v. Thomson McKinnon Sec., Inc,*
  756 F.2d 243 (2d Cir. 1985) .................................................................52

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l,*
  134 S. Ct. 2347 (U.S. 2014) ................................................. 2, 3, 9, 10, 25, 27, 28

*Am. Video Graphics, L.P. v. Elec. Arts, Inc.,*
  359 F. Supp. 2d 558 (E.D. Tex. 2005) .................................................32

*Arrival Star, Inc. v. Descartes Sys. Group, Inc.,*
  2004 U.S. Dist. LEXIS 22433 (S.D.N.Y. Nov. 5, 2004) .................................. 33

*Baron Servs. v. Media Weather Innovations LLC,*
  717 F.3d 907 (Fed. Cir. 2013) .............................................................37

*Bausch & Lomb v. Barnes-Hind/Hydrocurve, Inc.,*
  796 F.2d 443 (Fed. Cir. 1986), *cert. denied*, 484 U.S. 823 (1987) .....................21

*Biax Corp. v. Nvidia Corp.,*
  2015 U.S. App. LEXIS 3082 (Fed. Cir. Feb. 24, 2015) .................. 26, 30, 33, 34

*Bilski v. Kappos,*
  561 U.S. 593 (2010) ............................................................. 8, 10, 20, 25, 27, 35

*buySAFE, Inc. v. Google, Inc.,*
  765 F.3d 1350 (Fed. Cir. 2014) ...........................................................9

*Cadence Pharms., Inc. v. Exela PharmSci Inc.,*
  2015 U.S. App. LEXIS 4700 (Fed. Cir. Mar. 23, 2015) .....................................26

*Central Soya Co. v. Geo. A. Hormel & Co.,*
  723 F.2d 1573 (Fed. Cir. 1983) ...........................................................51

*Cognex Corp. v. Microscan Sys., Inc.,*
  2014 U.S. Dist. LEXIS 91203 (S.D.N.Y. June 30, 2014) ............................ 48, 49

*Data Distrib. Techs., LLC v. Brer Affiliates, Inc.,*
 2014 U.S. Dist. LEXIS 115543 (D.N.J. Aug. 19, 2014)......................................38

*Diamond v. Diehr,*
 450 U.S. 175 (1981) ...................................................................................21

*Dietgoal Innovations LLC v. Chipotle Mexican Grill,*
 2015 U.S. Dist. LEXIS 34782 (D. Tex. 2015)........................................ 26-27, 42

*DDR Holdings, LLC v. Hotels.com, L.P.,*
 773 F.3d 1245 (Fed. Cir. 2014)..................................................................... 9-10

*E. Coast Sheet Metal Fabricating Corp. v. Autodesk, Inc.,*
 2015 DNH 011 (D.N.H. 2015)…......................................................................40

*Electro-Mech. Indus. v. Universal Support Sys.,*
 359 Fed. Appx. 160 (Fed. Cir. 2009) ..................................................................48

*EMD Millipore Corp. v. AllPure Techs., Inc.,*
 768 F.3d 1196 (Fed. Cir. 2014)..........................................................................40

*FindTheBest.com, Inc. v. Lumen View Tech. LLC,*
 20 F. Supp. 3d 451 (S.D.N.Y. 2014)...................................................................23

*Finisar Corp. v. DirecTV Group, Inc.,*
 523 F.3d 1323 (Fed. Cir.), *cert. denied*, 555 U.S. 1070 (2008)..........................40

*Gametek LLC v. Zynga, Inc.,*
 2014 U.S. Dist. LEXIS 122834 (N.D. Cal. Sept. 2, 2014) ...............10, 27, 28, 48

*Halo Elecs. v. Pulse Elecs.,*
 2015 U.S. App. LEXIS 4696 (Fed. Cir. Mar. 23, 2015).....................................47

*Highmark, Inc. v. Allcare Health Mgm't Sys., Inc.,*
 134 S. Ct. 1744 (2014) .......................................................................................26

*Hoffmann-La Roche Inc. v. Invamed Inc.,*
 213 F.3d 1359 (Fed. Cir. 2000)..........................................................................33

*Homeland Housewares, LLC v. Sorensen Research & Dev. Trust*,
 2014 U.S. App. LEXIS 17300 (Fed. Cir. Sept. 8, 2014) ....................................29

*Imagineering, Inc. v. Van Klassens, Inc.*,
 53 F.3d 1260 (Fed. Cir. 1995)...........................................................................52

*Intellect Wireless, Inc. v. Sharp Corp.*,
 2014 U.S. Dist. LEXIS 73653 (N.D. Ill. May 30, 2014) ....................................48

*IPVX Patent Holdings, Inc. v. Taridium, LLC*,
 2014 U.S. Dist. LEXIS 127550 (E.D.N.Y. Aug. 6, 2014)...................................49

*Jones v. Hardy*,
 727 F.2d 1524 (Fed. Cir. 1984).........................................................................21

*Junker v. Eddings*,
 396 F.3d 1359 (Fed. Cir. 2005).........................................................................49

*Kilopass Tech., Inc. v. Sidense Corp.*,
 2015 U.S. Dist. LEXIS 30650 (N.D. Cal. Mar. 11, 2015)...................................46

*Lucent Techs., Inc. v. Gateway, Inc.*,
 580 F.3d 1301 (Fed. Cir. 2009).........................................................................40

*Lumen View Tech., LLC v. Findthebest.com, Inc.*,
 2014 U.S. Dist. LEXIS 150444 (S.D.N.Y. Oct. 23, 2014)................................47

*Markman v. Westview Instruments, Inc.*,,
 517 U.S. 370 (1996) ................................................................................. *passim*

*Mathis v. Spears*,
 857 F.2d 749 (Fed. Cir. 1988).........................................................................51

*New York Univ. v. E.piphany, Inc.*,
 2006 U.S. Dist. LEXIS 9157 (S.D.N.Y. Mar. 6, 2006) ......................................32

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
 521 F.3d 1351 (Fed. Cir. 2008).........................................................................36

*Octane Fitness, LLC v. ICON Health & Fitness, Inc,*
  134 S. Ct. 1749 (U.S. 2014) ........................................................... *passim*

*Perdue v. Kenny A.,*
  559 U.S. 542 (2010) ................................................................ 46, 50

*Perfect Web Techs., Inc. v. InfoUSA, Inc.,*
  587 F.3d 1324 (Fed. Cir. 2009) ..........................................................37

*Precision Links Inc. v. USA Prods. Group, Inc.,,*
  2014 U.S. Dist. LEXIS 85694 (W.D.N.C. June 24, 2014) .................................49

*Q-Pharma, Inc. v. Andrew Jergens Co.,*
  360 F.3d 1295 (Fed. Cir. 2004) ................................................... 31, 32

*Sensonics, Inc. v. Aerosonic Corp.,*
  81 F.3d 1566 (Fed. Cir. 1996) ..........................................................51

*Site Update Solutions, LLC v. Accor North America, Inc.,*
  2015 U.S. Dist. LEXIS 17603 (N.D. Cal. Feb. 11, 2015) ........................... 37, 42

*StoneEagle Servs., Inc. v. Pay-Plus Solutions, Inc.,*
  2015 U.S. Dist. LEXIS 15144 (M.D. Fla. Feb. 9, 2015) ...................................37

*Stryker Corp. v. Intermedics Orthopedics,*
  898 F. Supp. 116 (E.D.N.Y. 1995) ......................................................51

*TecSec, Inc. v. IBM,*
  731 F.3d 1336 (Fed. Cir. 2013) ................................................... 36, 37

*Teva Pharm. USA, Inc. v. Sandoz, Inc.,*
  135 S. Ct. 831 (2015) ..................................................................38

*Ulead Sys., Inc. v. Lex Computer & Mgmt. Corp.,*
  351 F.3d 1139 (Fed. Cir. 2003) ........................................................32

*Ultramercial, Inc. v. Hulu, LLC,*
  772 F.3d 709 (Fed. Cir. 2014) ..................................................... 9, 28

*Ultratec, Inc. v. Sorenson Communs., Inc.,*
  2014 U.S. Dist. LEXIS 141428 (W.D. Wis. Oct. 3, 2014).................................47

*View Eng'g, Inc. v. Robotic Vision Sys., Inc.,*
  208 F.3d 981 (Fed Cir. 2000)..............................................................................31

*Whitserve, LLC v. Computer Packages, Inc.,*
  694 F.3d 10 (Fed. Cir. 2012)...............................................................................51

*W.L. Gore & Assoc., Inc. v. Garlock, Inc,*
  721 F.2d 1540 (Fed. Cir. 1983)...........................................................................21

*Yama Capital LLC v. Canon Inc.,*
  2013 U.S. Dist. LEXIS 175983 (S.D.N.Y. Dec. 13, 2013) .................................32

## Rules

Fed. Cir. R. 28(a)(4) .......................................................................................... viii

Fed. Cir. R. 47 ................................................................................................... viii

## Statutes

28 U.S.C. § 1295(a)(1) ...........................................................................................1

28 U.S.C. § 1331 .....................................................................................................1

28 U.S.C. § 1338(a) ................................................................................................1

35 U.S.C. § 101 ........................................................................................... *passim*

35 U.S.C. § 282......................................................................................................26

35 U.S.C. § 284......................................................................................................47

35 U.S.C. § 285........................................................................................... *passim*

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Fed. Cir. R. 28(a)(4) and 47.5, Plaintiff Lumen View Technology LLC ("Lumen") states that no other appeal from the civil action or proceeding in the lower court was previously before this Court, or any other court.

## **STATEMENT OF JURISDICTION**

The District Court had jurisdiction over the action giving rise to this appeal under 28 U.S.C. §§ 1331 and 1338(a). The District Court entered final judgment, awarding attorneys fees and an enhancement pursuant to 35 U.S.C. § 285 on December 8, 2014. A37-A38. The time period for the Notice of Appeal was extended, and on January 15, 2015, Lumen timely filed its Notice of Appeal to the Federal Circuit.

This Court has exclusive jurisdiction pursuant to 28 U.S.C. § 1295(a)(1). This is an appeal from a final and appealable judgment.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether the District Court erred in finding noninfringement prior to any *Markman* hearings, and using this finding as the basis for a determination of exceptionality.

2. Whether the District Court erred in its application of the *Octane* factors to the determination of exceptionality.

3. Whether the District Court erred in determining that an award of enhanced fees was justified pursuant to 35 U.S.C. § 285.

## STATEMENT OF THE CASE

After conducting a thorough pre-suit infringement investigation, on May 29, 2013, well before the U.S. Supreme Court rendered its decision in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l,* 134 S. Ct. 2347 (2014), LUMEN VIEW TECHNOLOGY LLC. ("Lumen") filed suit in the Southern District of New York against Findthebest.com, Inc. ("FTB"). The Complaint, which exceeded the filing requirements of Rule 18, alleged that specific features of FTB's web-enabled service, in particular its "AssistMe" service (the "FTB AssistMe Service"), infringed on Claim 1 of United States Patent No. 8,069,073 B2 (the "'073 Patent"), entitled "System and Method for Facilitating Bilateral and Multilateral Decision-Making," issued on Nov. 29, 2011. A115-A143. Judge Denise Cote of the Southern District of New York presided over this litigation in the District Court.

On August 30, 2013, despite being provided no discovery by FTB, Lumen filed detailed Preliminary Infringement Contentions ("PICs"), evidencing how the FTB AssistMe Service infringed on the '073 Patent based solely upon publicly available information. A152-A172. The PICs included a detailed infringement claims chart which identified each element of Claim 1 of the '073 Patent as having been met by specific features of the FTB AssistMe Service. A156-A172. On September 19, 2013, FTB filed a letter with the District Court arguing that Lumen's PICs were insufficient and not in compliance with the court's local patent rules, requesting the judge to strike or modify Lumen's PICs. A144-A146. On September 24, 2013, Lumen, in response, argued its PICs were sufficient, (A149-A151), and the District Court agreed, ruling on September 24, 2013 that FTB's request that Lumen's PICs be stricken or ordered modified was denied. A173-A174.

On September 23, 2013, following an *en banc* split of this Court and prior to the U.S. Supreme Court's ruling in *Alice*, FTB filed a Motion for Judgment on the Pleadings under Rule 12(c), claiming the invention disclosed in the '073 Patent does not constitute patent eligible subject matter under § 101. A147-A148. On October 11, 2013, Lumen filed a memorandum in opposition to FTB's Motion for Judgment on the Pleadings, in addition to briefing on Claim Construction. A175-A204.

On November 22, 2013 prior to: (i) any discovery being provided to Lumen by FTB, although served, requested and ordered by the District Court A173-A174.

(ii) the District Court conducting a *Markman* hearing, or (3) the District Court issuing a claim construction order, the District Court ruled that the invention disclosed in the '073 Patent was patent-ineligible under § 101 and granted FTB's motion for judgment on the pleadings. A1-A36.  The District Court explicitly declined to issue a claim construction order deciding it was a waste of judicial resources. A35.

On December 10, 2013, FTB moved for attorneys' fees on the ground that Lumen's filing of its complaint was an "exceptional case" under Section 285. Lumen vehemently opposed any such finding. A795-A827. On April 29, 2014, the Supreme Court issued *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014), which addressed the definition of an "exceptional" case and the standard for granting an award of fees.  On May 30, 2014, FTB's motion seeking a declaration that this is an exceptional case was granted. A39-A55.  FTB requested $149,979.50 in fees and $4,899.63 in costs, in addition to interest and an enhancement of the attorneys' fees.

On October 23, 2014, Judge Cote awarded FTB attorneys' fees and costs as requested, as well as an enhancement of those fees. Because the District Court had already concluded that this case was "exceptional" under Section 285, this opinion dealt solely with a determination of the amount of fees to be awarded. A56-A70. Using the traditional "lodestar" analysis, Judge Cote calculated the lodestar fee

award as $148,592.00. Using the factors from the recent *Octane Fitness* decision as justification for a multiplier of two (2), the court awarded FTB $297,184.00 in attorney's fees and $4,899.63 in costs, as well as interest from May 30, 2014, at a rate of 9%.

On November 6, 2014, Lumen filed a Motion for Reconsideration, arguing that the Court abused its discretion in awarding FTB enhanced attorneys fees under Section 285. The Motion requested the District Court to reconsider the following: (i) the Court's finding of noninfringement prior to any *Markman* hearings, which was the basis for the enhanced award; (ii) the Court's application of the *Octane* factors to the determination of exceptionality, and; (iii) the award of an essentially punitive and unreasonable enhancement, justified by the same factors that supported the determination of exceptionality. A734-A791. On November 12, 2014, Judge Cote denied the Motion for Reconsideration. A792-794.  Lumen View filed its Notice of Appeal on January 15, 2014.

## STATEMENT OF THE FACTS

The District Court committed clear error in reaching the conclusion that this is an "exceptional" case justifying the award of enhanced attorney's fees, and in doing so it substituted its own personal biases toward Lumen as a patent licensing entity for the indisputable facts on the record. Lumen: (i) performed substantive and logical infringement analysis of the FTB AssistMe Service prior to filing suit against

FTB, (ii) relied on publicly available information describing the FTB AssistMe Service, (iii) initiated a lawsuit in which it exceeded its pleading obligations by providing a detailed description of its infringement and including reference to the specific features of the FTB AssistMe Service, (iv) offered FTB license fee that was reasonable and proportional to the significant value of the FTB AssistMe Service as regards FTB's entire web-enabled system, (v) was provided no discovery by FTB, (vi) was deprived by the District Court of a *Markman* hearing or claims construction, (vii) had to request protective relief from the District Court as a result of FTB using confidential information provided to FTB's counsel and Kevin O'Connor (FTB's CEO) continually calling, harassing and threatening the inventors of the '073 Patent and making defamatory statements to the press, including to non-profit organizations that the inventors supported and were active in, (viii) FTB using confidential settlement information in the case in chief over the objection of Lumen, and (ix) was denied the opportunity to present an infringement case to a jury.

The District Court failed to construe the evidence in the light most favorable to Lumen, the non moving party, and determined that this case was exceptional based on its own subjective "finding" of noninfringement. This finding not only misconstrues the scope of the '073 Patent but it clearly fails to support a finding of exceptionality. Furthermore, in a severe overextension of the *Octane* factors, the

6

District Court misconstrued the recent Supreme Court decision as a basis for an unreasonable enhanced fee award.

**The '073 Patent History**

United States Patent No. 8,069,073 B2 (the "'073 Patent"), entitled "System and Method for Facilitating Bilateral and Multilateral Decision-Making," issued on Nov. 29, 2011 and was the patent-in-suit. The '073 Patent family portfolio includes five issued patents and one pending patent application.[1]  The '073 Patent is composed of one independent claim and eight dependent claims.  The method of Claim 1 and the steps recited in each of the nine claims of the '073 Patent must be implemented by a computer-implemented method.

The independent claim of the '073 patent ("Claim 1") states in full:

> We claim: A computer-implemented method for facilitating evaluation, in connection with the procurement or delivery of products or services, in a context of at least one of (i) a financial transaction and (ii) operation of an enterprise, such context involving a *first class of parties in a first role* and a *second class of counterparties in a second role*, the method comprising:
>
> In a first computer process, retrieving *first preference data* from a first digital storage medium, the first preference data including attribute levels derived from choices made by at least one of the parties in the first class;

---

[1] U.S. Patent No. 6,915,269 issued June 5, 2005, U.S. Patent No. 7,184,968 issued Feb. 27, 2007, U.S. Patent No. 7,725,347 issued May 12, 2010, U.S. Patent No. 8,170,898 issued May 1, 2012 and U.S. Patent Application US2012/215,550 filed Apr. 27, 2012

In a second computer process, retrieving **second preference data** from a second digital storage medium, the second preference data including attribute levels derived from choices made by at least one of the counterparties in the second class;

In a third computer process, for a selected party, performing multilateral analyses of the selected party's preference data and the preference data of each of the counterparties, and computing a closeness-of-fit value based thereon; and

In a fourth computer process, using the computed closeness-of-fit values to derive and provide a list matching the selected party and at least one of the counterparties. (Emphasis added)

A113.

The '073 Patent was prosecuted before the USPTO by Attorney Bruce Sunstein of Sunstein, Kann, Murphy & Timbers, LLP, an attorney with more than forty years of patent prosecution experience. The USPTO's Examining Attorney agreed with Attorney Sunstein's proposed computer-implemented process claims pursuant to the sole Office Action rendered during the application's evaluation. At the time the '073 Patent was issued, the Supreme Court holding in *Bilski v. Kappos*, 561 U.S. 593 (2010) was controlling; this landmark case addressed the patent eligibility of a process, including those in the '073 Patent. Post-*Bilski*, the USPTO issued new guidelines in regards to patentability under 35 U.S.C. § 101 ("Section 101"), and pursuant to the USPTO and those post-*Bilski* guidelines, the computer-implemented process claims of the '073 Patent application were approved. The USPTO, Attorneys Sunstein and Wasserbauer, and Lumen were all in agreement

that the '073 Patent satisfied the existing guidelines for patentability under § 101 at the time Lumen filed its Complaint against FTB.

More than a year after Lumen's complaint was filed against FTB, the Supreme Court again addressed the issue of patentability under Section 101 in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014) (invalidating patent under Section 101). "The Court in *Alice* made clear that a claim that is directed to an abstract idea does not move into § 101 eligibility territory by "merely requir[ing] generic computer implementation." *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 713 (Fed. Cir. 2014).[2] However, the principle upon which the '073 Patent is based upon has remained in tact: "[o]n a fundamental level, the creation of new compositions and products based on combining elements from different sources has long been a basis for patentable inventions." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245,

---

[2]This Circuit has interpreted *Alice* as follows: "Based on the three implicit exclusions, the Court has created a framework for identifying claims that fall outside section 101. A claim that directly reads on matter in the three identified categories is outside section 101. But the provision also excludes the subject matter of certain claims that by their terms read on a human-made physical thing ('machine, manufacture, or composition of matter') or a human-controlled series of physical acts ('process') rather than laws of nature, natural phenomena, and abstract ideas. Such a claim falls outside section 101 if (a) it is 'directed to' matter in one of the three excluded categories and (b) 'the additional elements' do not supply an 'inventive concept' in the physical realm of things and acts—a 'new and useful application' of the ineligible matter in the physical realm—that ensures that the patent is on something 'significantly more than' the ineligible matter itself. This two-stage inquiry requires examination of claim elements 'both individually and 'as an ordered combination.'" *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1353 (Fed. Cir. 2014) (citations omitted).

1258 (Fed. Cir. 2014) (quotations omitted) (addressing patentability in the wake of the *Alice* decision).

It is important to note that the '073 Patent was issued post-*Bilski* and prior to the *Alice* decision. Lumen conducted its pre-filing infringement investigation prior to *Alice*, and the lawsuit was filed prior to Oral Argument being conducted in *Alice* (March 31, 2014) and prior to the Supreme Court's decision in *Alice* (June 19, 2014). The controlling law at the time the Patent was issued, and the time patent rights are enforced by the holder, is of particular relevance in an analysis of exceptionality under Section 285. "It is particularly relevant here that the substantive law in this area was unsettled at the time…." *Gametek LLC v. Zynga, Inc.*, 2014 U.S. Dist. LEXIS 122834 (N.D. Cal. Sept. 2, 2014) (noting that the patent was controlled by pre-*Alice* standards and ultimately denying attorneys fees under 285), *affirmed by Gametek LLC v. Zynga Inc.*, 2015 U.S. App. LEXIS 4516 (Fed. Cir. Mar. 17, 2015). Even assuming that *Alice* would have impacted whether the USPTO issued the '073 Patent, at the time of issuance and Lumen's attempted enforcement of the accompanying rights, the '073 Patent complied with existing guidelines for patentability under § 101.

## Investigation of Infringement by Lumen Prior to Litigation

Prior to the filing of the complaint against FTB, the record below demonstrates Lumen's counsel conducted an extensive pre-suit infringement

investigation to determine whether FTB infringed the '073 Patent. This analysis was conducted following a thorough review of the '073 Patent and its prosecution history, as well as the prosecution file histories of the related patents. Counsel reviewed FTB's web-enabled service and confirmed the accuracy of specific features of said service, including the "AssistMe" feature, which was the subject of Lumen's allegations of infringement. In fact, counsel for Lumen even filed a sworn affidavit as to his thorough pre-filing investigation A766-A791, A825-A827. The by-product of counsel's analysis was the generation of an infringement claims chart demonstrating, on an element-by-element basis, the infringement of the FTB AssistMe Service, and submitted same to the court along with Lumen's PICs. A152-A172. As objective evidence of counsel's reliance on this claim chart in drafting the Complaint, it is indisputable that the specific language of paragraphs 12 and 13 of the Complaint track to the right-hand column of the claims chart submitted with Lumen's PICs. A115-A143, A152-A172. The thorough and calculated approach that Lumen and its counsel took with respect to its pre-suit activities is at odds with the District Court's subjective finding that no reasonable litigant could have expected success.

As part of the pre-suit infringement investigation, counsel for Lumen was able to locate and identify publicly available information that reasonably supported Lumen's determination that the FTB AssistMe Service relied on **preference data**

**being inputted by multiple parties** and infringed the '073 Patent. For instance, in a publicly available video located on the Wall Street Journal website since 2011, Kevin O'Connor, FTB's CEO, gives an interview during which he describes FTB's comparison service as a research and "human curated" engine that provides consumers looking to make a purchase with an objective way to compare different sorts of information across a wide range of categories.  Lumen's reliance on this WSJ video was disclosed in Lumen's October 3, 2013 Responses to FTB's First Set of Interrogatories (Interrogatory No. 15).  A783-A791. Furthermore, Lumen relied on publicly available information for which FTB, and its CEO, were the direct source.

During the WSJ video, Mr. O'Connor describes how the FTB system operates and distinguishes it with that of other search engines by highlighting the fact that FTB uses its **own researchers** to clean and present data in a more structured and consumable manner. More specifically, Mr. O'Connor admits that certain features of FTB's system **rely on preference data being inputted by multiple parties**. Mr. O'Connor deliberately describes the specific factors or "attributes" that are inputted into the FTB system (via a "question and choice process") by consumers when they are looking to make a purchase. For purposes of Claim 1 of the '073 Patent, these consumers are a "first class of parties in a first role." Mr. O'Connor then continues to describe the importance of cleansing, categorizing and "curating" certain data in

the FTB system by FTB's staff and researchers. For purposes of Claim 1 of the '073 Patent, these staff and researchers are a "second class of counterparties in a second role."[3]

As Kevin O'Connor describes the distinguishing factor of FTB's system, he remarks that "it really takes a human component"…"a human curated component to figure out how do you make a decision [of] which dog to pick, which enterprise software to buy, which ski resort to go to…"  "What we do is we either get it [data] from integrated databases or either databases from associations or governments and we also human-curate a ton of information." A775-A779.  Kevin O'Connor makes a point of identifying a large class of products and services that can benefit from FTB's distinguishable human- and machine-powered comparison engine which help a consumer business make a quick and informed decision.

A reasonable person, having viewed this interview of FTB's CEO Mr. O'Connor, would reasonably and logically reach the conclusion that FTB's system, in particular the FTB AssistMe Service, relies on **_at least _two__** distinguishable and separate categories of parties: the category of individuals that support and maintain

---

[3] _FindTheBest's Kevin O'Connor Speaks!_, July 28, 2011 Wall Street Journal Video, available at: http://www.wsj.com/video/findthebest-kevin-oconnor-speaks/EC672AE9-4721-4114-B8DE-B2026792AC35.html#!EC672AE9-4721-4114-B8DE-B2026792AC35 (last accessed March 21, 2015).

the FTB system (*i.e.*, FTB's employees and researchers) and a separate category of consumer users (*i.e.*, users of FTB's service that are using the service to assist with purchasing decisions) ***each inputting different attribute preferences***. FTB's employees and researchers are making personal choices and structuring the "AssistMe" service around those choices – they are rating information and determining which attributes are more important (or preferential) to allow comparisons of similar, but somewhat different, products or services. The actual purchaser users (FTB's consumers) are then inputting their own preferences and attributes based upon their individual purchasing needs. ("***Our team of researchers fine-tunes the rating for each individual comparison.***") A160.

Without these distinguishing "human-curated" or human-rated steps being performed by FTB's own researchers and employees, Mr. O'Connor states that the FTB system would merely perform the same "scraping" functions as a search or price engine, that is collect information from a variety of sources and merely present the information at the request of a search query. Instead, Mr. O'Connor views FTB as a comparison engine, but in order to do so, it first requires a human-inputted rating element to thereby enable its purchaser users to make relevant comparisons between dissimilar products.

While the input from FTB's employees and researchers ("human curators") may be different from the question and choice process used by FTB for a purchaser

end user (consumers), these input processes performed by FTB's "human curators" can reasonably be construed as "choices." It is therefore wholly reasonable and plausible for Lumen to have deduced that attribute levels were then derived from these human-curated "choices" or "preferences." More specifically, it is plausible for Lumen to have assumed that the "AssistMe" scoring and ranking process would require some process for representing *each of the two categories of users' preferences* into some form of numerical expression or mathematical function, otherwise the calculation of a score would be improbable, <u>if not impossible</u>.

The calculated "AssistMe" scores are then used to rank similar (but different) consumer products based upon information submitted by purchaser users of the FTB system. It was also plausible for Lumen to assume, based on publicly available information that Lumen reviewed as part of its investigation, that FTB's system uses a closeness-of-fit analysis in order to create a product ranking when multiple products or services are being evaluated for an end user purchaser, although the details of the exact closeness of fit process used are obscured by FTB, as one would reasonably assume would be the case. Lumen assumes that FTB retains an advantage over its competitors by keeping explicit details regarding its ranking and scoring processes secret.

Despite Judge Cote's opinion that "it is undisputed that FTB's website does not match preference data inputted on its website by multiple parties," (A43), all of

the evidence in the record clearly shows that FTB's AssistMe Service relied on preference data being inputted by *multiple parties*.  In its Order, the District Court explicitly agreed that the '073 Patent requires "one or more parties on each side [to] input attribute preferences and intensity of preference data…" A57.  Based upon (i) Mr. O'Connor's own statements made prior to the filing of Lumen's complaint, and (ii) content provided on FTB's own website, it is indisputable that FTB has publicly acknowledged the reliance of its system on the input of data by two distinct categories of users (neither of whom are actually engaged in "matchmaking"). *This is the distinguishing feature of the FTB system that FTB's CEO touted to the media, its consumers and its investors*. The District Court erred in concluding that the FTB AssistMe Service does not rely on data being inputted by multiple parties, and this erroneous conclusion was then used as the basis for the finding of exceptionality and enhancement of fees.

In another reasonable interpretation of the FTB system's interworkings (as proffered by Lumen in its Claim Construction Brief) (A205-A560), selected sellers of products and services (a "first class of parties") are allowed by the FTB AssistMe Service to directly edit their own listings in the FTB system, changing attributes, preferences and making choices using various input mechanisms.  FTB's employees and researchers (a "second class of parties") can reasonably be construed as "co-evaluators" in these cases if any of their own personal choices, attributes or

preferences affect the "AssistMe" score calculation and ranking, which such ranking would then be used by FTB's purchaser users (consumers) (a "third class of parties") to input their own personal preferences and attributes for a particular product or service. Further, each of these three different classes of parties performs separate roles. This is yet another reasonable interpretation of the FTB AssistMe Service that Lumen relied on before filing suit against FTB. The District Court erroneously overlooked this interpretation when ruling that FTB's system does not rely on preference data inputted by multiple parties and ultimately declaring Lumen's infringement position unreasonable and frivolous.

Based upon the conclusive evidence that FTB's system relies on "one or more classes of parties on each side input[ing] attribute preferences and intensity of preference data," the publicly available information relied on by Lumen to reach this conclusion and its extensive element-by-element infringement analysis, Lumen filed suit against FTB, alleging that FTB infringed at least Claim 1 the '073 Patent. Despite the personal biases against Lumen, as reflected in the District Court's opinion, these are not the actions of an unreasonable, frivolous litigant that failed to conduct a basic pre-suit investigation, but rather the type of procedures and practices that most courts find to be more than adequate in terms of pre-filing infringement investigation and analysis.

**The '073 Patent Litigation**

Lumen's initial complaint, filed May 29, 2013, exceeded the requirements of Form 18 and provided allegations of infringement that not only tracked to the claim chart prepared prior to filing, but also to Lumen's Preliminary Infringement Contentions and Claim Construction Brief later submitted to the District Court. A115-A143, A152-A172, A205-A560. Lumen's pre-suit conduct and approach to litigation was reasonable, deliberate and calculated. Instead of merely meeting the Form 18 standard, counsel for Lumen chose to include a detailed summary of the infringement in the Complaint, specifically referencing the "AssistMe" feature of FTB's system such that FTB could understand the claim and decide whether to take a license to the '073 Patent. Once again, the record demonstrates that Lumen acted reasonably and with a good faith basis in pursuing their claims against FTB.

On July 8, 2013, FTB filed its Answer, and in so doing it: (i) denied the material allegations in the complaint, (ii) asserted nine skeletal, boilerplate affirmative defenses, and (iii) chose not to counterclaim Lumen on the basis of noninfringement. FTB did not file a Safe Harbor letter prior to its Answer. Shortly after, Lumen filed its preliminary infringement contentions as well as its preliminary claim construction brief. A152-A172, A205-A560. Additionally, Lumen provided substantial briefing on the § 101 issue, namely the patentability of the '073 Patent. A175-A204. During the litigation, Lumen repeatedly requested discovery of FTB

on the their computer-implemented process to offer proof of how the FTB system operates so as to track the steps of the computer-implemented process. Despite numerous requests to counsel, FTB provided no discovery or any objective evidence of how the FTB system operated and refused to comply with Lumen's requests. Counsel for FTB argued that FTB's responses to Lumen's discovery requests were substantially the same as the other defendants for whom counsel was representing in the litigation (*i.e.*, Adiccio, et al). A585-A638.    There were no decisions made by the District Court at that time, nor was any investigative material provided by FTB to demonstrate that the FTB AssistMe Service did not rely on data being inputted by multiple parties and thus did not infringe on the '073 Patent.

On September 23, 2013, FTB filed a Motion for Judgment on the pleadings under Rule 12(c), claiming the invention disclosed in the '073 Patent did not constitute patent eligible subject matter under § 101. A147-148. At this stage, no *Markman* hearing had taken place, nor was there any *Markman* ruling made on Lumen's Claim Construction. In fact, no record had been made (or was ever made) in construing any claims of the '073 Patent. No record had been made (or was ever made) in invalidating any claims of the '073 Patent over prior art. No record had been made (or was ever made) in determining noninfringement of any claims of the '073 Patent by the FTB system. On Oct. 11, 2013, Lumen filed a lengthy

memorandum in opposition to FTB's Motion for Judgment on the Pleadings. A175-204.

On November 22, 2013, prior to conducting a *Markman* hearing, and prior to issuing a claim construction order, the District Court ruled that the invention disclosed in the '073 Patent was patent-ineligible under § 101 and granted FTB's motion for judgment on the pleadings. A1-A36.  In rendering the invention disclosed in the '073 Patent as ineligible subject matter, the District Court:

1) Disagreed with the USPTO's position that the method underlying the "computer" aspect was patentable with or without the computer;

2) Disagreed with the USPTO's position that the inventive concept of the claims was taking a somewhat known process and applying it in a way that was novel and had never been done before;

3) Disagreed with the USPTO's post-*Bilski* position that it is entirely acceptable to obtain a patent on an old process or combination of processes, if the solution is novel and non-obvious; and

4) Chose to ignore each limitation in the '073 Patent claims that was more than simply "matching A with B," thereby rejecting the guidance of Section 2141.02 of the USPTO's Manual of Patent Examining Procedure (MPEP) with respect to

ignoring claim limitations and reducing the claims of the '073 Patent down to a "gist" or "thrust."[4]

Following the ruling on the Motion for Judgment on the pleadings, FTB requested an award of costs and attorneys' fees pursuant to 35 U.S.C. § 285 ("Section 285"). On May 30, 2014, the District Court found this to be a "prototypical" exceptional case, holding that Lumen's lawsuit against FTB was "frivolous" and "objectively unreasonable" "because the '073 Patent claimed a bilateral matchmaking process requiring multiple parties to input preference information, while FTB's "AssistMe" feature *utilizes the preference data of only one party*."

---

[4] Distilling an invention down to the "gist" or "thrust" of an invention *disregards the requirement of analyzing the subject matter "as a whole*." *W.L. Gore & Assoc., Inc. v. Garlock, Inc.*, 721 F.2d 1540 (Fed. Cir. 1983), *cert. denied*, 469 U.S. 851 (1984) (restricting consideration of the claims by disregarding certain limitations resulted in treating claims as though they read differently than allowed). "In determining the eligibility of respondents' claimed process for patent protection under § 101, **their claims must be considered as a whole**. It is inappropriate to dissect the claims into old and new elements and then to ignore the presence of the old elements in the analysis. This is particularly true in a process claim because a new combination of steps in a process may be patentable even though all the constituents of the combination were well known and in common use before the combination was made. The "novelty" of any element or steps in a process, or even of the process itself, is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter." *Diamond v. Diehr*, 450 U.S. 175, 188-89 (1981) (emphasis added); *see also Bausch & Lomb v. Barnes-Hind/Hydrocurve, Inc.*, 796 F.2d 443, 447-49 (Fed. Cir. 1986), *cert. denied*, 484 U.S. 823 (1987) (focusing on one concept, but disregarding express limitations about how the product is to be used); *see also Jones v. Hardy*, 727 F.2d 1524, 1530 (Fed. Cir. 1984) ("treating the advantage as the invention disregards statutory requirement that the invention be viewed 'as a whole'").

(Emphasis added).  A51.  Despite not having received any discovery from FTB or being permitted to present its infringement case, the District Court chose to ignore the specific allegations in Lumen's complaint, PICs, Claim Construction and claims chart.  In her Opinion, Judge Cote subjectively relied on alleged statements made by FTB's CEO and CIO, during a telephonic conference shortly after receiving the Complaint, that the "AssistMe feature did not use bilateral or multilateral preference matching" as if such telephonic statements were a suitable replacement for FTB providing any discovery or a finding of noninfringement by a jury.  A51-A52.  Judge Cote further opined that Lumen had failed "to point to any specific way in which FTB infringed the patent." A52

The District Court then determined that Lumen's decision to initiate an infringement action was unreasonable and without merit, because there was **no infringement** of the '073 Patent, therefore making the case exceptional. A39-A55. Judge Cote held, in contradiction to FTB's own public statements, that there is "no question that FTB does not employ the matching of multiple parties…." A54.  Judge Cote further stated that "***the invalidity of the '073 Patent plays no role in the reasoning underlying this Opinion. The question addressed here is whether Lumen could properly assert infringement based on the '073 Patent***." (Emphasis added.)  A54.   According to the District Court, the "exceptional" designation was solely based upon non-infringement.

## The Related RICO Litigation and FTB's Own Frivolous and Unreasonable Misconduct

On September 16, 2013, FTB as Plaintiff initiated action against Lumen and the inventors of the '073 Patent, alleging charges of racketeering under the Racketeering Influenced Corruption Act ("RICO"), extortion, abuse of process, civil conspiracy and violation of the California Business & Professional Code § 17200. *FindTheBest.com, Inc. v. Lumen View Tech. LLC*, 20 F. Supp. 3d 451, 455 (S.D.N.Y. 2014). On November 22, 2013, FTB amended their complaint in an attempt to expand on the conclusory allegations pled in its original complaint, in an effort to defeat Motions to Dismiss filed by Lumen and the other defendants. *Id.*

At the core of FTB's RICO suit was the allegation that Lumen acted in bad faith and filed a frivolous infringement suit against FTB without first conducting the necessary due diligence and infringement analysis. *Id.* Lumen and the other defendants argued that the facts set forth by FTB in the Complaint and Amended Complaint fell far short of those in other patent-related RICO actions with facts more favorable to plaintiffs, but where courts still determined that the pleading standard of RICO was simply not met. The District Court agreed, granting the Motions to Dismiss on May 19, 2014. *Id.* at 462 (noting FTB's complaint was conclusory and failed to meet pleading standards).

## October 23, 2014 Memorandum and Decision

On October 23, 2014, the District Court issued an Opinion & Order, awarding FTB attorneys' fees and costs, as well as an enhancement of those fees. A56-A70. Using the traditional "lodestar" analysis, the court calculated the lodestar fee award as $148,592.00. A63. Using the factors from *Octane* as justification for a multiplier of two (2), the Opinion awarded FTB $297,184.00 in attorneys' fees and $4,899.63 in costs, as well as interest from May 30, 2014 at a rate of 9%. A69-A70. The District Court used the factors that justify a case as exceptional and qualifying for an award of fees under Section 285 *as the same factors* that justify enhancement of that award: an extremely low lodestar, the need to deter, the desire to extract a nuisance settlement, the plaintiff's threats to make the litigation expensive, and the frivolous nature of the plaintiff's claims. A56-A70. These findings were built on the District Court's initial erroneous finding of non-infringement.

Patents would be much less valuable if infringers of them could not be notified of the consequences of infringement. Lumen has done nothing but act in the way a reasonable patent holder is expected to act, and has consistently denied any and all allegations of misconduct. To each unsupported allegation raised by the District Court and FTB, Lumen provided facts of the merits of this claim to FTB in discovery on multiple occasions, including in Lumen's PICs, Claim Construction Briefs, initial disclosures, documents and answers produced in response to FTB's discovery

requests. Conducting a thorough pre-suit infringement investigation, relying on a reasonable interpretation of the claims of the patent-in-suit, filing a complaint, attempting to negotiate a settlement with an infringer and asserting a vigorous litigation strategy should not be deemed either exceptional or punishable activity.

## I.      SUMMARY OF THE ARGUMENT

The District Court erred in finding the case exceptional under Section 285. This action was an abuse of discretion and must be reversed. The determination of exceptionality was premised upon an incorrect reading of the facts and the scope of the '073 Patent, and Lumen's infringement position was neither objectively baseless, nor unreasonable. Simply stated, it was a gross error to color Lumen's actions as those that are "rare" enough to be deterred through the award of fees, especially considering the record reflects a strong pre-litigation investigation, and reasonable reliance on and interpretation of a post-*Bilski* and pre-*Alice* patent duly issued by the USPTO, and the lack of anything in the record reflecting a finding of noninfringement.

Furthermore, the District Court erred in awarding FTB a punitive enhanced attorneys' fee award. The use of the same *Octane* factors (twice) to justify doubling the presumptively reasonable lodestar fee amount is without support in fact or law, and would represent an overextension and misuse of the *Octane* decision. Lumen

thereby respectfully requests that this Court reverse the District Court's Enhanced Attorneys' Fee Order.

## II.     STANDARD OF REVIEW

The decision of the District Court, awarding enhanced attorneys' fees pursuant to Section 285, is reviewed for abuse of discretion. *Highmark, Inc. v. Allcare Health Mgm't Sys., Inc.,* 134 S. Ct. 1744 (2014); *Biax Corp. v. Nvidia Corp.*, 2015 U.S. App. LEXIS 3082 (Fed. Cir. Feb. 24, 2015) (reversing the District Court award of fees under Section 285 under the abuse of discretion standard).

## III.     ARGUMENT

The undisputed record below demonstrates that the District Court committed a clear error in reaching the conclusion that this is an "exceptional" case justifying the award of enhanced attorneys' fees. As such, the decision must be reversed.

### A.     Presumption of Validity of Patents

The Patent Office is presumed to have properly done its job, and patents are presumed to be valid. 35 U.S.C. § 282; *Cadence Pharms., Inc. v. Exela PharmSci Inc.*, 2015 U.S. App. LEXIS 4700 (Fed. Cir. Mar. 23, 2015) (citations omitted). The presumption of validity of duly issued patents creates a high bar against arguing that assertion of a properly issued patent merits an award of fees. *Dietgoal Innovations*

*Llc v. Chipotle Mexican Grill*, 2015 U.S. Dist. LEXIS 34782, *4-5 (D. Tex. 2015). While a "sea change in patent law could occur" that might require patent holders to reevaluate the validity of their portfolios, neither *Bilski* nor *Alice-* "can be characterized as such a tide-reversing case." *Id.* at *4. It was therefore reasonable for Lumen to rely on the issuance of the patents by the USPTO and the presumption of validity that the '073 Patent carried. Judge Cote's opinion that Lumen should have known the patent did not infringe, and thus acted frivolously in pursuing litigation, was based upon an erroneous assessment of the scope of "AssistMe feature" and the '073 Patent.

As mentioned, the '073 Patent was issued post-*Bilski* and prior to the *Alice* decision. Lumen conducted its pre-filing infringement investigation prior to *Alice*, and the lawsuit was filed prior to *Alice*. The controlling law at the time the Patent was issued, and the time at which patent rights are attempted to be enforced by the holder, is of particular relevance in an analysis of exceptionality under Section 285. "*It is particularly relevant here that the substantive law in this area was unsettled at the time….*" *Gametek LLC v. Zynga, Inc.*, 2014 U.S. Dist. LEXIS 122834 (N.D. Cal. Sept. 2, 2014) (noting that the patent was controlled by pre-*Alice* standards and ultimately denying attorneys fees under 285), *affirmed by Gametek LLC v. Zynga Inc.*, 2015 U.S. App. LEXIS 4516 (Fed. Cir. Mar. 17, 2015).

The procedural history of *Gametek* is similar to the instant case. Plaintiff Gametek, a non-practicing entity, brought an action for infringement for a patent that

was ultimately determined to disclose an abstract idea. Defendants moved for judgment on the pleadings, which was granted, and subsequently requested attorneys' fees under Section 285. 2014 U.S. Dist. LEXIS 122834 at *4-5. Although the court agreed that it was the type of "rare" case in which invalidity may be determined on the pleadings, it was not the type of "rare" case justifying a designation as "exceptional" under Section 285. *Alice* was undecided at the time *Gametek* brought suit and this affected the court's assessment of exceptionality: "The rarity to which *Ultramercial* refers arises where the record is such that a determination of unpatentability can be made at the pleadings stage. It is not necessarily a judgment on the relative strength or weakness of the patentee's litigation position, particularly here where the critical issue of inventive concept is evolving." *Id*. at *11

While Judge Cote based her decision to award fees on non-infringement, and explicitly declined to construe claims under *Markman* standards, the pre-*Alice* standards of validity are still relevant to the reasonability and strength of Lumen's reasonable litigation position. It was Lumen's right to rely on the '073 Patent and the associated protections. In light of the "evolving" issues at play that impacted this patent, validity should have been an issue that required further consideration from the District Court.

**B.    Standard for Awarding Fees Under Section 285**

Section 285 provides: "The court in exceptional cases may award ***reasonable*** attorney fees to the prevailing party." 35 U.S.C. § 285; *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014). Fees are not a penalty for failure to win a patent infringement suit, but are appropriate only in extraordinary circumstances. *Octane*, 134 S. Ct. at 1753. An "exceptional" case is one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated.

This determination is to be made on a case- by-case basis considering the totality of the circumstances. *Id*. at 1754. A nonexclusive list of factors may include: "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id*.[5] Neither Section 285, *Octane*,

---

[5] Although *Octane* has simplified the standard for awarding fees, and reduced the prevailing party's burden, most cases awarding fees continue to involve substantial litigation misconduct or otherwise egregious behavior. *Homeland Housewares, LLC v. Sorensen Research & Dev. Trust*, 2014 U.S. App. LEXIS 17300 (Fed. Cir. Sept. 8, 2014) (patent owner repeatedly failed to introduce admissible evidence of infringement, filed unsolicited briefs after issues were taken under submission, and filed multiple meritless motions for reconsideration).

or any other case, provides for a court to award "enhanced" attorneys' fees under this analysis.

### C. The District Court Award of Fees Under Section 285 Was An Abuse of Discretion

#### 1. The District Court Finding of Exceptionality Was Based Upon An Improper Finding of Non-Infringement

Determining whether the District Court was correct that Lumen had no reasonable theory of infringement requires an understanding of the argument as to infringement. *Biax Corp.*, 2015 U.S. App. LEXIS 3082 at *8; *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada,* 687 F.3d 1266, 1273-74 (Fed. Cir. 2012). When analyzing the record, it is clear that the District Court's assessment of Lumen's infringement argument was clearly erroneous and cannot be used as the basis for an award under Section 285. Essentially, despite FTB's CEO admitting that certain features of the FTB system rely on preference data being inputted by multiple parties, and Lumen proposing numerous reasonable interpretations of how the multi-party "AssistMe feature" was infringing, the District Court chose to disregard such facts and found that <u>no portion</u> of the FTB website relied on preference data being inputted by multiple parties and that no reasonable litigant could have expected success on the merits. A39-A55.

Lumen relied on the strong presumption of validity of the '073 Patent. Lumen conducted a thorough pre-filing infringement investigation and relied on publicly available information for which FTB was the direct source. Lumen relied on a logical

and reasonable interpretation of Claim 1 of the '073 Patent. Lumen exceeded all pleading requirements and conformed its filings to lengthy claim construction charts. The District Court's subjective finding, that Lumen could not have expected success on its claims, that Lumen conducted <u>no</u> infringement investigation, that Lumen should have known its position was frivolous, is explicitly contradicted by the record. To each question raised, the non-moving party Lumen provided an answer. It was an abuse of discretion for the District Court to base the determination of exceptionality, and thus an award of enhanced fees, on this improper and unreasonable finding of non-infringement.

In determining whether the filing of a patent infringement suit was plausible, it is proper to consider how this Circuit has interpreted FRCP Rule 11 as requiring at a minimum that an attorney interpret the asserted patent claims and compare the accused device with those claims before filing a claim alleging infringement. *Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295 (Fed. Cir. 2004).[6] "The presence of an infringement analysis plays the key role in determining the reasonableness of the pre-filing inquiry made in a patent infringement case under Rule 11." *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981, 986 (Fed Cir. 2000); *see also*

---

[6] "Q-Pharma argues that it satisfied the requirements of Rule 11 because its attorney conducted a nonfrivolous claim construction analysis prior to filing suit; its claim of infringement was factually supported by Jergens' advertising and labeling statements regarding the accused product; and its belief in the validity of the '373 patent was supported, among other reasons, by the fact that several companies took licenses to the patent."  The Court agreed and declined to award sanctions. *Id*. at 1300.

*Q-Pharma*, 360 F.3d at 1302 (observing that "our case law makes clear that the key factor in determining ***whether a patentee performed a reasonable pre-filing inquiry is the presence of an infringement analysis***" and explaining that "***an infringement analysis can simply consist of a good faith, informed comparison of the claims of a patent against the accused subject matter***") (emphasis added).

Lumen conducted the exact type of infringement analysis required by courts like *Q-Pharma*, supporting the argument that its infringement position was reasonable and non-frivolous. The courts have declined to impose any additional or special pre-filing investigation requirements upon the plaintiff in patent cases, independent of FRCP Rule 11. *See, e.g., Ulead Sys., Inc. v. Lex Computer & Mgmt. Corp.*, 351 F.3d 1139, 1150 (Fed. Cir. 2003); *New York Univ. v. E.piphany, Inc.*, 2006 U.S. Dist. LEXIS 9157 (S.D.N.Y. Mar. 6, 2006) (noting the "Catch-22" that Plaintiffs in computer software infringement cases often find themselves in with regards to access to software and the requirements of the Rules).[7]

---

[7] "Software cases present unique challenges for the parties and the courts because, prior to discovery, plaintiffs usually only have access to the manifestation of the defendants' allegedly infringing source code and not the code itself. From this manifestation, plaintiffs must somehow divine whether the defendants' code infringes." *Am. Video Graphics, L.P. v. Elec. Arts, Inc.*, 359 F. Supp. 2d 558, 560 (E.D. Tex. 2005); *Yama Capital LLC v. Canon Inc.*, 2013 U.S. Dist. LEXIS 175983, *26-27 (S.D.N.Y. Dec. 13, 2013) ("Plaintiff is unquestionably correct that the Rules demand specificity, not prescience: Plaintiff need not explain how Defendants' software functions on a programming level without access to that software.");

The District Court ignored substantive and material facts presented by Lumen related to its pre-suit infringement analysis, the detailed infringement allegations which exceeded Form 18, the sworn affidavit of Lumen's counsel, public acknowledgements made by FTB's CEO, screenshots from FTB's own website in Lumen's PICs, and FTB's refusal to provide Lumen with any discovery. *Arrival Star, Inc. v. Descartes Sys. Group, Inc.*, 2004 U.S. Dist. LEXIS 22433 (S.D.N.Y. Nov. 5, 2004).[8] Such action by the District Court is a clear abuse of discretion.

Recently, this Court in *Biax Corp. v. Nvidia Corp.*, assessed the reasonableness of a patentee's infringement position and ultimately determined that Section 285 fees were not warranted. 2015 U.S. App. LEXIS 3082 (Fed. Cir. Feb. 24, 2015). In *Biax*, the district court found objective baselessness and bad faith based on the continued assertion of an objectively baseless claim. *Id*. at *5. However, this Court noted that there was an ambiguity regarding claim construction that was not resolved ***until*** the District Court's ruling on summary judgment; prior to this point, there was no reason for the Plaintiff to know that the Court interpreted their claim as

---

[8] In *Arrival Star*, the court declined to award sanctions in part because plaintiff had asked for but not received technical documentation regarding its software products. *Id*. (citing *Hoffmann-La Roche Inc. v. Invamed Inc.*, 213 F.3d 1359 (Fed. Cir. 2000)) ("[The defendant] has pointed to nothing else that it believes they could or should have done. Its position apparently is that because they were unable to obtain and set forth in their complaint facts showing infringement, they should not have filed suit at all." "While both parties might have been well served by engaging in further correspondence or discussion . . . the decision to file [the] action is not sanctionable."

"objectively baseless." Prior to the MSJ, the Plaintiff's infringement position was "reasonable under the District Court's claim construction orders, especially in light of the stipulated definition of 'computer'…." *Id*. at *9. The *Biax* Court specifically noted that the District Court was in error in interpreting the opinion of the plaintiff's expert regarding infringement.

Similar to the *Biax* holding, all the evidence in the Lumen record indicated that the FTB's AssistMe Service was a system that relied on multi-party data inputs until the District Court's ruling on invalidity under Section 101. Lumen put intensive, substantial and diligent effort into their litigation strategy, and at all times during the litigation maintained a steadfast intent in proving infringement by FTB, including during *Markman* hearings. Moreover, FTB challenged the PICs, Lumen responded with answers, and the District Court agreed that Lumen's PICs were sufficient. There was no reason (or ability) for Lumen to know, at the time of filing or otherwise that the District Court would independently deem FTB's system as not multi-party, especially in light of the facts presented by Lumen in the record.

Unlike the instant litigation, the *Biax* court had the benefit of claim construction, however it is highly relevant to the decision here that the Appellate Court found that the District Court simply got it wrong when it came to infringement. *Id*. at *13-14. Because the District Court made such an essential error, there was no basis for the finding of objective unreasonableness and bad faith. The District Court

here was also wrong in its assessment of the '073 Patent, upon which the determination of exceptionality was based at a "rare" early stage in the litigation. There are simply no facts, prior to Nov. 12, 2013, for Lumen to rely on to predict that the District Court would ultimately: (i) disagree with the USPTO on its issuance of a post-*Bilski* patent, (ii) disagree with Lumen's reasonable interpretations of the '073 Patent, or (iii) disagree with FTB's admitted description of its own system as relying on data inputted by multiple classes of parties.

The assessment of "frivolousness" and "unreasonableness" equates to an erroneous and unsupported finding of non-infringement by the District Court; its holding explicitly stated that invalidity played "***no role***" in the determination of an exceptional case. (Emphasis added). A54. "The question addressed here is whether Lumen could properly assert infringement based on the '073 Patent." A54. When properly considered, the material and substantive facts related to pre-filing investigation do not match up with the District Court's determination of "frivolousness" and "unreasonableness." Instead, the record suggests that the District Court, for whatever reason, either chose to ignore the record or simply made a critical error in its assessment of non-infringement, and then in turn, used this improper conclusion as the basis for exceptionality under Section 285. This was an abuse of discretion, and must be reversed.

### 2.    The District Court Finding of Exceptionality Was Made Without Claim Construction

The findings of "frivolousness" and "unreasonableness", and the enhanced award that they purport to justify, were reached by the District Court without a *Markman* hearing and claim construction to determine the full analysis of the scope of the '073 Patent. It is well settled that the Supreme Court in *Markman* requires a Court to provide a claim construction in order to define claim terms, and further instruct a jury regarding the scope of a patent. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1359 (Fed. Cir. 2008); *Markman v. Westview Instruments*, 517 U.S. 370, 374 (U.S. 1996); *Licensing GmbH & Co. KG v. Fujifilm Corp.*, 2015 U.S. App. LEXIS 1597 (Fed. Cir. Feb. 2, 2015) (noting that the District Court is tasked with ensuring "that final constructions serve their purpose of genuinely clarifying the scope of claims for the finder of fact.").

While the District Court ruled the '073 Patent invalid on other grounds, (ineligible subject matter under Section 101), the record lacks a claim construction to support any "finding" of non-infringement. *Markman*, 517 U.S. at 374.[9] A determination of patent infringement requires a two-step analysis, the first of which is claim construction. *TecSec, Inc. v. IBM*, 731 F.3d 1336, 1351 (Fed. Cir. 2013)

---

[9] "Victory in an infringement suit requires a finding that the patent claim 'covers the alleged infringer's product or process,' which in turn necessitates a determination of 'what the words in the claim mean.'" <u>Id</u>.

(*citing Baron Servs. v. Media Weather Innovations LLC*, 717 F.3d 907, 914 n.13 (Fed. Cir. 2013)). "Claim construction and sufficiency of the evidence showing an act of infringement are not alternative grounds on which to find non-infringement. They are part of a singular analysis." *Id.* Only after the claims are properly construed through *Markman* can a Court then determine evidence of infringement. *Id.* (citations omitted). If a *Markman* hearing is recommended but not required for a finding of ineligible subject matter under Section 101,[10] a *Markman* hearing ***is required*** for "finding" of non-infringement so as to properly construe the scope of the claims.

Furthermore, post-*Octane* decisions have noted that claim construction is relevant to the exceptionality inquiry "because the court evaluates considerations of objective unreasonableness, frivolousness, and the substantive strength of a party's litigating position." *Site Update Solutions, LLC v. Accor North America, Inc.*, 2015 U.S. Dist. LEXIS 17603, *8-9 (N.D. Cal. Feb. 11, 2015); *StoneEagle Servs., Inc. v. Pay-Plus Solutions, Inc.*, 2015 U.S. Dist. LEXIS 15144 (M.D. Fla. Feb. 9, 2015) (denying motion for judgment on the pleadings as premature, finding claim

---

[10] "[A] court may not invalidate the claims of a patent without construing the disputed limitations of the claims and applying them to the allegedly invalidating acts. However, a district court need not "construe *undisputed* claim terms prior to issuing a summary judgment of invalidity." *Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1332 (Fed. Cir. 2009) (citations omitted).

construction was necessary); *Data Distrib. Tech., LLC v. BRER Affiliates, Inc.*, 2014

U.S. Dist. LEXIS 115543 (D.N.J. Aug. 19, 2014) (denying motion to dismiss

because patent eligibility was not ripe for adjudication).

In reaching its conclusion that the claims of the '073 Patent are ineligible

subject matter under Section 101, the District Court explicitly declined to perform a

*Markman* claim construction, stating: "[w]hile claim construction may sometimes

be helpful in resolving a Section 101 motion where detailed explication of the claims

in a patent would reveal material issues, the Federal Circuit has said that 'conducting

a claim construction analysis before addressing §101' is 'not required'. …Here, the

Section 101 inquiry encompasses only 'broad subject matter categories' and claim

construction is not necessary to reveal any material legal issues and would not be 'a

wise use of judicial resources.'" A35.

Claim construction is legally mandated by the Supreme Court in order for the

Court to correctly define the scope of the patent. *Teva Pharm. USA, Inc. v. Sandoz,*

*Inc.*, 135 S. Ct. 831 (2015); *Markman v. Westview Instruments, Inc.*, 517 U.S. 370

(1996) (holding that construing patent claims is a question of law for the judge,

separate from determining whether infringement occurred which is a question of fact

to be submitted to the jury). Since there is no claim construction, the legal conclusion

of "frivolous" and "objectively unreasonable" simply cannot be maintained or

supported on a specific reading of the scope of the claims of the '073 Patent, *i.e.*

what the claims cover and do not cover. The District Court, in claiming to conserve judicial resources, declined to construe the claims. A1-A36. The District Court should not have been permitted to do so after the fact, and after determining ineligibility under § 101.

The District Court concluded that "it is undisputed that FTB's website does not match preference data inputted on its website by multiple parties." A43. Footnote 1, further states: "Lumen does not argue otherwise here." A43. Such a finding is simply without support or merit as stated above and Lumen was given no chance by the District Court to brief or present on these issues. Lumen maintained from prior to the filing of the lawsuit that FTB's "AssistMe feature" was multiparty, and infringed upon the '073 Patent. Furthermore, FTB did not provide *any* discovery or objective evidence of how the FTB system operated. Lumen requested discovery on the FTB computer-implemented process to offer proof of how the FTB system operates so as to track the steps of the computer-implemented process. FTB *provided no evidence* of how the FTB system (computer-implemented process) works.

Once the District Court decided the motion on the ineligible subject matter, the District Court closed the case. Lumen was provided no opportunity to argue otherwise. Lumen informed the Court that there *was no record established* for any claim construction infringement analysis, *no invalidity record had been made* by

39

FTB's invalidity contentions, **and no "finding" of invalidity** had been made by the Court. A736-791, A795-A827.  Lumen was, first and foremost, not given any chance to argue the merits as the Court decided patentability *on other grounds* and declined to perform a claim construction.  Despite this lack of any record, the District Court still considered these factual findings and conclusions in determining the amount of the fee award and the enhancement in its Opinion.

### 3.    *The District Court Finding of Non-Infringement Was An Issue for A Jury*

"Patent infringement is a question of fact." *E. Coast Sheet Metal Fabricating Corp. v. Autodesk, Inc.*, 2015 DNH 011 (D.N.H. 2015), *citing EMD Millipore Corp. v. AllPure Techs., Inc.*, 768 F.3d 1196 (Fed. Cir. 2014). Claim construction is a question of law, however comparison of the construed claims to the accused device presents a question of fact. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1309-10 (Fed. Cir. 2009) (*citing Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323 (Fed. Cir.), *cert. denied*, 555 U.S. 1070 (2008) ("Infringement is a question of fact, reviewed for substantial evidence when tried to a jury."). "Litigants have the right to have a case tried in a manner which ensures that factual questions are determined by the jury and the decisions on legal issues are made by the court…." *Structural Rubber Products Co. v. Park Rubber Co.*, 749 F.2d 707, 713 (Fed. Cir. 1984) (citations omitted). There "is no dispute that infringement cases today must

be tried to a jury, as their predecessors were more than two centuries ago." *Markman*, 517 U.S. at 377 (discussing role of the jury and Seventh Amendment in patent context).

The Seventh Amendment to the U.S. Constitution preserves the right to a trial by jury so as to guarantee a patentee that a jury will decide the ultimate question of infringement. While the Court can exercise its discretion to essentially replace its opinion for that of the examination at the USPTO, it cannot opine on, and make findings of fact on, the ultimate question of infringement without a proper *Markman* hearing and claim construction.

Lumen made a proper demand for a jury trial in this case. The District Court chose to adopt the facts as presented by FTB, but disputed by Lumen, regarding the scope and infringement of the '073 Patent. The District Court ruled based on a subjective disbelief of Lumen's factual allegations. In improperly rendering an opinion of non-infringement without conducting *Markman*, the District Court's findings bypassed a pivotal stage of patent litigation. In so doing, the District Court erroneously rendered a decision outside of the adversarial issues presented by the parties and deprived Lumen of a judicial process mandated by the Supreme Court. It was error for the District Court to remove this analysis from the province of the jury, and then subsequently make a finding of frivolousness, unreasonableness, and non-infringement, and then further using that finding as support for an award of

enhanced attorneys' fees. This clear error supports a reversal of the award of enhanced attorneys' fees.

### 4. *The Underlying Decision Was Based on Error Because of Unsupported Underlying Factual Findings*

A Plaintiff's willingness to lower its initial settlement demand "does not establish that its settlement behavior was an arbitrary attempt at a shake-down…." *Site Update Solutions, LLC v. Accor North America, Inc.*, 2015 U.S. Dist. LEXIS 17603 (N.D. Cal. Feb. 11, 2015) (holding that settlement behavior did not rise to the level sufficient to establish exceptionality). Plaintiffs often have valid reasons for lowering an initial settlement demand. This behavior is not an ultimatum, but likely the result of developments in litigation, settlements with other parties, or other factors may have caused a change in position. *Id.*; *Dietgoal Innovations Llc*, 2015 U.S. Dist. LEXIS 34782 at *11-12 ("…it does not matter whether that party is a non-practicing entity, whether it sues numerous defendants, or whether it settles its claims for relatively small sums. The exceptional case finding turns mainly on whether the claim is plausible or objectively baseless.").

The District Court's subjective inferences with respect to: (1) the number of prior lawsuits by Lumen involving the '073 Patent, (2) it's unsupported opinion that Lumen failed to conduct pre-suit infringement investigation and analysis and (3) Lumen's conduct during its litigation with FTB, are wholly unsupported. It was an

abuse of discretion to determine that the $85,000 license fee offered by Lumen to FTB equated to a "nuisance offer," and using this determination as a basis for enhanced fees. With approximately six years remaining on the '073 Patent, such license fee is arguably well within "market" rates for similar annual licenses software technology. The District Court's determination was not based on a comparison of other licensing fees, or any case law that creates a *per se* rule of nuisance for this amount. The District Court declined to engage in any analysis of the amount of the proposed licensing fee, including any basis for the following: Was the license amount offered reasonable in light of the technology involved? Would the license fee be reasonable in light of a finding of infringement? Would the District Court have used the amount of an initial license fee offer as a factor if Lumen had made an initial offer of $500,000 or $1,000,000? Instead, the District Court subjectively concluded "nuisance" without any authority or basis for labeling it as such. It is therefore an abuse of discretion for the District Court to rely on this as a factor for an enhanced, unreasonable and unsupported award of attorneys' fees.

Making an early-stage offer of settlement, in lieu of either party expending litigation costs or expenses, is not a rare litigation strategy.[11] In determining a

---

[11] Although the District Court concluded that Lumen's increase of the settlement amount post-litigation was a threat, it is logical to assume that any such settlement amount is likely to increase if each party engages in litigation.

reasonable but modest license fee, Lumen took into consideration the entirety of FTB's infringing activities as compared to the entire FTB system. As evident by FTB's CEO in touting the "human curated" data analysis of its employees and researchers as a distinguishing feature of its system, including its reliance on data imputed by multiple classes of parties, FTB publicly acknowledged the importance and perceived value of the specific "AssistMe" features that Lumen accurately identified as infringing. Nevertheless, Lumen respected the many other non-infringing features of the FTB system when it made a reasonable judgment in determining its initial offer letter.[12] The fact that such offer was less than the attorneys' fees actually incurred by FTB is irrelevant and any allegation that it was simply a "nuisance fee" is wholly unsupportable, clear error, and an abuse of discretion.

It is a further abuse of discretion by the District Court in determining that the previous lawsuits against other well-funded defendants were frivolous, and it was error to use this factor as a basis for enhancement. What did FTB offer in the record other than the fact that previous lawsuits were actually filed? A careful review of the complaints for each of those prior lawsuits will find that very detailed and specific

---

[12] The initial letter reminded FTB of its obligations regarding discovery and that it was to preserve all relevant information. This type of letter and accompanying instructions are routinely sent to each party in a litigation.

allegations of infringement were made in each complaint that not only exceeded Form 18, but identified with precision the infringing conduct of each Defendant. Each past litigation by Lumen in asserting the '073 Patent identified with clarity the infringement analysis for each case – there was nothing frivolous about any pre-suit infringement investigations, nor were any details regarding those cases used as support for the District Court's conclusion of frivolousness. Because the underlying factual findings were erroneous and unsupported, and those errors justified the award and the enhancement, reversal is warranted.

### D.     The Enhancement of Attorneys' Fees Was An Abuse of Discretion

The District Court calculated the hours expended on the patent litigation, and multiplied these hours by an hourly rate.[13] After calculating the lodestar, a

---

[13] The Opinion discredited Lumen's argument that the amount of fees should be reduced to reflect the fact that Counsel for FTB represented a joint defense group involving three other infringers of the '073 Patent, Adicio Inc., Advanced Magazine Publishers Inc. and Penton Media Inc.. "Since all four clients were separately billed, and any overlapping work was divided among the clients, no reduction on this ground is warranted." A63-A64.  This conclusion however was not supported by FTB's submission to the District Court, as no detailed or specific evidence had been presented by FTB on the issue of counsel's representation of a joint defense group, other than Attorney Leventhal's declaration. This baseless conclusion was clearly erroneous, and justifies reconsideration. Furthermore, if approximately $150,000 represents only 1/4 of the entire bill for this case, the total lodestar amount would be closer to $450,000 for the other three clients – an amount that directly contradicts the District Court's label of the lodestar as "extremely low."

presumptively reasonable fee, the Court doubled this amount based on the following: (1) an extremely low lodestar, (2) the need to deter, (3) the plaintiff's desire to extract a nuisance settlement, (4) the plaintiff's threats to make the litigation expensive, and (5) the frivolous nature of the plaintiff's claims.

An award of attorney fees under § 285 must be reasonable. The Supreme Court mandates that the lodestar figure must be the guiding light of our fee-shifting jurisprudence, and there is a strong presumption that the lodestar represents the reasonable fee. Kilopass Tech., Inc. v. Sidense Corp., 2015 U.S. Dist. LEXIS 30650, *17-18 (N.D. Cal. Mar. 11, 2015) (citations omitted).[14] A lodestar figure includes most, if not all, of the relevant factors constituting a reasonable attorneys' fee, and should only be enhanced in "rare" or "exceptional" circumstances. *Perdue v. Kenny A.*, 559 U.S. 542 (2010) (discussing enhancements based on performance). Specific evidence must be provided to support an enhanced award. "This requirement is essential if the lodestar method is to realize one of its chief virtues, *i.e.*, providing a calculation that is objective and capable of being reviewed on appeal." *Id.*

---

[14] The *Kilopass* attorneys' fee award included a contingency fee arrangement, which provided for an enhanced fee. Under those circumstances, where the fee had been agreed upon prior to commencement of the litigation, enhancement of the lodestar was appropriate. *Id.* at *25-26, *citing Perdue v. Kenny A.*, 559 U.S. 542, 553 (2010) ("We have noted that the lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorneys fee, and have held that an enhancement may not be awarded based on a factor that is subsumed in the lodestar calculation.").

### 1.    The _Octane_ Factors Are Used for the Exceptionality Analysis, and Not Enhancement

It was an abuse of discretion, and a misapplication and severe overextension of the _Octane_ standard, for the District Court to use the _Octane_ factors as the basis for both (i) a finding of exceptionality and an award of attorneys' fees, as well as (ii) an enhanced lodestar attorneys' fee award. _See also Ultratec, Inc. v. Sorenson Communs., Inc._, 2014 U.S. Dist. LEXIS 141428 (W.D. Wis. Oct. 3, 2014) (noting that _Octane_ involved 35 U.S.C. § 285, **and not the damages enhancement provision of § 284**, and it should not be extended absent further guidance from the Federal Circuit); _see Halo Elecs. v. Pulse Elecs._, 2015 U.S. App. LEXIS 4696 (Fed. Cir. Mar. 23, 2015) (discussing the standards under 284 and 285 and requesting clarification on the scope of the enhanced damages provision under 284);[15] _Lumen View Tech., LLC v. Findthebest.com, Inc._, 2014 U.S. Dist. LEXIS 150444 (S.D.N.Y. Oct. 23, 2014) ("Several of the Octane Fitness factors that this Court considered in finding that an award of fees was appropriate similarly support an enhancement of the lodestar fee."). If the same factors are used for both tests (exceptionality and enhancement), a finding of exceptionality would automatically translate into an award of enhanced damages, using _Octane_ as the basis (when the actual _Octane_

---

[15] "I believe the full court should hear this case en banc to reevaluate our jurisprudence governing an award of enhanced damages under 35 U.S.C. § 284." _Halo Elecs., Inc. v. Pulse Elecs., Inc._, 2015 U.S. App. LEXIS 4696 (Fed. Cir. Mar. 23, 2015) (O'Malley, J., dissenting).

decision is silent on the issue). This is not reasonable, and does not result in a reasonable attorneys' fee award.

*Octane* itself is silent as to enhancements. The District Court acknowledged that it is "not aware of any Federal Circuit decision affirming or denying an enhancement of the award of attorneys' fees under Section 285." A65.  Since the *Octane* decision, no other court has used the *Octane* factors, nor the exceptionality analysis, to justify a multiplier or award of enhanced fees under Section 285. The law allows "only for the award of 'reasonable attorney fees' to the prevailing party, it does not allow for enhancement of those reasonable fee." *Electro-Mechanical Indus. v. Universal Support Sys.*, 359 Fed. Appx. 160, 167 (Fed. Cir. 2009) (denying request for enhancement of reasonable fees, holding Section 285 allows only for the award of reasonable fees, **not enhancement of reasonable fees**) (emphasis added); *Cognex Corp. v. Microscan Sys.*, 2014 U.S. Dist. LEXIS 91203 (S.D.N.Y. June 29, 2014) (denying request for enhanced fees, while granting attorneys fees under § 285).[16]

---

[16] Although *Octane* eased the standard for fee shifting, post-*Octane* decisions awarding fees have concerned *extremely egregious behavior*. *Gametek LLC v. Zynga, Inc.*, 2014 U.S. Dist. LEXIS 122834, 12-13 (N.D. Cal. Sept. 2, 2014) (*denying motion for fees where judgment on the pleadings was granted based on a finding that the asserted patent claimed an unpatentable abstract idea*) (citing *Intellect Wireless, Inc. v. Sharp Corp.*, 2014 U.S. Dist. LEXIS 73653, 2014 WL 2443871, at *6 (N.D. Ill. May 30, 2014) (awarding fees based on false declarations

The alleged "frivolousness" of the '073 Patent litigation, which Lumen vehemently disputes, is appropriately considered only in determining exceptionality, and not in assessing a random and unsupported multiplier to enhance a presumptively reasonable fee after a finding of exceptionality has already been made. *IPVX Patent Holdings, Inc. v. Taridium, LLC*, 2014 U.S. Dist. LEXIS 127550 (E.D.N.Y. Aug. 6, 2014) (noting new *Octane* standard to be used to assess whether attorneys fees are appropriate and declining to award fees).

### 2.      *There is No Specificity to Justify an Enhanced Fee*

In addition, the District Court abused its discretion in failing to provide ***any*** specificity to justify an enhanced fee. *Junker v. Eddings*, 396 F.3d 1359 (Fed. Cir. 2005) (award of attorneys' fees to prevailing patent infringement plaintiff in amount that was more than double plaintiff's actual fees was reversible error where court failed to give any explanation for its conclusion that such fee was "reasonable."). There has been no showing that a multiplier was necessary to provide fair or

---

before the PTO, without which, the court concluded, the plaintiff would not have obtained the patents at issue); *Cognex Corp. v. Microscan Sys., Inc.*, 2014 U.S. Dist. LEXIS 91203, 2014 WL 2989975, at *4 (S.D.N.Y. June 30, 2014) (criticizing plaintiff for post-trial motions that simply sought to re-litigate issues decided during trial and awarding fees at least as to those motions); *Precision Links Inc. v. USA Products Group, Inc*., 2014 U.S. Dist. LEXIS 85694, 2014 WL 2861759, at *3 (W.D.N.C. June 24, 2014) (criticizing plaintiff for seeking a preliminary injunction based in large part on a previously-rejected theory of liability and filing frivolous post-dismissal motions).

reasonable compensation for the services provided. What justification does a multiplier of two (2) have, as opposed to some other multiplier or percentage? The Supreme Court in *Perdue v. Kenny A.*, 559 U.S. 542 (2010), asked the same questions of the District Court, where a random enhancement of 75% was given to a fee award:

> In the present case, the District Court did not provide proper justification for the large enhancement that it awarded. The court increased the lodestar award by 75% but, as far as the court's opinion reveals, this figure appears to have been essentially arbitrary. Why, for example, did the court grant a 75% enhancement instead of the 100% increase that respondents sought? And why 75% rather than 50% or 25% or 10%?

*Perdue*, 559 U.S. at 557.

It is essential that an award provide a reasonably specific explanation for all aspects of that award, including any enhancement.[17] There has been no showing that a multiplier of two (2) is reasonable. Section 285 provides that FTB is entitled to "reasonable" fees, and not reasonable attorneys' fees ***plus an enhancement***. There is no basis to justify the enhancement in this case, and for the District Court to randomly assign a multiplier was an abuse of discretion.

---

[17] Without specificity, adequate appellate review is impossible; without such review, "widely disparate awards may be made, and awards may be influenced (or at least, may appear to be influenced) by a judge's subjective opinion regarding particular attorneys or the importance of the case." *Id*. at 558.

### 3.    *Punitive Awards Are Inappropriate*

Finally, the District Court enhanced the attorneys' fee award in order to deter future similar conduct. However, the element of deterrence is already being served by a finding of exceptionality and an award of attorneys' fees, without any enhancement added. *Mathis v. Spears*, 857 F.2d 749, 753 (Fed. Cir. 1988). Multiplying the fee award by two (2), essentially doubling down on the deterrence factor, is not reasonable and is essentially a punitive award labeled as enhanced attorneys' fees. Courts routinely identify enhanced damages as punitive. *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 37 (Fed. Cir. 2012).[18]

A punitive award of this type was not intended by § 285, the purpose of which is to compensate the prevailing party for its monetary outlays in the defense of the suit. *Central Soya Co. v. Geo. A. Hormel & Co.*, 723 F.2d 1573 (Fed. Cir. 1983) (citations omitted). Although it serves deterrent purposes, it is primarily a compensatory provision, designed "to reimburse a party injured when forced to undergo an exceptional case." *Mathis*, 857 F.2d at 753. Attorneys' fees are not intended to be a penalty to the losing party, but to prevent injustice to the winner for bearing the burden of its own counsel fees. A punitive damage award must bear a reasonable relationship to the injury and a court "must inquire to ensure that the

---

[18] *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1574 (Fed. Cir. 1996) (**"**enhanced damages are punitive, not compensatory"); *Stryker Corp. v. Intermedics Orthopedics*, 898 F. Supp. 116, 122 (E.D.N.Y. 1995) (noting that enhanced damages "are in nature a punishment").

punitive damages do not exceed that amount reasonably necessary to secure the purposes of such awards, and thus to become in part a windfall to the individual litigant." *Imagineering, Inc. v. Van Klassens, Inc.*, 53 F.3d 1260, 1266 (Fed. Cir. 1995), *citing Aldrich v. Thomson McKinnon Sec., Inc.*, 756 F.2d 243, 249 (2d Cir. 1985) (quotations omitted) (vacating punitive damage award in infringement action as unreasonable).

Not only is the District Court's objective misguided, but also it creates a chilling effect on patent holders. What support does the District Court offer to subjectively determine that FTB did not infringe and that the conduct undertaken by Lumen is that which must be deterred? Lumen: (1) performed substantive infringement analysis, (2) relied on publicly available information provided by FTB and its own CEO, (3) initiated a suit in which it exceeded its pleading obligations, (4) provided a detailed description of infringement, (5) offered a license fee that was reasonable and proportional to a particular infringing feature of FTB's overall system, (6) was provided no discovery by FTB, (7) was deprived of a *Markman* hearing or claims construction, (8) had to request protective relief from the District Court as a result of FTB's CEO use of confidential settlement information as well as continually harassing and threatening the inventors of the '073 Patent, and (9) was denied the opportunity to put on an infringement case to a jury.

Awarding enhanced fees based on deterrence does more than reimburse FTB for costs incurred in its defense: it punishes Lumen, and provides a windfall to FTB,

something that was not intended by § 285. This type of award is not reasonable and the District Court provided insufficient explanation to support the enhanced fees. There was no inquiry as to the effect of this essentially punitive enhanced award, nor any inquiry into whether a random doubling of the amount of the award would serve as a windfall to FTB.

## IV.    CONCLUSION AND STATEMENT OF RELIEF SOUGHT

The instant case warrants reversal to correct the abuse of discretion by the award of attorneys' fees, including an enhancement thereof. The determination of the fee award was based on an erroneous subjective, and unsupported assessment of non-infringement by the District Court, without adhering to the Supreme Court requirements in *Markman* or the constitutional right to a trial of the issue of fact of infringement by a jury. Furthermore, the District Court used these same erroneous findings to justify an enhancement, which represents a misapplication of the *Octane* standard and distortion of the purposes of Section 285.

Wherefore, Lumen respectfully requests that this Court reverse the District Court's Enhanced Attorneys' Fee Order and grant any further and just relief.


Dated:  April 13, 2015              /s/ Damian Wasserbauer
                                    Damian Wasserbauer (DW3507)

                                    *Attorney for Plaintiff*
                                    *Lumen View Technology LLC*

# ADDENDUM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
Lumen View Technology LLC,             :
                                       :
                    Plaintiff,         :        13 CIV. 3599 (DLC)
                                       :
            -v-                        :        OPINION & ORDER
                                       :
Findthebest.com, Inc.,                 :
                                       :
                    Defendant.         :
                                       :
-------------------------------------- X


APPEARANCES

For the plaintiff:

Damian Wasserbauer
Aeton Law Partners, LLP
101 Centerpoint Drive, Suite 105
Middletown, CT 06457

For the defendant:

Joseph Leventhal
Leventhal Law, LLP
600 West Broadway, Suite 700
San Diego, CA 92101


DENISE COTE, District Judge:

     On September 24, 2013, defendant Findthebest.com, Inc.

("Findthebest") moved for judgment on the pleadings in this

patent infringement action pursuant to Fed. R. Civ. P. 12(c) on

the ground that the patent on which plaintiff Lumen View

Technology LLC ("Lumen View") predicates its claim for

infringement is invalid for failure to claim patent-eligible
subject matter.  For the reasons that follow, the patent claims
the abstract idea of computer assisted matchmaking and is
invalid under 35 U.S.C. § 101 ("Section 101").  The defendant's
motion for judgment on the pleadings is granted.


BACKGROUND

    Findthebest is a corporation that operates a website which
matches users with goods or services according to criteria they
enter.  Lumen View is a company that owns patents and licenses
them to other users for fees.  On May 29, 2013, Lumen View
brought suit against Findthebest on the ground that the matching
process in Findthebest's website allegedly infringed a patent
owned by Lumen View.  That patent is United States Patent No.
8,069,073 ("'073 patent").

<u>The '073 patent</u>

    The '073 patent is entitled "System and Method for
Facilitating Bilateral and Multilateral Decision-Making."  It is
comprised of one independent claim and eight dependent claims.
The application for the patent was filed in April 2010, and the
patent was issued on November 29, 2011.  The April 2010
application was a "continuation of application" for the
invention claimed by this patent, and the initial application
was made in 1999.  The inventors of the '073 patent are listed

A2

as Eileen C. Shapiro and Steven J. Mintz.  Listed as the

assignee of the patent is a limited liability company called

Dalton Sentry, LLC.  Lumen View asserts that it is "the

exclusive licensee of the '073 patent and possesses all rights

of recovery under the '073 patent, including the right to sue

and recover all damages for infringement thereof, including past

infringement."

<u>The Independent Claim ("Claim 1") of the '073 patent</u>

The independent claim of the '073 patent ("Claim 1") states

in full:

> We claim: A computer-implemented method for facilitating
> evaluation, in connection with the procurement or delivery
> of products or services, in a context of at least one of
> (i) a financial transaction and (ii) operation of an
> enterprise, such context involving a first class of parties
> in a first role and a second class of counterparties in a
> second role, the method comprising:
> In a first computer process, retrieving first
> preference data from a first digital storage medium, the
> first preference data including attribute levels derived
> from choices made by at least one of the parties in the
> first class;
> In a second computer process, retrieving second
> preference data from a second digital storage medium, the
> second preference data including attribute levels derived
> from choices made by at least one of the counterparties in
> the second class;
> In a third computer process, for a selected party,
> performing multilateral analyses of the selected party's
> preference data and the preference data of each of the
> counterparties, and computing a closeness-of-fit value
> based thereon; and
> In a fourth computer process, using the computed
> closeness-of-fit values to derive and provide a list
> matching the selected party and at least one of the
> counterparties.

The "summary of the invention" provision of the patent elaborates that:

> The method involves supplying to at least one of the parties a series of forced choice questions[1] so as to elicit party responses; supplying to at least one of the counterparties a series of forced choice questions so as to elicit counterparty responses; and delivering a list matching the at least one party and the at least one counterparty according to analysis of preference profiles determined using conjoint analysis of the party responses and the counterparty responses.  In alternative embodiments the list may be ranked according to closeness of fit.

In summary, the purported invention disclosed by the '073 patent is a method of matchmaking whereby one or more parties on each side input attribute preferences and intensity of preference data and then a computer matches the parties on each side by a "closeness-of-fit" process and produces a list.

The patent also contains in its specification examples illustrating potential uses of the claimed process.  One example is the matching of job applicants with employers based on both parties' preferred attributes in applicants and employers, respectively.  The specification contemplates having each party disclose desired attributes, and intensity of preferences with respect to those attributes, and then having a computer match employees and employers whose desired attributes and intensities of preferences mutually align.  Also listed as an exemplar use of the '073 patented method is the matching of "college

---

[1] A forced choice question is a question with a closed set of possible responses.

A4

applicants and . . . colleges seeking applicants" by having each

input preference data.

<u>The Dependent Claims of the '073 patent</u>

Claims 2 through 9 of the '073 patent are all dependent on

Claim 1.  They purport to add limitations to Claim 1's claimed

process of computerized bilateral and multilateral decision-

making.  The claims are as follows:[2]

> 2. A method according to claim 1, wherein the list is ranked according to closeness of fit.
> 3. A method according to claim 1, further comprising receiving co-evaluator choices made by a party co-evaluator or a counterparty co-evaluator, wherein the list matches the at least one party and the at least one counterparty according to a multilateral analysis of preference data determined using such co-evaluator choices.
> 4. A method according to claim 1, wherein the party choices reveal, with respect to each level of each of a first series of attributes, a utility value which indicates the value that the party places on the level of the attribute.
> 5. A method according to claim 4, wherein the party choices reveal the utility values without the utility values being provided explicitly.
> 6. A method according to claim 4, wherein the counterparty choices reveal, with respect to each level of each of a second series of attributes that complements the first series of attributes, a utility value which indicates the value that the counterparty places on the level of the attribute.
> 7. A method according to claim 6, wherein the counterparty choices reveal the utility values without the utility values being provided explicitly.
> 8. A method according to claim 1, wherein at least one of the first preference data, second preference data, and the list is obtained from a remote server over a communication network.

---

[2] The parties have not construed these dependent claims.  All claim construction has focused on the terms in Claim 1.

9. A method according to claim 1, wherein the party choices and the counterparty choices are provided to a remote server over a communication network.

All of these method claims are expressly predicated on Claim 1.[3] Claim 2 (perhaps redundantly) claims the closeness of fit component of Claim 1's computerized bilateral and multilateral decision-making process claim. Claim 3 claims the process of inclusion of a "co-evaluator's data in the multilateral analysis.[4] Claim 4 claims the process of attributing a utility value, indicating the value a party places on an attribute. Claim 5 permits the utility values to be created but not revealed to the participants. Claims 6 and 7 are identical to Claims 4 and 5 but are applied to a counterparty, rather than the initial party. Claims 8 and 9 allow the process claimed in Claim 1 to be provided to a remove server over a communication network -- presumably the Internet.

<u>Procedural History</u>

On May 29, 2013, Lumen View filed suit against Findthebest for infringement of the '073 patent. In its complaint, Lumen View contends that Findthebest infringes on the '073 patent in

_____

[3]  Claims 5 and 6 are "method[s] according to [C]laim 4, and Claim 7 is a "method according to Claim 6." But since Claims 4 is a "method according to Claim 1," Claims 5, 6, and 7 are all ultimately predicated on Claim 1.
[4]  An example of such a co-evaluator given in the Specification is a guidance counselor, whose preference data might play a role in the matchmaking between a college and a college applicant.

A6

[O]ffer[ing] recommendation services via the
www.findthebest.com website ('Defendant Website') for
individuals seeking the purchase of products and
individuals offering to sell the products," by "execut[ing]
a computer implemented method for facilitating evaluation,
in connection with the procurement or delivery of products
or services, in a context of the operation of an
enterprise, such context involving a first class of parties
(e.g., consumers) in a first role and a second class of
counterparties in a second role (e.g., individuals selling
goods).

On September 24, Findthebest moved for judgment on the
pleadings on the ground that the '073 patent was invalid because
it claimed an "abstract idea," which does not constitute patent
eligible subject matter under Section 101 of the codified Patent
Act.  35 U.S.C. § 101.  The motion was fully submitted on
October 18.


DISCUSSION

The standard governing a Section 101 challenge is well
established.  "Whether a claim is drawn to patent-eligible
subject matter under § 101 is a threshold inquiry, and any claim
of an application failing the requirements of § 101 must be
rejected even if it meets all of the other legal requirements of
patentability." In re Bilski, 545 F.3d 943, 950 (Fed. Cir.
2008) (citation omitted) (hereinafter "Bilski I").  A patent is
presumed to be valid by statute.  See 35 U.S.C. § 282.  The
party challenging the validity of a patent bears the burden of
proving invalidity by clear and convincing evidence.  See, e.g.,

A7

<u>Pfizer, Inc. v. Apotex, Inc.</u>, 480 F.3d 1348, 1359 (Fed. Cir. 2007).  The question of whether a patent is invalid under Section 101 of the codified Patent Act is an "issue of law." <u>Bilski I</u>, 545 F.3d at 951.

<u>Section 101 of the Patent Act</u>

Section 101 of the codified Patent Act defines the subject matter that is patentable:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

35 U.S.C. § 101 ("Section 101").  Section 101 lays out four subject matter categories of inventions or discoveries eligible for patent protection: processes, machines, manufactures, or compositions of matter.  The '073 patent claims a "method for facilitating evaluation," which plainly is a process.  Section 100(b) of the Patent Act provides that "[t]he term 'process' means process, art or method, and includes a new use of a known process, machine, manufacture, composition of matter, or material."  35 U.S.C. § 100.  The Supreme Court has elaborated on this statutory definition:

> A process is a mode of treatment of certain materials to produce a given result.  It is an act, or a series of acts, performed upon the subject-matter to be transformed and reduced to a different state or thing.  If new and useful, it is just as patentable as is a piece of machinery.  In the language of the patent law, it is an art.  The machinery pointed out as suitable to perform the process

8

A8

> may or may not be new or patentable; whilst the process
> itself may be altogether new, and produce an entirely new
> result.  The process requires that certain things should be
> done with certain substances, and in a certain order; but
> the tools to be used in doing this may be of secondary
> consequence.

Diamond v. Diehr, 450 U.S. 175, 183-84 (1981).

Courts construe the Section 101 definitions broadly.  "In
choosing such expansive terms ... modified by the comprehensive
'any,' Congress plainly contemplated that the patent laws would
be given wide scope."  Diamond v. Chakrabarty, 447 U.S. 303, 308
(1980).  The Supreme Court has recognized, however, "three
specific exceptions to [Section 101's] broad patent-eligibility
principles: laws of nature, physical phenomena, and abstract
ideas."  Bilski v. Kappos, 130 S. Ct. 3218, 3225 (2010)(citation
omitted).  The three exceptions "are consistent with the
[statutory] notion that a patentable process must be 'new and
useful' . . . [and] have defined the reach of the [patent]
statute as a matter of statutory stare decisis going back 150
years."  Id.  These exceptions protect from monopolization
concepts that constitute "part of the storehouse of knowledge of
all men ... free to all men and reserved exclusively to none."
Funk Brothers Seed Co. v. Kalo Inoculant Co., 333 U.S. 127, 130
(1948).  "Einstein could not patent his celebrated law that E =
mc2; nor could Newton have patented the law of gravity."  Diehr,
450 U.S. at 185 (citation omitted).

A9

I. <u>Claim 1 of the '073 patent under Section 101</u>

Findthebest contends that Claim 1 of the '073 patent is not drawn to patent eligible subject matter under Section 101 because the claimed process constitutes the abstract idea of matchmaking. "[A]bstract intellectual concepts are not patentable, as they are the basic tools of scientific and technological work." <u>Gottschalk v. Benson</u>, 409 U.S. 63, 67 (1972). "A principle, in the abstract, is a fundamental truth; an original cause; a motive; these cannot be patented, as no one can claim in either of them an exclusive right." <u>Le Roy v. Tatham</u>, 55 U.S. 156, 175 (1853).

Courts have had some difficulty defining with precision the line between an impermissibly abstract idea and a patentable process. But the Supreme Court in the 2010 case of <u>Bilski</u>, 130 S.Ct. 3218, provided lower courts with some guidance in drawing the line. Although declining to provide an authoritative definition of "process" for purposes of Section 101, the Court directed lower courts to look to, as "guideposts," its previous applications of the abstract idea exception in the cases of <u>Benson v. Kappos</u>, 409 U.S. 63, <u>Parker v. Flook</u>, 437 U.S. 584 (1978), and <u>Diamond v. Dieher</u>, 450 U.S. 175. <u>Bilski</u>, 130 S.Ct. at 3231. The <u>Bilski</u> Court said that the Federal Circuit's "machine or transformation" test, set out in <u>Bilski I</u>, 545 F.3d at 958, should serve as "a useful and important clue" and "an

10

A10

investigative tool" for determining whether a patent claims patent eligible subject matter under Section 101, in conjunction with comparison of the above mentioned Court precedents, as part of a holistic analysis. <u>Bilski</u>, 130 S. Ct. at 3227. Accordingly, to resolve this motion it is necessary to conduct a holistic analysis of whether the '073 patent constitutes an abstract idea in light of the precedents of <u>Benson</u>, <u>Flook</u>, <u>Dieher</u>, and <u>Bilski</u> itself.[5]  As part of this analysis, the "machine or transformation" test serves as a non-dispositive "investigative tool."

A. <u>The Supreme Court's Abstract Idea Cases</u>

In the 1972 case of <u>Benson v. Kappos</u>, the Court invalidated a patent that claimed "a method of programming a general-purpose digital computer to convert signals from binary-coded decimal form into pure binary form." <u>Benson</u>, 409 U.S. at 65.  The <u>Benson</u> Court held that the patent claimed not a patentable process, but an algorithm which constituted an abstract idea. The conceptual grounding of the court's holding was the impermissible breadth of the preemptive effect of patenting such a method.  The Court noted that "the patent would wholly pre-

---

[5] <u>Bilski</u> directs a court to look to the facts and holdings of <u>Benson</u>, <u>Flook</u>, and <u>Dieher</u> as "guideposts" in determining whether a claimed process constitutes and impermissible abstract idea. It follows that <u>Bilski</u> itself should also be consulted in the same fashion.

empt the mathematical formula [undergirding the conversion of binary decimals to pure binary form] and in practical effect would be a patent on the algorithm itself." Id. at 72.  The Court further emphasized the preemption concern in noting that the patent's "'process' claim is so abstract and sweeping as to cover both known and unknown uses . . . vary[ing] from the operation of a train to verification of drivers' licenses to researching the law books for precedents." Id. at 68 (citation omitted).

In the 1978 case of Parker v. Flook, the Court invalidated a patent that claimed a new process for monitoring certain catalytic conditions during the oil refining process.  The patent claimed a computer implemented method, which was undergirded by a mathematical formula by which monitors could be more easily alerted to dangerous developments during that process.  Relying on its holding in Benson that a mathematical formula constituted an abstract idea that could not be patented, the Court framed the question in Flook as "whether the identification of a limited category of useful, though conventional, post-solution applications of such a formula makes [a patented] method eligible for patent protection." Flook, 437 U.S. at 585.  The Court answered in the negative.  It held that post-solution application of an abstract idea to a particular field could not save a patent that fundamentally claimed an

abstract idea.  Id.  Even though the patent at issue in Flook
was more limited in its preemptive effect than that in Benson
given that it claimed a process which was restricted to a
particular industrial refining process unlike the binary decimal
conversion method of general applicability in Benson, the Court
found that the only contribution made by the patent's claimed
invention was a mathematical algorithm, which constituted an
abstract idea.

The Flook Court also made clear that computer
implementation of the claimed process did not save it from
invalidity due to abstractness.  The Court invalidated that
patent even though it, like the claim in Benson, was limited in
being predominately tied to a computer in its application.
Recognizing that "the abstract of disclosure makes it clear that
the formula is primarily useful for computerized calculations,"
the Court nonetheless invalidated the patent's claims.  Id. at
586.

In the 1981 case of Diamond v. Dieher, the Court outlined
the outer limits of the abstract idea in the course of upholding
a patent that claimed a process for curing synthetic rubber.
450 U.S. at 184.  There, as in Benson and Flook, the challenged
claim took the form of a mathematical formula.  The Court
distinguished the claim at issue, however, under the guiding
principle that the preemptive effect of patenting the process in

13

A13

Dieher was more limited.  The Court reasoned that, unlike the patent in Flook -- which claimed a formula for computing an "alarm limit" which could be of general applicability -- the process claimed in Dieher was of restricted applicability to the rubber curing industry.  Id. at 186-87.

The Dieher Court also made two observations about the abstract idea exception to Section 101 patentability.  First, it stressed that "in a process claim . . . a new combination of steps in a process may be patentable even though all the constituents of the combination were well known and in common use before the combination was made."  Id. at 188.  Second, it emphasized that although Benson and Flook had invalidated process patents tied to computers, "a claim drawn to subject matter otherwise statutory [under Section 101] does not become nonstatutory simply because it uses a mathematical formula, computer program, or digital computer."  Id. at 187.  Instead, in "determining the eligibility of [a] claimed process for patent protection under § 101, [any] claims must be considered as a whole" to determine whether their applications to a particular context provides material of additional value beyond the abstract idea itself.  Id. at 188.  The Court stressed, however, that this holistic analysis "cannot be circumvented by attempting to limit the use of the formula to a particular technological environment."  Id. at 191.

14

A14

Most recently, the Supreme Court addressed the abstract idea exception in the 2010 case Bilski v Kappos. In Bilski, the Court invalidated as an abstract idea a business method patent that claimed a general method for hedging risk in the energy commodities market. Bilski, 130 S. Ct. at 3223. The independent claim in the Bilski patent read as follows:

> (a) initiating a series of transactions between said commodity provider and consumers of said commodity wherein said consumers purchase said commodity at a fixed rate based upon historical averages, said fixed rate corresponding to a risk position of said consumers; (b) identifying market participants for said commodity having a counter-risk position to said consumers; and (c) initiating a series of transactions between said commodity provider and said market participants at a second fixed rate such that said series of market participant transactions balances the risk position of said series of consumer transactions.

Id. at 3223-24. Rejecting the Federal Circuit's application of the "machine or transformation" test as the exclusive test for determining Section 101 patentability, the Court relied on Benson, Flook, and Dieher to hold that the patent claimed an abstract idea and was invalid. The Court held that "[t]he concept of hedging . . . is an unpatentable abstract idea, just like the algorithms at issue in Benson and Flook." Id. at 3231. The Court also grounded its reasoning in concern about preemption. It explained that "[a]llowing petitioners to patent risk hedging would pre-empt use of this approach in all fields,

15

A15

and would effectively grant a monopoly over an abstract idea."
Id. at 3231.

B. The Federal Circuit's Application of Bilski

After Bilski, the Federal Circuit worked to provide further definition to Bilski's somewhat open-ended test for determining process patent eligibility under Section 101.  In May 2013, the Federal Circuit attempted, unsuccessfully, to provide definitive guidance to lower courts adjudicating a claim of impermissible abstractness in its opinion in CLS Bank Int'l v. Alice Corp. Pty. Ltd., 717 F.3d 1269 (Fed. Cir. 2013) (hereinafter "Alice"). The patent holder in Alice claimed a computerized method of hedging risk in a two-party deal by enlisting a mutually trusted third party to ensure that each party complies with its payment obligation during the period between the making of the deal and the actual closing.  The patent holder had four patents.  The first two were "method" patents -- which "were directed to a method (i.e., process), while the claims of the [other two] Patents [were] directed to a [computerized] system or product" to implement that method.  CLS Bank Int'l v. Alice Corp. Pty. Ltd., 768 F. Supp. 2d 221, 223 (D.D.C. 2011).  The district court had held that both the method patents and the system patents claimed abstract ideas and were invalid under the "machine or transformation" test and the Supreme Court's precedents in Benson, Flook, Dieher, and Bilski. Id.  The

16

A16

Federal Circuit issued a per-curium opinion, wherein a majority
of the court affirmed the invalidation of the method patents on
the ground that they claimed an abstract idea while dividing 5-5
on the question whether the system patents claimed patent
eligible subject matter.  <u>Alice</u>, 717 F.3d at 1273.

The Federal Circuit's reasoning fractured into five
separate opinions.  One judge noted that

> Although a majority of the judges on the court agree that
> the method claims do not recite patent eligible subject
> matter, no majority of those judges agrees as to the legal
> rationale for that conclusion.  Accordingly, though much is
> published today discussing the proper approach to the
> patent eligibility inquiry, nothing said today beyond our
> judgment has the weight of precedent.

<u>Alice</u>, 717 F.3d 1269, 1292 n.1 (Fed. Cir. 2013).  Three
different tests emerge from the five opinions.  First, Judge
Lourie's opinion would ask a court to evaluate to what extent
the claim avoids broad preemption by containing "additional
substantive limitations that narrow, confine, or otherwise tie
down the claim so that, in practical terms, it does not cover
the full abstract idea itself," <u>id.</u> at 1282, with particular
reference to whether the claim contains an "inventive concept .
. . a genuine human contribution to the claimed subject matter."
<u>Id.</u> at 1283.  Second, Chief Judge Rader proposed an inquiry less
focused on preemption than Judge Laurie's, stating that "the
relevant inquiry must be whether a claim includes <u>meaningful
limitations</u> restricting it to an application, rather than merely

17

A17

an abstract idea." Id. at 1299 (emphasis added). "A claim may
be premised on an abstract idea -- the question for patent
eligibility is whether the claim contains limitations that
meaningfully tie that idea to a concrete reality or actual
application of that idea." Id. at 1299-1300. Finally, Judge
Newman, writing only for herself, would eschew the
"abstractness" Section 101 inquiry altogether and hold that if a
claim fell into the enumerated categories of "useful arts," that
the inquiry should proceed to apply "the laws of novelty,
utility, prior art, obviousness, description, enablement, and
specificity . . . [obviating the] need for an all-purpose
definition of 'abstractness' or 'preemption,' as heroically
attempted." Id. at 1322.

While Alice did not produce controlling reasoning, its
holding that the method claim patents were invalid has
precedential weight and must be followed by lower courts to the
extent that the facts regarding any patents challenged in those
courts are similar. Moreover, while the Alice judges disagreed
on the fundamental methodology to apply in adjudicating patent
invalidation questions of this type and produced no binding
method, guidance can be drawn from any reasoning to the extent
that its interpretation of the Supreme Court's cases in this
area is persuasive.

18

A18

C. Applying the Supreme Court's and Federal Circuit's precedents to the '073 patent

Applying the principles of Benson, Flook, Dieher, and Bilski, along with what guidance can be wrought from Alice, it is evident that Claim 1 of the '073 patent claims an abstract idea and does not qualify as a "process" under Section 101.  The '073 patent claims the idea of bilateral and multilateral matchmaking using a computer in the context of a financial transaction or an enterprise.  It is preemptive in the broadest sense.  And its only real limitation -- the use of a computer -- constitutes mere post-solution application of an abstract idea to a common context.  The patent must be invalidated under any of the above described Supreme Court precedents as well as under either the Judge Laurie or the Judge Rader methodology in Alice.

1. Preemption

The first common thread in the above cases is concern that a patented process will preempt all applications of an abstract idea.  Concern about broad preemption undergirds the Supreme Court's precedent of patent invalidation in Benson, Flook, and Bilski and the Federal Circuit's invalidation of the method claims in Alice.  Applying that principle here, it is clear that the '073 patent cannot stand.  Put simply, the patent preempts the use of a computer to facilitate matchmaking.  Its preemptive breadth is enormous.  "Allowing [a patent holder] to patent [a

A19

broad process] would pre-empt use of this approach in all fields, and would effectively grant a monopoly over an abstract idea." Bilski, 130 S.Ct. at 3231.   Permitting Lumen View this level of preemption would be out of step with the balance the patent system has struck between promoting innovation and allowing the widespread use of new and productive inventions and discoveries.

The preemptive reach of Claim 1 of the '073 patent extends at least as far as that of the invalidated patent claims in any of the above described precedents.   For example, in Benson, the Supreme Court lamented that the claimed process of converting binary decimals was "so abstract and sweeping as to cover both known and unknown uses . . . vary[ing] from the operation of a train to verification of drivers' licenses to researching the law books for precedents."   Here, as there, permitting the patenting of bilateral or multilateral matchmaking using a computer would also cover "known and unknown uses," varying from the matching of online daters to securities traders looking for trading partners.   And while the invalidated Flook patent was at least limited to preempting the use of an alert system in the oil refining industry, Claim 1 of the '073 patent preempts the use of computer assisted matchmaking in the context of any transaction or enterprise.   Unlike the process held patentable in Dieher, which was directed to a specific application (rubber

curing), the '073 patent is a patent of general applicability.
Even the invalidated Bilski patent which the Supreme Court
admonishingly described as purporting "to patent both the
concept of hedging risk and the application of that concept to
energy markets," Bilski, 130 S.Ct. at 3229, at least specified a
market where its preemptive effect would presumably be
predominantly felt.

    2. Absence of meaningful limitations

    A second common thread in the above cases invalidating
patent claims for abstractness is that the patents lacked
sufficient limitations to direct the claim to a particular area.
This well established notion is embodied in Judge Rader's
proposed test in Alice that a claim must have "meaningful
limitations restricting it to an application, rather than merely
an abstract idea." Alice, 717 F.3d at 1299. The "meaningful
limitations" inquiry is present in all of the above described
Supreme Court cases, most saliently in Dieher, where the
limitation of an algorithm to the oil processing field saved it
from invalidation on the ground of abstractness. Dieher, 450
U.S. at 188. Claim 1 of the '073 patent contains no meaningful
limitation on conventional matchmaking at all. It is directed
to financial transactions and the operation of enterprises. And
as is described below, the application of matchmaking to a

computer context is not a "meaningful" limitation that can save
the Claim from invalidity.

3. Lack of genuine human contribution to the subject matter

The '073 patent would also fail Judge Laurie's proposed
test in Alice, which requires an "inventive idea" constituting a
"genuine human contribution" to the subject matter, such that
the claim moves outside of the realm of abstract ideas and into
the category of particularized inventions.  717 F.3d at 1283.
There is no inventive idea here.  Having two or more parties
input preference data is not inventive.  Matchmakers have been
doing this for millennia.  Nor is an unspecified closeness of
fit process an inventive idea.  It is merely a mathematical
manifestation of the underlying process behind matchmaking:
determining good matches.  Nothing in the '073 patent evinces an
inventive idea beyond the idea of the patent holder to be the
first to patent the computerization of a fundamental process
that has occurred all through human history.

4. The role of a computer in the '073 patent does not render
   it patentable.

The abstract ideas exception to the Section 101 categories
"cannot be circumvented by attempting to limit the use of the
[idea] to a particular technological environment."  Dieher, 450
U.S. at 191.  The fact that the the '073 patent's matchmaking
claim is implemented through a computer does not save it from

22

A22

invalidation.  Indeed, all of the process patents invalidated in
Benson, Flook, Bilski, and Alice were implemented by a computer.
The Federal Circuit's most recent test for determining the
relevance of a computer element of a claim in the Section 101
analysis is context specific.  "To salvage an otherwise patent-
ineligible process, a computer must be integral to the claimed
invention, facilitating the process in a way that a person
making calculations or computations could not."  Bancorp Servs.
L.L.C. v. Sun Life Assur. Co. of Canada (U.S.), L.L.C., 687 F.3d
1266, 1278 (Fed. Cir. 2012); accord SiRF Tech., Inc. v. Int'l
Trade Comm'n, 601 F.3d 1319, 1333 (Fed. Cir. 2010) ("for the
addition of a machine to impose a meaningful limit on the scope
of a claim, it must play a significant part in permitting the
claimed method to be performed, rather than function solely as
an obvious mechanism for permitting a solution to be achieved
more quickly, i.e., through the utilization of a computer for
performing calculations.").  Claim 1 of the '073 patent recites
the process of a computerized retrieval of preference data from
two or more parties and the computation of a closeness of fit
test to match parties.  The steps in the Claim are: 1)
retrieving the submitted preference data; 2) analyzing the data
to compute a closeness of fit conclusion; and 3) providing a
list.  These processes can be performed by a human absent a
computer.  The computer element of the claim "function[s] solely

A23

as an obvious mechanism for permitting [matchmaking] to be achieved more quickly." Id.

A slightly different test for the relevance of the computer component to an otherwise abstract idea claim was set forth by Judge Rader in her opinion in Alice. Judge Rader posited that:

> The key to this inquiry is whether the claims tie the otherwise abstract idea to a specific way of doing something with a computer, or a specific computer for doing something; if so, they likely will be patent eligible, unlike claims directed to nothing more than the idea of doing that thing on a computer.

Alice, 717 F.3d at 1302. Under this test as well, the computer element of Claim 1 does not save the claim from invalidation. Neither Claim 1 nor the specification in the '073 patent discloses any special way of programming a computer to achieve the matchmaking function. In other words, the '073 patent does not disclose a specific method of using a computer to execute the abstract idea of matchmaking, it only claims the abstract concept of computerized matchmaking in a business or enterprise context.

D. The Machine or Transformation Test

As part of the holistic analysis required by Bilski, the "machine or transformation" test serves as a useful non-dispositive "investigative tool." Bilski, 130 S.Ct. at 3227. Under the "machine or transformation" test, "[a] claimed process

24

A24

is surely patent-eligible under § 101 if: (1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing." Id. at 3224 (citation omitted). Claim 1 of the '073 patent fails both prongs of the "machine or transformation" test and therefore its application confirms the conclusion, predicated on the above analysis of Supreme Court precedent, that it cannot stand.

1. Whether Claim 1 of the '073 patent is "tied to a particular machine or apparatus"

Claim 1 recites "[a] computer-implemented method for facilitating evaluation," wherein "digital storage medium[s]" are used to hold inputted preference data and a computer performs "multilateral analyses" of each party's preference data to compute a "closeness of fit value." This claim fails the machine prong of the machine or transformation test for two reasons. First, the matchmaking functions claimed do not require a computer to be performed. "[M]erely claiming a software implementation of a purely mental process that could otherwise be performed without the use of a computer does not satisfy the machine prong of the machine-or-transformation test." Cybersource Corp. v. Retail Decisions, Inc., 654 F.3d 1366, 1375 (Fed. Cir. 2011). The core of the claimed process in Claim 1 of the '073 patent is the abstract idea of bilateral and multilateral matchmaking. Matchmaking by having parties declare

25

A25

preference data and deciding on good fits is a process as old as
humanity itself.  Adding a computer to the mix without showing
how the computer adds significant value constitutes mere "post
solution activity."  Flook, 437 U.S. at 590.  And as Bilski
makes clear, "the prohibition against patenting abstract ideas
cannot be circumvented by attempting to limit the use of the
formula to a particular technological environment or adding
insignificant post-solution activity."  Bilski, 130 S. Ct. at
3230 (citation omitted).

     The Federal Circuit addressed a similar claim in which a
computerized process could be performed by a human alone in
Cybersource, 654 F.3d at 1366.  There, the claim at issue
recited a method of detecting fraud in credit card transactions
that were conducted over the Internet.  The patent holder
claimed that the patent was tied to a machine or apparatus
because the claimed process required the Internet in order to be
performed.  Id. at 1370.  The district court rejected that
notion, and the Federal Circuit affirmed on the ground that the
Internet was not required to perform the core function in the
claim.  The Federal Circuit noted that "while [the claim]
describes a method of analyzing data regarding Internet credit
card transactions, nothing in [the claim] requires an infringer
to use the Internet to obtain that data."  CyberSource, 654 F.3d
at 1370.  Similarly, here, the use of a computer to perform a

26

A26

process humans can perform independently is insufficient to fulfill the machine prong of the "machine or transformation" test.

Second, Claim 1 of the '073 patent fails the machine prong of the test because it is not tied to a "particular machine or apparatus," as the test requires. Lumen View argues that the claimed process requires a "specifically programmed computer" such that it satisfies the machine prong of the test. This contention is unavailing. Merely directing a computer to perform a function does not transform the computer into a specialized computer. Such a principle would lead to the absurd result of allowing the patenting the computerized use of even the most basic abstract ideas. Given the ubiquity of computers in modern life, adopting such a principle would have enormous preemptive effect. Nothing in Section 101 or the precedents interpreting it allow a party to monopolize the building blocks of innovation in a computerized world. Moreover, as noted above, all of the process patents invalidated in Benson, Flook, Bilski, and Alice were implemented by a computer. In none of those cases was there any intimation that the patents could be saved by virtue of the notion that the computers used were somehow "specialized" by virtue of performing the abstract processes at issue. Consequently, to the extent that the "machine" prong serves as an "investigative tool" it cuts

27

A27

against holding that the '073 patent claims Section 101 eligible
subject matter.

    2.  <u>Whether Claim 1 of the '073 patent "transforms a
particular article into a different state or thing"</u>

    If a process is not tied to a particular machine then the
"machine or transformation" test next asks whether the process
produces a "transformation and reduction of an article to a
different state or thing." <u>Benson</u>, 409 U.S. at 70.  Lumen View
argues that pulling preference data and creating a list derived
from a closeness-of-fit analysis is transformative such that it
fits this prong.  This contention is unavailing.

    The "transformation" prong originally contemplated physical
transformation of a physical entity through a given process.  By
way of early example, in <u>Dieher</u>, the patent which the Court
upheld under the transformation prong claimed a process that
physically transformed raw, uncured rubber into molded, cured
rubber products.  <u>See</u> <u>Dieher</u>, 450 U.S. at 187.  Later, a
doctrine emerged allowing the transformation test to apply to
manipulations of non-physical data.  The Federal Circuit
explained that:

> The raw materials of many information-age processes . . .are
> electronic signals and electronically-manipulated data. . .
> [raising the question of] [w]hich, if any, of these processes
> qualify as a transformation or reduction of an article into a
> different state or thing constituting patent-eligible subject
> matter?

28

A28

Bilski I, 545 F.3d at 962. The Federal Circuit drew a line in

Bilski I in holding that the data manipulated must transform

either a "physical object or substance, or an electronic signal

representative of any physical object or substance." Id. at 964

Applying that test to the facts at issue in Bilski I, the

Federal Circuit declared that a computerized risk hedging

process which transformed "public or private legal obligations

or relationships, [or] business risks" did not fulfill the

transformation prong:

> Purported transformations or manipulations simply of public
> or private legal obligations or relationships, business,
> risks, or other such abstractions cannot meet the
> [transformation] test because they are not physical objects
> or substances, and they are not representative of physical
> objects or substances.

Id. at 963.

    Here, the preferences that are manipulated in the claimed

matchmaking process do not represent physical objects or

substances. They are inapposite "abstractions" for purposes of

the test. Consequently, the transformation prong of the test

also cuts in favor of invalidating the '073 patent.

    II.  The Dependent Claims of the '073 patent are also Invalid

        The eight dependent claims of the '073 patent rely on Claim

1's claim of the computerized matchmaking process. The claims

simply add broad, non-value added limitations to Claim 1's

process of computerized matchmaking. They are invalid for two

reasons.  First, all of the dependent claims expressly depend on the invalid Claim 1.  Claims 2, 3, 4, 8, and 9 are all disclosed as "method[s] according to claim 1."  Claims 5 and 6 are disclosed as "method[s] according to claim 4" (which is dependent on the invalid Claim 1).  And claim 7 is disclosed as a "method according to claim 6" (which is dependent on Claim 4, which in turn is dependent on the invalid Claim 1").  Without Claim 1, the claims are no longer grounded in anything and are incoherent.

Second, none of the limitations materially limit Claim 1 such that they could survive independently even if Claim 1 were not invalidated.  Claim 2 is simply the concept of adding a closeness of fit test to Claim 1.  Claim 3 adds the abstract idea of using data from external co-evaluators in the process.  Claims 4 and 6 claim the abstract idea of assigning a value to the preferences inputted.  Claims 5 and 7 claim the equally abstract idea of not revealing that value to the parties in the matchmaking process.  Finally, Claims 8 and 9 claim the quintessentially commonplace idea of using the internet.  It is clear that none of these limitations create a process that can survive under the foregoing tests.  None of them are tied to a particular machine nor do they transform anything.  And they are all even more abstract than the processes invalidated in <u>Benson</u>, <u>Flook</u>, <u>Bilski</u>, and <u>Alice</u>.

A30

The dependent claims of the '073 patent are analogous to the dependent claims invalidated by the Supreme Court in Bilski following the Court's invalidation of the underling independent claim there.  See Bilski, 130 S. Ct. at 3231.  After invalidating the independent claim of the process of risk hedging in the commodities context, the Bilski Court invalidated the dependent claims on the ground that the "remaining claims are broad examples of how hedging can be used in commodities and energy markets."  Id.  The Court explained that "[t]these [dependent] claims attempt to patent the use of the abstract idea of hedging risk in the energy market and then instruct the use of well-known random analysis techniques to help establish some of the inputs into the equation."  Id.

The dependent claims in the '073 patent add similarly little value to those invalidated in Bilski.  Like the dependent claims in Bilski, the dependent claims here merely add to the unpatentable abstract idea of matchmaking the "well-known . . . analysis technique[s]" of: incorporating "closeness of fit" analysis (Claim 2); adding data from external co-evaluators (Claim 3); assigning a value figure to the preference data inputted (Claims 4 and 6); hiding that value figure from participants (Claims 5 and 7); and using the Internet (Claims 8 and 9).  Notably, although Findthebest devoted a section in its

31

A31

initial motion as to why Claims 2-9 were invalid, Lumen View
failed to respond with any defense of those claims individually.

III. <u>Lumen View's Arguments that the Motion is Procedurally</u>
     <u>Improper</u>

Lumen View contends that a motion to invalidate a patent
based on Section 101 is premature at the motion to dismiss stage
for three reasons.  First, Lumen View argues that the only
relevant inquiry is whether it complied with the "Form 18" -- an
illustrative pleading form for patent cases in the Federal Rules
of Civil Procedure.  Second, Lumen View argues that the "clear
and convincing" evidence standard for patent invalidation means
that a patent usually should not be invalidated at the pleadings
stage.  And third, Lumen View somewhat contradictorily argues
both that this motion should not be decided before claim
construction has occurred and that the Court should adopt Lumen
View's proffered claim construction in deciding this motion now.

Lumen View's Form 18 argument can be disposed of quickly.
Lumen View confuses the fact that compliance with Form 18 may
immunize a complaint from an attack on the <u>sufficiency of the</u>
<u>details pled</u>[6] with the notion that compliance with Form 18
prevents a legally meritless claim from being dismissed on the
pleadings.  Lumen View relies on the Federal Circuit's statement

---

[6] Under the pleading standards enunciated in <u>Bell Atlantic Corp.</u>
<u>v. Twombly</u>, 550 U.S. 544 (2007), and <u>Ashcroft v. Iqbal</u>, 556 U.S.
662, (2009).

A32

in In re Bill of Lading Transmission & Processing Sys. Patent Litig., 681 F.3d 1323 (Fed. Cir. 2012), that "[a]s long as the complaint in question contains sufficient factual allegations to meet the requirements of Form 18, the complaint has sufficiently pled direct infringement." Id. at 1336. But the reason that compliance with Form 18 was sufficient to save those claims from dismissal at the pleading stage was that the patent-invalidation "arguments all focus[ed] on whether the amended complaints' allegations of direct infringement contain[ed] sufficient factual detail to withstand attack under Twombly and Iqbal." Id. at 1335. In other words, compliance with Form 18 is usually sufficient to defeat an argument that a pleading is insufficiently detailed. But compliance with a pleading form cannot, of course, prove that a claim is legally meritorious.

Second, Lumen View argues that the "clear and convincing evidence" standard under which a patent invalidation motion must be adjudicated makes resolution of this motion improper at this procedural stage. But as Lumen View concedes, a motion to invalidate a patent on the pleadings is "not precluded, at this stage." It is true that "it will be rare that a patent infringement suit can be dismissed at the pleading stage for lack of patentable subject matter . . . because every issued patent is presumed to have been issued properly, absent clear and convincing evidence to the contrary." Ultramercial, Inc. v.

33

A33

Hulu, LLC, 722 F.3d 1335, 1338 (Fed. Cir. 2013). But rare does
not mean never. Whether a patent is valid under Section 101 is
a pure question of law. And when "the only plausible reading of
the patent must be that there is clear and convincing evidence
of ineligibility" the patent must be invalidated at the pleading
stage. Id. As described in the foregoing, whether the '073
patent is addressed to Section 101 ineligible subject matter is
not a close question. It is evident by clear and convincing
evidence that the patent is invalid.

Finally, Lumen View objects to the fact that this motion
was brought before claim construction has occurred. At the same
time, Lumen View argues that "since the parties have already
filed their statement of [claim construction] this Court should
adopt Lumen View's proffered constructions in considering this
motion." Findthebest urges that this motion be resolved absent
any claim construction, and in the alternative it consents to
use the construction of the claims submitted by Lumen View for
purposes of this motion.

While claim construction may sometimes be helpful in
resolving a Section 101 motion where detailed explication of the
claims in a patent would reveal material legal issues, the
Federal Circuit has said that "conducting a claim construction
analysis before addressing § 101" is "not required." This is
"because eligibility is a 'coarse' gauge of the suitability of

broad subject matter categories for patent protection, . . .
[and therefore] claim construction may not always be necessary
for a § 101 analysis." Id. at 1339.  In support of its holding
that claim construction is not required prior to a Section 101
analysis, the Federal Circuit has "cited [Bilski, 130 S. Ct. at
3225], noting that the Supreme Court 'f[ound] subject matter
ineligible for patent protection without claim construction.'"
Bancorp Servs., 687 F.3d at 1273.

     This motion turns on the question of whether one
independent claim in the '073 patent claims a process that is
impermissibly abstract.  The claimed process elements of Claim 1
are straightforward.  No components are opaque such that claim
construction would be necessary to flush out its contours.
"[T]he question of eligible subject matter must be determined on
a claim-by-claim basis.  Construing every asserted claim and
then conducting a § 101 analysis may not be a wise use of
judicial resources." Ultramercial, 722 F.3d at 1340.  Here, the
Section 101 inquiry encompasses only "broad subject matter
categories" and claim construction is not necessary to reveal
any material legal issues and would not be "a wise use of
judicial resources."[7]  Id.

_____

[7] In any event, having examined Lumen View's proposed claim
construction, nothing contained in these submissions would alter
the outcome of this motion.  In fact, Lumen View urged in its
claim construction brief that all of the claim terms which it

A35

CONCLUSION

Claim 1 of the '073 patent claims an abstract idea, which is patent ineligible subject matter under Section 101 of the codified Patent Act.  The dependent claims are invalid as well. Findthebest's September 24, 2013 motion for judgment on the pleadings is granted.  The Clerk of Court shall enter judgment for the defendant and close the case.


Dated:    New York, New York
          November 22, 2013


                              _____
                                    DENISE COTE
                         United States District Judge


---

sought to be construed by the Court be construed according to their "plain and ordinary meaning[s]."

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
LUMEN VIEW TECHNOLOGY LLC,

                                        Plaintiff,

                    -against-

FINDTHEBEST. COM, INC.,

                                        Defendant.
-------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/26/2013

13 **CIVIL** 3599 (DLC)

**JUDGMENT**

Whereas on September 24, 2013 defendant Findthebest.com, Inc. ("Findthebest") having

moved for judgment on the pleadings in this patent infringement action pursuant to Fed. R. Civ. P.

12(c) on the ground that the patent on which plaintiff Lumen View Technology LLC ("Lument

View") predicates its claim for infringement is invalid for failure to claim patent-eligible subject

matter, and the matter having come before the Honorable Denise L. Cote, United States District

Judge, and the Court thereafter, on November 22, 2013 having rendered its Opinion and Order that

claim 1 of the '073 patent claims an abstract idea, which is patent ineligible subject matter under

Section 101 of the codified Patent Action, that the dependent claims are invalid as well, granting

Findthebest's September 24, 2013 motion for judgment on the pleadings, and directing the Clerk

of Court to enter judgment for the defendant and close the case, it is,

**ORDERED, ADJUDGED AND DECREED:** That for the reasons set forth in

the Court's Opinion and Order dated November 22, 2013, that claim 1 of the '073 patent claims an

abstract idea, which is patent ineligible subject matter under Section 101 of the codified Patent Act;

the dependant claims are invalid as well;  Findthebest's September 24, 2013 motion for judgment

on the pleadings is granted; and judgment is hereby entered for the defendant; accordingly, the case

is closed.

A37

**Dated:** New York, New York
November 26, 2013

RUBY J. KRAJICK

_____
Clerk of Court

BY: _____
Deputy Clerk

**THIS DOCUMENT** WAS ENTERED
ON THE DOCKET ON _____

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
                                      :
Lumen View Technology, LLC,           :
                                      :
                       Plaintiff,     :      13 CIV. 3599 (DLC)
                                      :
            -v-                       :      OPINION & ORDER
                                      :
Findthebest.com, Inc.,                :
                                      :
                       Defendant.     :
                                      :
--------------------------------------X
```

APPERANCES

For the plaintiff:

Damian Wasserbauer
Aeton Law Partners, LLP
101 Centerpoint Drive, Suite 105
Middletown, CT 06457

For the defendant:

Joseph Leventhal
Leventhal Law, LLP
600 West Broadway, Suite 700
San Diego, CA 92101


DENISE COTE, District Judge:

Findthebest.com, Inc. ("FTB") moves for award of attorneys'
fees and other expenses from Lumen View Technology, LLC ("Lumen
View"), on the ground that this case is exceptional under 35
U.S.C. § 285 ("Section 285").  This is a prototypical
exceptional case.  FTB's motion is granted.

BACKGROUND

FTB is a corporation that operates a website which matches users with goods or services according to criteria that the users enter, at times using FTB's proprietary "AssistMe" program.  Lumen is a patent holding "Non Practicing Entity" that acquires patents and instigates patent infringement lawsuits.  Lumen appears to be a shell company that is one of a number of related companies involved in litigating patent infringement suits.  This motion arises out of a lawsuit brought by Lumen against FTB alleging infringement of United States Patent No. 8,069,073 ("'073 Patent").

I. The '073 Patent

Lumen became the exclusive licensee of '073 Patent on March 1, 2012, which was approximately a week after Lumen was formed.  The '073 Patent was issued on November 29, 2011, and is entitled a "System and Method For Facilitating Bilateral And Multilateral Decision-Making."  The single independent claim of the '073 Patent states in full:

> We claim: A computer-implemented method for facilitating evaluation, in connection with the procurement or delivery of products or services, in a context of at least one of (i) a financial transaction and (ii) operation of an enterprise, such context involving a first class of parties in a first role and a second class of counterparties in a second role, the method comprising:

A40

In a first computer process, retrieving first preference data from a first digital storage medium, the first preference data including attribute levels derived from choices made by at least one of the parties in the first class;

In a second computer process, retrieving second preference data from a second digital storage medium, the second preference data including attribute levels derived from choices made by at least one of the counterparties in the second class;

In a third computer process, for a selected party, performing multilateral analyses of the selected party's preference data and the preference data of each of the counterparties, and computing a closeness-of-fit value based thereon; and

In a fourth computer process, using the computed closeness-of-fit values to derive and provide a list matching the selected party and at least one of the counterparties.

The "summary of the invention" provision of the '073 Patent

elaborates that:

The method involves supplying to at least one of the parties a series of forced choice questions so as to elicit party responses; supplying to at least one of the counterparties a series of forced choice questions so as to elicit counterparty responses; and delivering a list matching the at least one party and the at least one counterparty according to analysis of preference profiles determined using conjoint analysis of the party responses and the counterparty responses.  In alternative embodiments the list may be ranked according to closeness of fit.

    In sum, the purported invention disclosed by the '073

Patent is a method of matchmaking whereby one or more parties on

each side input attribute preferences and intensity of

preference data and then a computer matches the parties on each

A41

side by a "closeness-of-fit" process and produces a list.  On

November 22, 2013, this Court held that the '073 Patent claimed

an abstract idea, which was patent ineligible subject matter

under the codified Patent Act, 35 U.S.C. § 101.  Lumen View

Tech. LLC v. Findthebest.com, Inc., 13 CIV. 3599 (DLC), 2013 WL

6164341, at *16 (S.D.N.Y. Nov. 22, 2013).


   II.  Prosecution History of Lumen's Lawsuit Against FTB

     Lumen filed its complaint (the "Complaint") against FTB on

May 29, 2013, alleging that FTB infringed the '073 Patent.  The

Complaint was one of at least twenty substantially similar

patent infringement complaints filed by Lumen against various

companies in 2012 and 2013.  The Complaint against FTB alleges a

single claim of infringement of the '073 Patent's independent

claim, and consists of conclusory allegations that mirror the

language of the '073 Patent.  The Complaint alleges that FTB had

        infringed and continues to infringe one or more claims
        of the '073 Patent by making, using, providing,
        offering to sell, and selling (directly or through
        intermediaries), in this district and elsewhere in the
        United States, a computer implemented method for
        facilitating evaluation, in connection with the
        procurement or delivery of products or services, in a
        context of at least one of a financial transaction and
        operation of an enterprise, such context involving a
        first class of parties in a first role and a second
        class of counterparties in a second role.

     Specifically, Lumen alleges in the Complaint that FTB's

website's "AssistMe" feature utilizes a computer implemented

A42

method to match the preference data inputted by at least two parties who input preference data into the website:

> The Defendant Website retrieves first preference data from a digital storage medium, <u>the first preference data received from the individual(s) registering on and/or using the Defendant Website</u>, and assigns attribute levels based on the choices made by the individuals (first class of parties). The Defendant Website retrieves the second preference data from a digital storage medium, <u>the second preference data received from the individuals registering on and/or using the Defendant Website</u>, and assigns attribute levels based on the choices made by the individuals (counterparties).

(emphasis added). Despite these allegations, it is undisputed that FTB's website does not match preference data inputted on its website by multiple parties.[1]

On May 30, Lumen sent a demand letter to FTB, and enclosed the Complaint. Lumen alleged that FTB's website "meets one or more claims of the '073 Patent." Lumen invited FTB to "discuss license terms" if FTB wanted to "avoid[] the need for filing responsive pleadings." Lumen's letter contained a number of threats suggesting that expensive litigation would follow if FTB did not quickly agree to a settlement. Lumen stated that "[w]hile it is Plaintiff's desire that the parties amicably resolve this matter, please be advised that Plaintiff is

---

[1] Lumen's Preliminary Infringement Contention made a reference to the ability of users of the FTB website to add, and edit for accuracy, listings containing factual information about products and services. But this does not constitute "preference" data. Lumen does not argue otherwise here.

prepared for full-scale litigation to enforce its rights.  This
includes all motion practice as well as protracted discovery."
Lumen threatened to increase its settlement demand every time
FTB filed a responsive pleading.  Lumen warned that

> [s]hould [FTB] engage in early motion practice,
> however, we must advise that it will force us to
> reevaluate and likely increase Plaintiff's settlement
> demand.  Please be advised that for each
> nondispositive motion filed by Company, Plaintiff will
> incorporate an escalator into its settlement demand to
> cover the costs of its opposition papers and argument.

Lumen also demanded immediate preservation of electronically
stored information ("ESI") from FTB, which, it contended "should
be afforded the broadest possible definition."  Lumen advised
FTB that it had an obligation to act to preserve ESI "in areas
you may deem not reasonably accessible."  Lumen also suggested
that FTB remove and sequester any devices potentially containing
ESI from certain employees.  Lumen stated that it would "not
hesitate to seek sanctions, court costs, or an independent
action for spoliation where appropriate."

Shortly after the Complaint was filed, FTB's attorney
contacted Lumen's attorney.  Lumen's attorney represented that
Lumen would settle the case for an $85,000 "licensing fee."

On June 19, FTB CEO Kevin O'Connor and FTB Director of
Operations Danny Seigle telephoned Lumen's attorney.  Seigle and
O'Connor explained that FTB's website did not use a bilateral or
multilateral preference matching process.  Lumen's attorney

6

stated that FTB "should trust that [Lumen] had done due
diligence," but failed to provide any facts supporting the claim
of FTB's infringement.  Lumen now contends that it "had no
obligation to explain its infringement analysis."

On June 26, FTB's attorney sent Lumen's attorney a letter
recounting the contents of a telephone call of the same day
between the two.  FTB's attorney explained, inter alia, that
Lumen's attorney was unable to describe the alleged second class
of preference profiles used in FTB's "AssistMe" program, and
that FTB consequently could not be infringing the '073 Patent.
FTB's attorney demanded a more specific description of the
alleged infringement.  Lumen's attorney declined to provide any
detail.  FTB's attorney advised Lumen's attorney that Lumen's
conduct may "result in an 'exceptional case' determination under
35 U.S.C. § 285 entitling [his] clients to an award of
attorneys' fees."

In "late June or early July" O'Connor telephoned Eileen
Shapiro, one of the inventors of the '073 Patent.  Following a
conversation between Shapiro and O'Connor, Lumen's attorney
represented to FTB's attorney that O'Connor had committed a hate
crime under Ninth Circuit law by using the term "patent troll."
FTB's attorney contends that Lumen's attorney threatened to
pursue criminal charges unless FTB apologized, financially
compensated Shapiro and Lumen's attorney, and settled the

A45

litigation by paying Lumen a licensing fee in connection with the '073 Patent.  FTB's attorney claims that Lumen's attorney stated that the offer was only good until the close of business that day and that FTB should "act quickly."

On July 7, the day prior to the due date for the filing of FTB's answer, Lumen offered FTB a "one-day only offer" to settle the litigation for a reduced licensing fee of $55,000.  Lumen advised that the offer would expire if Lumen filed an answer. FTB answered the Complaint on July 8.  Lumen did not follow through with the settlement demand escalator that it had threatened on May 30 in response to FTB's responsive pleading.

On August 30, Lumen served on FTB Preliminary Infringement Contentions ("PICs"), as required by SDNY Local Patent Rule 6. On September 19, FTB complained to the Court that the PICs were inadequately detailed and should be stricken or ordered modified.  Following a telephone conference, the Court denied FTB's application on September 24.

On October 11, Lumen filed its claim construction statement.  Lumen's proposed claim construction construed the independent claim of the '073 Patent (which Lumen alleged that FTB infringed) as requiring matching of preference data inputted by at least two parties.  Lumen's proposed claim construction construed, <u>inter alia</u>, the following relevant portion of the independent claim:

A46

> in a first computer process, retrieving first
> preference data from a first digital storage medium,
> the first preference data including attribute levels
> derived from choices made by at least one of the
> parties in the first class;
> [2] in a second computer process, retrieving
> second preference data from a second digital
> storage medium, the second preference data
> including attribute levels derived from choices
> made by at least one of the counterparties in
> the second class

Lumen stated that the term "preference data" should be construed "in conjunction with its plain and ordinary meaning." Lumen stated that "[t]he Court can simply let the 'plain meaning' of [the] term [preference data] speak for itself." Lumen's proposed construction of "preference data" was that "the term 'Preference data' is data generated for each <u>party based on the party's choices or selections made by the party or counter party to a set of questions.</u>" (Emphasis added.)  Lumen also provided in its claim construction brief that "[t]he term 'first' modifies 'preference data' and . . . first class of parties in a first role is numerical succession designating a distinct set . . . ."  Lumen further stated that "the term 'second' modifies 'preference data' and . . . second class of counterparties in a second role is numerical succession designating a distinct set . . . ."

On October 22, Lumen complained to the Court that persons associated with FTB were disclosing information about the

A47

litigation and painting Lumen in a bad light.  Lumen moved for a
gag order prohibiting FTB from discussing settlement
negotiations publicly.  Lumen's application was denied in an
Opinion of November 12.  Lumen View Tech. LLC v.
Findthebest.com, Inc., 13 CIV. 3599 (DLC), 2013 WL 6003734
(S.D.N.Y. Nov. 12, 2013).  Lumen's patent infringement lawsuit
against FTB was dismissed in an Opinion of November 22, 2013.
Lumen View Tech, 2013 WL 6164341, at *16.

     FTB moved for a declaration that this was an "exceptional
case" under Section 285 on December 10.  The motion was fully
submitted on January 17, 2014.  On April 29, the Supreme Court
of the United States issued an opinion in Octane Fitness, LLC v.
ICON Health & Fitness, Inc., 134 S. Ct. 1749 (2014), which
addressed the definition of an "exceptional" case under Section
285.  The Court gave the parties an opportunity to make
supplemental submissions regarding the significance of the
Octane Fitness decision to this motion.  The parties made those
submissions on May 16.

DISCUSSION

     The Patent Act's fee shifting provision provides that a
"court in exceptional cases may award reasonable attorney fees
to the prevailing party."  35 U.S.C. § 285.  "[U]nder § 285 the
interest of the patentee in protecting his statutory rights is

balanced by the interest of the public in confining such rights to their legal limits."  Eltech Sys. Corp. v. PPG Indus., Inc., 903 F.2d 805, 810 (Fed. Cir. 1990).  Recently, in Octane Fitness, 134 S. Ct. at 1749, the Supreme Court addressed the definition of an "exceptional" case.

> [A]n "exceptional" case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated. District courts may determine whether a case is "exceptional" in the case-by-case exercise of their discretion, considering the totality of the circumstances.

Id. at 1756.

Octane Fitness abrogated the Federal Circuit's more rigid test, articulated in Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc., 393 F.3d 1378, 1381-82 (Fed. Cir. 2005).  Under the Brooks Furniture standard, a case was "exceptional" only upon a finding of litigation-related misconduct of an independently sanctionable magnitude, or a determination that the litigation was both brought in subjective bad faith and objectively baseless.  Id.  Such a finding had to be made by "clear and convincing evidence."  Id. at 1382.  The Octane Fitness Court articulated a more flexible, totality of the circumstances inquiry.  It also replaced the "clear and convincing" evidence standard, with a "preponderance of the evidence" standard. Octane Fitness, 134 S. Ct. at 1758.

11

A49

In directing courts to consider the totality of the
circumstances, the Octane Fitness Court provided guidance as to
the factors to be applied.  The Court pointed to a similar fee
shifting provision of the Copyright Act, 17 U.S.C. § 505, and
explained that under that provision, courts consider a
"nonexclusive" list of factors, including "'frivolousness,
motivation, objective unreasonableness (both in the factual and
legal components of the case) and the need in particular
circumstances to advance considerations of compensation and
deterrence.'"  Id. at 1756 n.6 (quoting Fogerty v. Fantasy,
Inc., 510 U.S. 517, 534 n.19 (1994)).  This articulation of a
non-exclusive list of factors does not displace other factors
relevant to the inquiry, including "a determination of what pre-
filing preparation, if any, was done by" the plaintiff.
Superior Fireplace Co. v. Majestic Prods. Co., 270 F.3d 1358,
1378 (Fed. Cir. 2001).  If a court finds a case "exceptional,"
it has discretion whether to award attorneys' fees.  Octane
Fitness, 134 S. Ct. at 1756.

This case is "exceptional" under the totality of the
circumstances test articulated in Octane Fitness.  First,
Lumen's lawsuit against FTB was "frivolous" and "objectively
unreasonable."  "To be objectively baseless, the infringement
allegations must be such that no reasonable litigant could
reasonably expect success on the merits."  Dominant

A50

Semiconductors Sdn. Bhd. v. OSRAM GmbH, 524 F.3d 1254, 1260
(Fed. Cir. 2008) (citation omitted).  No reasonable litigant
could have expected success on the merits in Lumen's patent
infringement lawsuit against FTB because the '073 Patent claimed
a bilateral matchmaking process requiring multiple parties to
input preference information, while FTB's "AssistMe" feature
utilizes the preference data of only one party.  Lumen's own
claim construction brief construed the independent claim of the
'073 Patent as requiring two or more parties to input preference
data.  That submission urged the term "preference data" to be
construed "in conjunction with its plain and ordinary meaning."
And Lumen's Complaint alleged that FTB's infringement was
predicated on the alleged use of bilateral preference matching.
But FTB does not employ bilateral preference matching.

    And the most basic pre-suit investigation would have
revealed this fact.[2]  See Superior Fireplace Co., 270 F.3d at
1378.  FTB's website contains no opportunity for bilateral
preference matching or any suggestion that it is employed.  And
if there were any confusion on this score -- and Lumen has
provided no basis to find it was confused by the website --
Lumen was certainly on notice of this fact from the outset of

---

[2] Lumen claims to have conducted "weeks" of infringement analysis
with respect to the FTB website, but offers no facts to support
this conclusory claim.

A51

the litigation.  FTB's Seigle and O'Connor informed Lumen that
FTB's AssistMe feature did not use the bilateral or multilateral
preference matching process in a telephone conversation of June
19.  And FTB's attorney again informed Lumen by telephone and by
letter of June 26.  Yet Lumen proceeded with an obviously
baseless lawsuit, failing to point to any specific way in which
FTB infringed the patent.  "Where . . . the patentee is
manifestly unreasonable in assessing infringement, while
continuing to assert infringement in court, an inference is
proper of bad faith, whether grounded in or denominated wrongful
intent, recklessness, or gross negligence."  Eltech Sys., 903
F.2d at 811.

    The "motivation" prong of the Octane Fitness test counsels
as well in favor of a finding of an exceptional case.  Lumen's
motivation in this litigation was to extract a nuisance
settlement from FTB on the theory that FTB would rather pay an
unjustified license fee than bear the costs of the threatened
expensive litigation.  Lumen never sought to enjoin FTB from the
allegedly infringing conduct in its prayer for relief.  Lumen's
threats of "full-scale litigation," "protracted discovery," and
a settlement demand escalator should FTB file responsive papers,
were aimed at convincing FTB that a pay-off was the lesser
injustice.

14

A52

The "deterrence" prong of the Octane Fitness test also weighs in favor of an exceptional case finding.  The boilerplate nature of Lumen's complaint, the absence of any reasonable pre-suit investigation, and the number of substantially similar lawsuits filed within a short time frame, suggests that Lumen's instigation of baseless litigation is not isolated to this instance, but is instead part of a predatory strategy aimed at reaping financial advantage from the inability or unwillingness of defendants to engage in litigation against even frivolous patent lawsuits.  The need "to advance considerations of . . . deterrence" of this type of litigation behavior is evident. Octane Fitness, 134 S. Ct. at 1756 n.6 (quoting Fogerty, 510 U.S. at 534 n.19).[3]

Lumen contends that the abbreviated nature of this litigation provides an inadequate record to find that the case is exceptional.  Lumen points specifically to the lack of a claim construction opinion by the Court, and contends that there is not sufficient evidence to find that its infringement claim against FTB was unreasonable.  This argument is unavailing.

---

[3] FTB also contends that Lumen's "offensive litigation tactics" provide an additional reason to find that this is an exceptional case.  FTB points to Lumen's threat of prosecution of FTB for allegedly using the term "patent troll," Lumen's attempt to obtain a gag order, and Lumen's (or those people behind Lumen's) use of a number of shell entities to avoid complying with discovery requests.  Because this case is "exceptional" even absent these considerations, it is unnecessary to address their merits.

A53

There is no question that FTB does not employ the matching of
multiple parties' preference data.  And Lumen's own claim
construction brief construes the '073 Patent's independent claim
as requiring the input of multiple parties' preference data.
(Indeed, the '073 Patent is entitled "System and Method for
Facilitating Bilateral and Multilateral Decision-Making.").
Even under Lumen's proffered claim construction, no reasonable
litigant could have expected success on the merits.  The fact
that the Court adopted a schedule to reach the merits as
expeditiously as was reasonable and to avoid imposing additional
litigation costs on the parties does not counsel against a
finding that this is an exceptional case.

    Lumen also asserts that FTB's request for fees is
"ultimately based upon the Court's recent determination of
invalidity under Section 101 [of the '073 Patent]."  Lumen
contends that it was entitled to rely on a duly issued patent.
The invalidity of the '073 Patent plays no role in the reasoning
underlying this Opinion.  The question addressed here is whether
Lumen could properly assert infringement based on the '073
Patent.  As such, Lumen's objection is misplaced.

    Having found this case to be exceptional, this Court
exercises its discretion to award attorneys' fees and costs to
FTB.  The question of whether this cased is exceptional is not
close, and fee shifting in this case will "serve as an

A54

instrument of justice." <u>Superior Fireplace Co.</u>, 270 F.3d at 1378 (citation omitted).

CONCLUSION

    FTB's December 10, 2013 Motion for Declaration of Exceptional Case and Award of Fees and Nontaxable Expenses is granted.  An Order will follow with a schedule for briefing with respect to the amount of fees and expenses to be awarded.


    SO ORDERED:

Dated:   New York, New York
         May 30, 2014

_____
            DENISE COTE
    United States District Judge

17

A55

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
-                                      :
                                       :
Lumen View Technology, LLC,            :
                                       :     13cv3599 (DLC)
                    Plaintiff,         :
                                       :     OPINION & ORDER
          -v-                          :
                                       :
Findthebest.com, Inc.,                 :
                                       :
                    Defendant.         :
                                       :
---------------------------------------X
```

Appearances:

For Plaintiff:

Damian Wasserbauer
Aeton Law Partners LLP
101 Centerpoint Drive
Middletown, CT 06457

For Defendant:

Joseph S. Leventhal
The Leventhal Law Firm, APC
600 West Broadway, Suite 700
San Diego, CA 92101


DENISE COTE, District Judge:

Defendant Findthebest.com, Inc. ("FTB") seeks an award of attorneys' fees and costs from Lumen View Technology, LLC ("Lumen") on the ground that this case is exceptional under 35 U.S.C. § 285 ("Section 285"). For the following reasons, the defendant is awarded attorneys' fees and costs, as well as an enhancement.

**BACKGROUND**

FTB is a corporation that operates a website that matches users with goods or services according to criteria that the users enter, at times using FTB's proprietary "AssistMe" program.  Lumen is a patent-holding Non-Practicing Entity that acquires patents and instigates patent infringement lawsuits.  Lumen appears to be a shell company that is one of a number of related companies involved in litigating patent infringement suits.  This request for fees arises out of a lawsuit brought by Lumen against FTB alleging infringement of United States Patent No. 8,069,073 ("'073 Patent").

**I.    The '073 Patent Litigation**

The '073 Patent was issued on November 29, 2011, and is entitled a "System and Method For Facilitating Bilateral And Multilateral Decision-Making."  Essentially, the purported invention disclosed by the '073 Patent is a method of matchmaking whereby one or more parties on each side input attribute preferences and intensity of preference data and then a computer matches the parties on each side by a "closeness-of-fit" process and produces a list.

Lumen became the exclusive licensee of '073 Patent on March 1, 2012, which was approximately a week after Lumen was formed.  Lumen filed its complaint (the "Complaint") against FTB on May

2

29, 2013, alleging that FTB infringed the '073 Patent.  The
Complaint was one of at least twenty substantially similar
patent infringement complaints filed by Lumen against various
companies in 2012 and 2013.

On September 24, FTB moved for judgment on the pleadings on
the ground that the '073 Patent was invalid.  The motion was
fully submitted on October 18.  On November 22, this Court held
that the '073 Patent claimed an abstract idea, which was not
patentable under the codified Patent Act, 35 U.S.C. § 101.
Lumen View Tech. LLC v. Findthebest.com, Inc., 13cv3599 (DLC),
2013 WL 6164341, at *16 (S.D.N.Y. Nov. 22, 2013).  Lumen
appealed this decision to the Federal Circuit.  The Federal
Circuit stayed the case pending the Supreme Court decision in
Alice Corp. Pty. Ltd. v. CLS Bank Int'l, 134 S. Ct. 2347 (2014).
The Court issued its decision in Alice on July 19.  Lumen
voluntarily dismissed the appeal to the Federal Circuit on
September 12, 2014.

**II.  FTB's Motion for Attorneys' Fees**

FTB moved on December 10, 2013 for attorneys' fees on the
ground that this is an "exceptional case" under Section 285.
The motion was fully submitted on January 17, 2014.  On April
29, the Supreme Court issued its decision in Octane Fitness, LLC
v. ICON Health & Fitness, Inc., 134 S. Ct. 1749 (2014), which
addressed the definition of an "exceptional" case under Section

3

A58

285.  This Court gave the parties an opportunity to make
supplemental submissions regarding the significance of the
Octane Fitness decision for this motion.  The parties filed
those submissions on May 16.  On May 30, FTB's motion seeking a
declaration that this is an exceptional case was granted.  Lumen
View Tech. LLC v. Findthebest.com, Inc., 13cv3599 (DLC), 2014 WL
2440867, at *6 (S.D.N.Y. May 30, 2014) ("May 30 Opinion").  The
May 30 Opinion is incorporated by reference and familiarity with
that decision is assumed.

   FTB made a submission as to the amount of attorneys' fees
and costs on July 18, 2014, and asserted that an enhancement of
the award would be appropriate in this case.  FTB requested an
award of $141,719.50 to reflect its' attorneys' fees and also
$4,184.76 in costs.  FTB also requested interest on its fees and
costs from the date of the May 30 Opinion granting attorneys'
fees, and an enhancement.  FTB did not specify the amount of
enhancement it sought.  Lumen responded to FTB's submission on
August 1, requesting a reduction on a number of grounds.  Lumen
does not, however, challenge the reasonableness of the rates
charged by FTB's attorneys and staff, nor does it contend that
FTB's attorneys overstaffed the matter.  FTB responded on August
8, and revised its fee request to exclude four entries.  Its
request for attorneys' fees and costs was $144,307.00 and
$4,823.51.  FTB revised its fee request again on September 16

4

following Lumen's withdrawal of the appeal to the Federal
Circuit.  Its final request is $149,979.50 in fees and $4,899.63
in costs, plus interest and an enhancement.

**III. FTB'S RICO Complaint**

There is related litigation between FTB and Lumen.  On
September 16, 2013, FTB filed a complaint against Lumen alleging
violations of the federal Racketeering Influenced and Corrupt
Organizations Act ("RICO").  FTB's counsel began its work on the
RICO claim on August 1, 2013.  FTB filed an amended complaint on
November 22.  Lumen filed a motion to dismiss on December 23.
Lumen's December 23 motion to dismiss was granted on May 19,
2014.  Findthebest.com, Inc. v. Lumen View Tech. LLC, 13cv6521
(DLC), 2014 WL 2050610 (S.D.N.Y. May 19, 2014).  Both Lumen and
FTB agree that the fees and costs associated with this related
litigation may not be recovered here.


DISCUSSION

Section 285 of the Patent Act provides that "[t]he court in
exceptional cases may award reasonable attorneys' fees to the
prevailing party."  35 U.S.C. § 285.  Having already determined
that this case is "exceptional" under the Patent Act and thus
eligible for fee-shifting, the sole remaining issue is the
determination of the amount.

A60

The starting point in determining an attorneys' fees award
is calculating the "lodestar" number, which is "the number of
hours reasonably expended on the litigation multiplied by a
reasonable hourly rate." Healey v. Leavitt, 485 F.3d 63, 71 (2d
Cir. 2007) (citation omitted); see Bywaters v. United States,
670 F.3d 1221, 1228-29 (Fed. Cir. 2012).[1]  In determining what
constitutes a reasonable hourly rate, courts look first to the
rates commonly charged by attorneys for similar work in the
district in which the court sits.  See, e.g., Simmons v. New
York City Transit Auth., 575 F.3d 170, 174 (2d Cir. 2009);
Bywaters, 670 F.3d at 1228.  The calculation of attorneys' fees
rests in the sound discretion of the district court.  Takeda
Chem. Indus., Ltd. v. Mylan, 549 F.3d 1381, 1390-91 (Fed. Cir.
2008).

"[T]he fee applicant bears the burden of establishing
entitlement to an award and documenting the appropriate hours
expended and hourly rates." Hensley v. Eckerhart, 461 U.S. 424,
437 (1983).  To aid in calculating the lodestar, the prevailing
party must provide contemporaneous time records, affidavits, and
other materials to support its application for the amount of

---

[1] Federal Circuit law parallels Second Circuit law regarding the
calculation of attorneys' fees.  "[T]he Supreme Court has
advised that all federal fee-shifting statutes calling for an
award of 'reasonable' attorney's fee should be construed
'uniformly.'"  Bywaters, 670 F.3d at 1228 (citing City of
Burlington v. Dague, 505 U.S. 557, 562 (1992)).

A61

reasonable hours expended.  McDonald v. Pension Plan of the
NYSA-ILA Pension Trust Fund, 450 F.3d 91, 96 (2d Cir. 2006).
"Where the documentation of hours is inadequate, the district
court may reduce the award accordingly."  Hensley, 461 U.S. at
433.

Fee requests should be reduced to exclude hours that are
not "reasonably expended," such as those that are excessive or
redundant.  Id. at 434 (citation omitted).  An across-the-board
percentage cut in hours can be employed when a fee reduction is
appropriate, but fee petitions are voluminous and item-by-item
review is impracticable.  In re Agent Orange Prod. Liab. Litig.,
818 F.2d 226, 237 (2d Cir. 1987) (common fund case).

In response to this motion, Lumen opposes the amount of the
FTB fee request.  Lumen has not provided a specific alternative
calculation, but requests three blanket reductions and opposes
any enhancement.  Lumen has not taken a position on the
appropriateness of an award of costs and interest.  Lumen's
arguments are addressed in turn.

**1. Unnecessary or Unrelated Work**

Lumen requests a blanket reduction of fifty percent from
the amount of the fee request on the ground that FTB cannot
recover attorneys' fees expended in pursuit of unrelated,
unsuccessful RICO litigation.  No blanket reduction is warranted
here.

FTB does not dispute that the hours spent in pursuit of the RICO lawsuit should be excluded from the lodestar, and contends that it has done so.[2]  It has also excluded time records that describe both the RICO and patent litigation, resulting in the exclusion of over 370 hours of attorney and paralegal time. Having reviewed FTB's time records, with a single exception, FTB has succeeded in excising from its claim time spent on the RICO litigation.[3]  The entry for 9/10/2013 (CJ) will also be excluded on the ground that it appears related to work on the RICO suit. The exclusion of this additional item reduces the lodestar fee award by $1,387.50 to $148,592.00.

Lumen also requests a seventy-five percent reduction of fees accumulated prior to October 16, 2013, as fees accumulated prior to this point were in conjunction with a joint defense agreement between FTB and three other defendants sued by Lumen

---

[2] In its revised fee request of August 8, FTB identified four additional entries to be excluded from its time records.

[3] Lumen contends that generic statements like "case strategy" contained in many of FTB's entries could refer to either the patent or the RICO litigation.  Lumen has failed, however, to identify any specific entries that should be excluded on this ground.  Furthermore, the context of entries containing potentially ambiguous statements reveals that the entries were for the patent litigation.  Virtually all of such statements are made in the context of a larger time entry that makes it clear that the hours being billed relate to the patent litigation. Other factors, like the attorney who billed the hours and the date of the entry, also provide clarity to potentially ambiguous statements.  Based on a careful review of FTB's time records with care, all hours used to calculate the lodestar here relate to the patent litigation.

for infringement of the '073 Patent.  Since all four clients
were separately billed, and any overlapping work was divided
among the clients, no reduction on this ground is warranted.

Finally, in a two-sentence argument, Lumen also requests a
reduction because FTB opposed its motion to extend the claim
construction briefing schedule.  No reduction is warranted for
this reason either.  Lumen's motion to extend the claim
construction briefing schedule was denied on September 25, 2013.
FTB's refusal to consent to Lumen's motion to extend was not
unreasonable and it did not result in hours being billed that
were excessive or redundant.

2.  **Enhancement of the Lodestar**

While there is a "strong presumption" that the lodestar is
reasonable, "that presumption may be overcome in those rare
circumstances in which the lodestar does not adequately take
into account a factor that may properly be considered in
determining a reasonable fee."  Perdue v. Kenny A. ex rel. Winn,
559 U.S. 542, 554 (2010); see Bywaters, 670 F. 3d at 1229.  A
district court must provide "a reasonably specific explanation"
for any enhancement of a fee award.  Perdue, 559 U.S. at 558.

In determining what is a "reasonable" award, "[a]lthough
the amount the client paid the attorney is one factor for the
court to consider in determining a reasonable fee, it does not
establish an absolute ceiling."  Junker v. Eddings, 396 F.3d

A64

1359, 1365 (Fed. Cir. 2005).[4]  The nonexclusive list of factors
that a court may consider in awarding attorneys' fees in a
patent case includes "frivolousness, motivation, objective
unreasonableness (both in the factual and legal components of
the case) and the need in particular circumstances to advance
considerations of compensation and deterrence."  Octane Fitness,
134 S. Ct. at 1756 n.6 (citation omitted).

Section 285 does not permit fee-shifting as a matter of
course, but only in "exceptional" cases.  While the primary goal
of Section 285 is to compensate parties who have been forced to
defend against frivolous and unwarranted suits, it also serves
as a deterrent against such litigation.  See id.; Mathis v.
Spears, 857 F.2d 749, 754 (Fed. Cir. 1988).  The instigation of
a lawsuit brought in bad faith against a defendant causes a
severe injury to the defendant that cannot fully be compensated.
Mathis, 857 F.2d at 754.  In rare cases, the lodestar will be
insufficient to deter baseless litigation.  While Section 285 is
not intended to punish a plaintiff for bringing a suit, even a
baseless one, Rohm & Haas Co. v. Crystal Chem. Co., 736 F.2d
688, 691-92 (Fed. Cir. 1984), it is intended to deter such
litigation.  Where the lodestar is extremely low, an award
greater than the lodestar may more easily be justified.

---

[4] The Court is not aware of any Federal Circuit decision
affirming or denying an enhancement of the award of attorneys'
fees under Section 285.

Several of the Octane Fitness factors that this Court
considered in finding that an award of fees was appropriate
similarly support an enhancement of the lodestar fee.  They
include the need to deter the plaintiff's predatory strategy,
the plaintiff's desire to extract a nuisance settlement, the
plaintiff's threats to make the litigation expensive, and the
frivolous nature of the plaintiff's claims.  As noted in the May
30 Opinion, "[n]o reasonable litigant could have expected
success on the merits . . . .  [T]he most basic pre-suit
investigation would have revealed this fact." Lumen View Tech.,
2014 WL 2440867, at *6.  Not only that, FTB's attorneys informed
Lumen of the baselessness of the suit from the onset of
litigation and repeatedly sought clarification as to the nature
of the alleged infringement.  Lumen also sought a gag order to
keep revelations about its abusive behavior out of the public
record.  Id. at *4.  In filing this lawsuit, Lumen was motivated
not by a desire to protect its rights, but by its plan "to
extract a nuisance settlement from FTB on the theory that FTB
would rather pay an unjustified license fee than bear the costs
of the threatened expensive litigation." Id. at 6.  Lumen
threatened FTB with "full-scale litigation," "protracted
discovery," and a settlement demand escalator should FTB file
papers responsive to the complaint.  Id.  The nature of Lumen's
complaint, the absence of any reasonable pre-suit investigation,

and the number of similar lawsuits filed within a short time frame all indicate that "Lumen's instigation of baseless litigation is not isolated to this instance, but is instead part of a predatory strategy aimed at reaping financial advantage from the inability or unwillingness of defendants to engage in litigation against even frivolous patent lawsuits." Id. at *7.

This litigation was resolved on the merits because this defendant has the financial ability to resist the plaintiff's pressure and because it chose to fund a defense in court rather than pay an unwarranted, less expensive licensing fee.  It appears that none of the other defendants sued by Lumen made that choice.  As a result, but for FTB's financial resources and resolve, Lumen's predatory behavior would likely have proceeded unchecked.  Any award in this action must be substantial enough to deter Lumen from pursuing baseless claims in the manner Lumen used in this case.  An enhancement in this case is not punitive in nature.  While Lumen engaged in bad faith and meritless litigation, the purpose of any enhancement in the lodestar is to deter similar misconduct in the future by Lumen.

One reason that an award limited to the lodestar amount would fail to provide sufficient deterrence is that the lodestar in this case is extremely low.  This is the result of a schedule adopted in this case that permitted the Court to reach the

merits as expeditiously as possible.  Lumen View Tech., 2014 WL
2440867, at *7.

At the initial pre-trial conference, Lumen represented that
everyone it had sued to date had settled with it, some through
the execution of a "reasonably priced" license, that there had
been no court ruling on the validity of its patent, and that it
intended to file more lawsuits making claims that others had
infringed the '073 Patent.  FTB requested a schedule that would
permit a prompt motion on the validity of the '073 Patent; Lumen
opposed that proposal and requested an aggressive discovery
schedule.  Lumen's proposed schedule was rejected, and a
discovery schedule that would permit resolution of the validity
issue prior to most fact and expert discovery was adopted.  A
lodestar amount significantly greater than that incurred here
would have been reasonable and would have been incurred but for
the prompt resolution of the motion addressed to the validity of
the '073 Patent.

Relying on Perdue, Lumen contends that a district court may
not enhance the lodestar.  But, Perdue itself rejected the
contention that "a fee determined by the lodestar method may not
be enhanced in any situation."  Perdue, 559 U.S. at 553.
Moreover, Perdue addressed a fee award under 42 U.S.C. § 1988 in
a civil rights case.  The Supreme Court noted that, under many
fee-shifting statutes, attorneys' fee awards are paid by state

13

A68

and local taxpayers and thus should generally be limited to the
lodestar amount.  Id. at 1677.  This concern does not apply in
the patent context, where the fees will be borne by private
parties.  See In re Mkt. Ctr. E. Retail Prop., Inc., 730 F.3d
1239, 1247 (10th Cir. 2013) (rejecting application of Perdue to
the bankruptcy context as the underlying policy reasons are
different).  Attorneys' fees under Section 285 serve primarily
to deter bad faith litigation and compensate parties for the
cost of defending against such a suit.  Octane Fitness, 134 S.
Ct. at 1756 n.6; Mathis, 857 F.2d at 754.  Without an
enhancement, the relatively low lodestar amount in this case
would be insufficient to deter similar misconduct in the future.

   Given the policy justifications under Section 285 and the
need to deter similar conduct in the future, the award of
attorneys' fees in this case will be enhanced by a multiplier of
two.  Thus, FTB is awarded $148,592.00 in attorneys' fees
enhanced by a multiplier of two for a total of $297,184.00.


### CONCLUSION

   Defendant is awarded $297,184.00 in attorneys' fees and
$4,899.63 in costs, for a total of $302,083.63.  Interest is

14

A69

awarded from May 30, 2014 at a rate of 9%.


Dated:     New York, New York
           October 23, 2014


                                    _____
                                              DENISE COTE
                              United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LUMEN VIEW TECHNOLOGY LLC,

        Plaintiff,

v.

FINDTHEBEST.COM, INC.,

        Defendant.

No. 13 CV 3599

ECF CASE

12/8/2014

## ~~PROPOSED~~ JUDGMENT

Whereas on December 10, 2013, defendant Findthebest, Inc. ("FTB"), having moved for an order declaring this case to be exceptional and for an award of attorneys' fees and costs pursuant to 35 U.S.C. § 285 on the ground that plaintiff Lumen View Technology, LLC ("Lumen View") pursued objectively baseless claims against FTB and engaged litigation misconduct, and the matter having come before the Honorable Denise L. Cote, United States District Judge, and the Court thereafter, on May 30, 2014 having rendered its Opinion and Order that this case is exceptional under 35 U.S.C. § 285 and on October 23, 2014 having rendered its Opinion and Order that FTB is entitled to an award of $297,184.00 in attorneys' fees and $4,899.63 in costs, for a total of $302,083.63 plus interest from May 30, 2014 at a rate of 9%, it is,

**ORDERED, ADJUDGED, AND DECREED:** That for the reasons set forth in the Court's Opinion and Order dated May 30, 2014 and the Court's Opinion and Order dated October 23, 2014, that this case is exceptional under 35 U.S.C. § 285 and that FTB is awarded

1.

A71

$302,083.63 in attorneys' fees and costs plus interest from May 30, 2014 at a rate of 9%; FTB's

December 10, 2013 motion for an order declaring this case to be exceptional and for an award of

attorneys' fees and costs pursuant to 35 U.S.C. § 285 is granted; and judgment is hereby entered

for the defendant; accordingly, the case is closed.

Dated:    New York, New York

_December 5_, 2014

_____
DENISE COTE
United States District Judge

2.

US008069073B2

(12) **United States Patent**
Shapiro et al.

(10) **Patent No.:** US 8,069,073 B2
(45) **Date of Patent:** *Nov. 29, 2011

(54) **SYSTEM AND METHOD FOR FACILITATING BILATERAL AND MULTILATERAL DECISION-MAKING**

(75) Inventors: **Eileen C. Shapiro**, Cambridge, MA (US); **Steven J. Mintz**, Saddle River, NJ (US)

(73) Assignee: **Dalton Sentry, LLC**, Wilmington, DE (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/754,291**

(22) Filed: **Apr. 5, 2010**

(65) **Prior Publication Data**

US 2010/0191664 A1    Jul. 29, 2010

**Related U.S. Application Data**

(63) Continuation of application No. 11/711,249, filed on Feb. 27, 2007, now Pat. No. 7,725,347, which is a continuation of application No. 11/171,082, filed on Jun. 29, 2005, now Pat. No. 7,184,968, which is a continuation of application No. 09/538,556, filed on Mar. 29, 2000, now Pat. No. 6,915,269.

(60) Provisional application No. 60/173,259, filed on Dec. 23, 1999.

(51) Int. Cl.
*G06Q 10/00* (2006.01)
(52) U.S. Cl. ........................ **705/7.14**; 705/327; 705/321
(58) Field of Classification Search ................ 705/7.14, 705/327, 321
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,258,351 A  *  3/1981  Shigeta et al. ................. 340/942
6,711,522 B2 *  3/2004  Shirai et al. ................... 702/179

OTHER PUBLICATIONS

Gilbert, "The Myth of Fingerprints", *Stumbling on Happiness*, pp. 245-257 (2006).
Lehrer, "Choking on Thought", *How We Decide*, pp. 133-166 (2009).

* cited by examiner

*Primary Examiner* — Johnna Loftis
(74) *Attorney, Agent, or Firm* — Sunstein Kann Murphy & Timbers LLP

(57) **ABSTRACT**

Techniques for facilitating evaluation, in connection with the procurement or delivery of products or services, in a context of at least one of (i) a financial transaction and (ii) operation of an enterprise, are disclosed. The techniques involve retrieving party and counterparty preference data from digital storage media; performing multilateral analyses of the combined preference data by computing a closeness-of-fit value; and delivering a list matching the at least one party and the at least one counterparty using the computed closeness-of-fit values.

**9 Claims, 11 Drawing Sheets**



Obtain from each party in a first class responses to a first set of questions, and store
11
Obtain from each counterparty in a second class responses to a second set of questions, and store
12
Derive a first preference profile for each of parties
13
Derive a second preference profile for each of counterparties
14
Analyze preference profiles, to derive a list, for each party, of counterparties providing a relatively close fit of preferences
15
Communicate list of closely fitting counterparties to each party
16

*FIG. 1*

Q1
Q2
QN
Orthogonal Array of Questions
201
R1
R2
RN
Rankings
202
U1(a1)
U2(a2)
Um(am)
Utility Functions
203
Choice of method (for alternate described embodiments)
V1
V2
Vm
Value Vector
204
U1(V1)
U2(V2)
Um(Vm)
Evaluate Party's Utility Function at each Counterparty's Utility-maximizing Values
205
Calculate Aggregate Values for each Party / Counterparty Pair
206
Calculate Proximity Values for Utility Functions of each Party / Counterparty Pair
207
List of Closest Fits of Preferences
208

*FIG. 2*



**FIG. 3**



*FIG. 4*

A97

**U.S. Patent**     Nov. 29, 2011     Sheet 5 of 11     US 8,069,073 B2



FIG. 5

Case 1:13-cv-03599-DLC   Document 29-1   Filed 10/14/13   Page 8 of 23



*FIG. 6*

Case 1:13-cv-03599-DLC   Document 29-1   Filed 10/14/13   Page 9 of 23



*FIG. 7*

Applicant
overall team performance
lower base pay with high options
unclear and unbounded roles
maximize financial returns exclusively
fix problems quickly
recognition based on power
amorphous structure for getting resources
incomplete control over significant resources
long work week
socializing expected in off hours
deal with external customers
frequent overnight travel
0 2 4 6 8 10 12 14 16 18 20
Company
unclear and unbounded roles
lower base pay with high options
overall team performance
fix problems quickly
maximize financial returns exclusively
recognition based on power
amorphous structure for getting resources
long work week
incomplete control over significant resources
socializing expected in off hours
deal with external customers
frequent overnight travel
0 2 4 6 8 10 12 14 16 18 20

*FIG. 8*



*FIG. 9*

**U.S. Patent**      Nov. 29, 2011      Sheet 10 of 11      US 8,069,073 B2



**FIG. 10**



*FIG. 11*

A104

US 8,069,073 B2

**1**

# SYSTEM AND METHOD FOR FACILITATING BILATERAL AND MULTILATERAL DECISION-MAKING

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of our application Ser. No. 11/711,249, filed Feb. 27, 2007, which is a continuation of our application Ser. No. 11/171,082, filed Jun. 29, 2005 (U.S. Pat. No. 7,184,968), which is a continuation of our application Ser. No. 09/538,556, filed Mar. 29, 2000 (U.S. Pat. No. 6,915,269), which claims the benefit of our provisional application Ser. No. 60/173,259, filed Dec. 23, 1999; these related applications are hereby incorporated herein by reference.

## TECHNICAL FIELD

The present invention relates to bilateral and multilateral evaluation methods and systems.

## BACKGROUND

Consumers constantly decide which products and services best satisfy their needs and desires. Producers correspondingly decide how best to configure their products and services, from amongst a wide array of choices. They must not only choose a suitable price, but also must decide which combination of other attributes of their products and services will best satisfy consumers.

In order to facilitate these decisions, there have therefore arisen a variety of marketing research techniques. Among these are forced trade-off or forced choice methodologies, including conjoint analysis. Through statistical methods, these techniques allow prediction of which attributes of products and services are relatively more and less valuable to a given group of constituents.

Based on these conventional techniques, producers of goods and services are able to model buyers' or users' preferences, thereby facilitating design or selection of products and processes that best satisfy those preferences. For purposes on two sides of a transaction (a producer and a group of consumers, for example), conventional techniques permit persons on one side of the transaction to model the preferences of a group of constituents on the other side of the transaction. Conventional techniques may therefore be called unilateral, or one-sided, evaluation techniques.

## SUMMARY OF THE INVENTION

In accordance with one aspect of the invention there is provided a method for facilitating evaluation, in connection with the procurement or delivery of products or services, in a context of at least one of (i) a financial transaction and (ii) operation of an enterprise, such context involving a member of a first class of parties in a first role and a member of a second class of counterparties in a second role. The method involves supplying to at least one of the parties a series of forced choice questions so as to elicit party responses; supplying to at least one of the counterparties a series of forced choice questions so as to elicit counterpart responses; and delivering a list matching the at least one party and the at least one counterparty according to analysis of preference profiles determined using conjoint analysis of the party responses and the counterparty responses.

In alternative embodiments, the list may be ranked according to closeness of fit.

In alternative embodiments, the method may further involve supplying to at least one party or counterparty co-evaluator a series of forced choice questions so as to elicit co-evaluator responses, wherein the list matches the at least one party and the at least one counterparty according to analysis of preference profiles determined using such co-evaluator responses.

In alternative embodiments, the party responses may reveal, with respect to each level of each of a first series of attributes, a utility value which indicates the value that the party places on the level of the attribute. Such party responses may reveal the utility values without the utility values being provided explicitly. Additionally, the counterparty responses may reveal, with respect to each level of each of a second series of attributes that complements the first series of attributes, a utility value which indicates the value that the counterparty places on the level of the attribute. Such counterparty responses may reveal the utility values without the utility values being provided explicitly.

In alternative embodiments, the series of forced choice questions and/or the list may be obtained from a remote server over a communication network. The series of forced choice questions may be supplied by making available a set of web pages providing a set of questions and permitting entry of responses thereto. The party responses and the counterparty responses may be provided to a remote server over a communication network.

## BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing features of the invention will be more readily understood by reference to the following detailed description, taken with reference to the accompanying drawings, in which:

FIG. **1** shows a block diagram of an embodiment of a method in accordance with the present invention for facilitating bilateral and multilateral decision-making;

FIG. **2** shows a block diagram of a further embodiment of a method in accordance with the present invention in which conjoint analysis is employed;

FIG. **3** shows a block diagram of an embodiment of a system in accordance with the present invention;

FIGS. **4** and **5** illustrate the logical flow of a method according to an embodiment of the invention, that may be implemented using a web server on the Internet;

FIGS. **6** and **7** are histogram representations of a preference profile of a party who is a job applicant and of a counterparty employer in accordance with an embodiment of the invention;

FIG. **8** presents a side-by-side comparison of the preference profiles of FIGS. **6** and **7**; and

FIGS. **9**, **10**, and **11** are screenshots demonstrating hierarchically structured questions organized into three stages in accordance with an embodiment of the invention.

## DETAILED DESCRIPTION OF SPECIFIC EMBODIMENTS

By contrast with conventional methods, embodiments of the present invention enable a bilateral evaluation of preferences: a decision is recommended based on its providing a relatively close fit between the preferences of each potential pairing of party and counterparty to a potential transaction, when compared with other possible pairs of parties to the potential transaction. Indeed, embodiments of the present

US 8,069,073 B2

3

invention may likewise be employed when information about preferences is provided not just by two parties to the transaction (a party and a counterparty), but also by at least one co-evaluator, who provides a useful perspective on the preferences of a party or a counterparty. In this case, the evaluation is multilateral rather than bilateral.

In various embodiments of the present invention, there can be employed questions that require a forced choice to reveal preferences of the respondent. The benefit of the forced choice approach is that it helps to uncover underlying preferences that are hidden and sometimes not consciously evident even to the respondent.

In this connection embodiments of the invention may employ conjoint analysis. See for example, Cattin, P. and R. R. Wittink, "Commercial Use of Conjoint Analysis: A Survey", 45 *Journal of Marketing* 44-53 (No. 3, Summer, 1982), and "Commercial Use of Conjoint Analysis: An Update", 53 *Journal of Marketing* 91-96 (July, 1982); Green, P. E. and Y. Wind, "New Way to Measure Consumers' Judgments," *Harvard Business Review*, July 1975 ("Green and Wind"); see also the references identified in the extensive bibliography of Patrick Bohl: *Conjoint Literature Database CLD*, University of Mainz, Germany, 1997. The foregoing articles and references are hereby incorporated herein by reference.

As used in this description and the accompanying claims, the following terms shall have the meanings indicated, unless the context otherwise requires:

The term "party" includes a natural person or an entity, wherein an entity may be any association, organization, or governmental agency. A "counterparty" is similarly any other natural person or an entity.

A "financial transaction" is a transaction in which services or products are being procured or delivered under circumstances involving an expectation that they will be paid for. Thus "financial transactions" include enrollment at a college or university or a private school (wherein educational services are rendered for tuition), employment by an entity (wherein an employee's services are rendered for payment by the employer), engagement of a physician or health maintenance organization (wherein health care services are provided for compensation), choosing a retirement community, investing in a mutual fund, taking a vacation, or in executing a merger or joint venture or acquisition. The terms "services" and "products" include the singular as well as the plural.

An "enterprise" is a business organization (regardless of form), a government agency or organ, or a non-profit-organization (including a religious, scientific, or charitable organization).

"Attributes" of a product or service include characteristics, features, and benefits of the product or service. Hence (as an example) if the service is college education, attributes may include the size of the school, the prestige of the school, and the degree of structure of the school's educational program.

A "level" of an attribute is a value associated with the attribute that pertains to a characteristic, feature or benefit of a product or service. The value may, but need not, be quantitative; the value may be categorical. Hence if the service is college education, the level of the attribute "school size" may be quantitative, as for example, "9378 students"; or may be categorical, as for example, "between 5,000 and 10,000." Attribute levels may be categorized even when more abstract attributes are involved. For example, if the attribute is prestige, a level may be "widely viewed as highly prestigious"; if the attribute is degree of structure in the education program, a level may be "low degree of structure".

FIG. 1 is a block diagram of an embodiment of a method in accordance with the present invention for facilitating bilateral

4

and multilateral decision-making. In this embodiment, six activities are involved. As shown in item 11, first there is obtained from each party in a first class responses to a first set of questions, and the responses are stored in a suitable digital storage medium. Also, in item 12, there is obtained from each counterparty in a second class responses to a second set of questions, and the responses are stored in a suitable digital storage medium. (We discuss the nature of suitable questions in connection with later figures.) (Note items 11 and 12 need not be contemporaneous and need not be sequenced in any order.) In item 13, a first preference profile is generated for each party, based on the party's responses to the first set of questions; and, similarly, a second preference profile is generated, in item 14, for each counterparty, based on the counterparty's responses to the second set of questions. The questions and the resulting profiles may be developed using any of a wide range of approaches. In some embodiments, as described below, there may be employed conjoint analysis or other forced-choice methodologies. It is within the scope of the invention to utilize a first methodology in connection with the first set of questions and a second methodology in connection with the second set of questions. Once these preference profiles have been generated, the method next analyzes, for each party in the first class, the preference profiles of counterparties in the second class, and derives a ranked list of counterparties that provide the closest fit of preferences with that party, as compared with the fit of all counterparties in the second class (item 15). Finally, in item 16, the list of closest fitting counterparties for each party is communicated to that party. (Similarly for each counterparty, the method derives a ranked list of parties that provide the closest fit of preferences with that counterparty, as compared with the fit of all parties in the first class; and the list of closest fitting parties for each counterparty is communicated to that counterparty.) By providing such a list in each case, based on a bilateral or multilateral preference analysis, the method facilitates parties and counterparties in making decisions that are based on the closeness of the fit between their preferences.

FIG. 2 shows one embodiment of a method according to the invention, in which, first, preference profiles for parties and counterparties are generated using conjoint analysis techniques. Conventional conjoint analysis techniques, used in a unilateral fashion, are described in the references described above near the beginning of this section of the description.

Once preference profiles have been generated according to the embodiment of FIG. 2, they are then used to recommend to each party a set of counterparties who provide the closest fit of preferences amongst the counterparties considered. Since the embodiment uses a preference profile for both parties and counterparties to evaluate the closeness of fit of preferences, it is a bilateral preference analysis method as opposed to the unilateral methods of the prior art.

We now consider the embodiment of FIG. 2 in further detail. First, in the embodiment of FIG. 2, a set of questions 201 is posed to each party and counterparty. The questions are designed to reveal the utility value that each respondent places on the possible levels of a set of attributes $\{a_1, a_2, \ldots a_m\}$ related to the proposed transaction.

Bilateral preference methodologies according to the embodiment of FIG. 2 are useful in, but are not limited to, three exemplary contexts.

In the first exemplary context, an individual party wishes to enter a transaction with an organization counterparty. In the transaction, the party seeks to identify an organization with respect to which the preferences of such party are a good fit relative to the alternatives. The organization counterparty, on the other hand, seeks to give entry to parties who will be

US 8,069,073 B2

5

successful within the organization. Examples of the first exemplary context include a student (as the individual party) choosing colleges to attend (the organization counterparty), and an employee (the individual party) choosing a corporate employer (the organization counterparty).

In the first exemplary context, the questions asked of the party are designed to reveal the utility values that the party places on possible levels of a set of attributes related to the environment within the counterparty organization. The preference profile created by the party's answers can thus be called a "value profile" in this context. By contrast, the questions asked of each potential counterparty organization are designed to reveal the preference profile that the counterparty considers necessary for a party to be successful within its organization. The preference profile created by the counterparty's answers in this context can thus be called a "success profile". In the first exemplary context, a decision is recommended to the party based on a relatively close fit between the party's value profile and the counterparty's success profile.

Note that questions for a counterparty organization in the first exemplary context are not necessarily directed to revealing profiles of successful individuals within its organization in the past. The questions may instead elicit the value profiles of individuals that the counterparty believes will be successful within its organization in the future.

In a second exemplary context, both the party and the counterparties to a potential transaction are organizations. In the transaction, the party and counterparty seek to join together to form one organization. An example of such a context is a corporate merger or acquisition. In the second exemplary context, the questions asked of both the party and potential counterparties are designed to reveal the value profile that each respondent considers necessary for success within its organization. Thus, in the second exemplary context, a decision is recommended based on a relatively close fit between the success profiles of the party and counterparty. In a merger example, such a recommended decision maximizes "culture fit" between merging companies.

Finally, in a third exemplary context, both the party and the counterparties to a potential transaction are individuals. In the transaction, the party and counterparty seek to enter a financial relationship. For example, an individual party may seek a counterparty partner for a joint venture. In this third context, the questions asked of the party and each potential counterparty are designed to reveal the utility value that each respondent places on possible levels of a set of attributes related to the proposed relationship. A decision is then recommended based on a relatively close fit between the resulting value profiles of the party and a counterparty.

For convenience in this section of the description, we refer predominantly to a "potential transaction". However, embodiments of the present invention may also be used in dealing with operation of an enterprise. In such a case, the party and the counterparty may (but need not) be different constituents of the same enterprise and the issues of fit between the constituents may involve, for example, addressing organizational inefficiencies in the workplace and a wide variety of other activities. In one example, the party and counterparty may be management and labor, and the issue of fit may involve a company policy to deal with staggered work hours. Alternatively, the party and counterparty may be a managers of two different divisions of a company having competing claims on a common resource to them, such as marketing. Or, as yet another example, the enterprise may be city government, the party may be the police force, the counterparty may be the mayor, and the issues of fit may be related to employee benefits, including terms of a health insurance, to

6

cover the police force. In any case, the technical approach for embodiments of this type is similar to that described below with respect to a potential transaction between party and counterparty.

A common feature of questions used in each of the exemplary contexts is that the attributes are chosen so that those of the parties "mirror", or otherwise complement, those of the counterparties. For example, for a party who is a college applicant deciding which college to attend, the attributes may include: population of the locality in which the school is located, degree of structure of the learning environment, and average class size. The counterparties for this transaction may be college admissions personnel, and their "mirror" attributes in helping students to decide whether this school would provide a close fit of preferences may be: "students who do well here prefer being in a locality with what population"; "students who do well here prefer attending a school with what degree of structure of the learning environment"; and "students who do well here prefer having classes of what average class size."

An example of questions according to one embodiment of the invention is provided in Table 1 for college applicants and for colleges seeking applicants. Table 2 provides a similar set of questions for mutual fund purchasers and mutual funds seeking investors. Table 3 provides a set of questions for job seekers and employers seeking job candidates.

In process **201** of the embodiment of FIG. **2**, each respondent is posed N questions $\{Q_1, Q_2, \ldots Q_N\}$. As described above, questions for counterparties typically mirror the questions for parties. These questions may be fashioned in a wide variety of forms. In one form of questioning, each respondent is provided a series of individual multi-attribute descriptions and asked to rate each of these descriptions. In another form of questioning, each respondent is provided with a series of pairs of multi-attribute alternative descriptions, and is asked, for each pair, to select a desired one of the alternatives. In yet another form of questioning, each respondent may be asked to select from among two or more alternative multi-attribute descriptions.

Proper design of the questions permits statistical evaluation of the responses, from which may be derived utility values for each respondent. For example, the college applicant may be asked to rate a selection of potential colleges from 1 to 10, with 10 being most favorable; each college may be characterized by a level for each of a series of attributes. For example, in the case of attributes such as population of locality, degree of structure of the learning environment, and class size, one of the colleges to be ranked may be characterized by levels as follows: in a locality with population 100, 000, unstructured learning environment, and small class size.

In general, each attribute $\{a_i\}$ will have possible attribute levels which characterize it—in the example, there may be possible college locations with populations between 15,000 and 100,000; two options for learning environment (structured or unstructured); three class sizes (small, medium, and large), and so on. Note that the attribute levels need not be numbers, but may also be yes/no choices, or choices of items from a list of categories. Furthermore, note that attributes, and levels of the attribute, may also be directed to "soft" characteristics related to a transaction; that is, characteristics which are more emotional in nature and less quantifiable. For example, in an employment setting, a relevant attribute could be the degree of expected after-work socializing with fellow employees, and the levels of the attribute could be "rare," "moderate," and "frequent."

The questions $\{Q_i\}$ need not, however, ask each respondent to evaluate a list of all possible combinations of attribute

US 8,069,073 B2

7 8

levels. Rather, the set of questions actually posed to the respondents are selected to achieve a balance across independent contributions of each attribute (or, alternatively, such that every point in the space of possible attribute level combinations may be represented as a linear combination of the chosen combinations). In other words, the questions may be designed so that responses to them can be analyzed in terms of attributes that, in mathematical terms, are orthogonal to one another or nearly so.

In order to increase efficiency of the process of obtaining information from respondent or, to enhance the collection of information that is most pertinent, questions may be structured hierarchically. In this way, responses for one or more questions may be used to gate the selection of subsequent questions. Alternatively, or in addition, questions may be in suites, with each suite dealing with a given area of inquiry. For example, in the college selection example, one suite of questions may address factors governing the experience of life at the school such as school size, social activities, geographic location, climate, facilities, nature of housing accommodations, and another suite may address conditions associated with pursuing a given major (say history or engineering) at the school (conditions such as class size, expected hours per week studying, use of teaching assistants or use of full professors). Also, for example, in the job example, one suite may address company-related factors (such as expectation/participation in company-sponsored events, expectation around consensus building, locations, and emphasis on cross-training between functions), and another suite may address function specific matters (such as frequency of overnight travel, work week hours, and type of job training programs).

In one particular embodiment, the questions are organized into three stages. In the first stage, the respondent ranks the levels of each attribute, in descending order of preference. For example, "1" could signify the most preferred level, and "3" the least preferred level, for three possible levels of an attribute. In the second stage, the respondent is asked to rate his or her degree of preference for the most preferred level of each attribute, over its least preferred level; for example, the degrees of preference could be "1, slightly preferred"; "2, moderately preferred"; "3, greatly preferred"; "4, I must have—the least preferred level would be upsetting." Finally, in the third stage, a series of two-option choices is given to the respondent, forcing the respondent to express the degree to which he or she would prefer one of two multi-attribute combinations. For example, the respondent could be presented with option A and option B, each having different levels of two attributes, and asked to rank them on a scale of 1 to 9 (1 meaning "strongly prefer option A", 5 meaning "the two are equal," and 9 meaning "strongly prefer option B"). Examples of questions from each of these three stages are shown in FIGS. 9 through 11.

Once each respondent has provided a set of ratings {R₁, R₂, . . . Rₙ} in answer to the questions (process 202), the embodiment of FIG. 2 next calculates a preference profile for each respondent, which includes the utility value that each respondent places on possible levels of the attributes {aⱼ} related to the proposed transaction. The preference profile is generated in process 203 by establishing, for each respondent, a utility function $U_j(a_j)$ for each attribute; this function provides a utility value corresponding to each level of the attribute $a_j$. The utility functions are generated by first calculating a total utility for each example combination that was ranked by the respondent. The total utilities are calculated by evaluating proposed utility functions for each attribute at the attribute levels composing each combination, and, for each combination, summing the resulting utility values. The func-

tions are then chosen from amongst the proposed functions by the criterion that a ranking of the total utilities should correspond to the respondent's actual rankings as closely as possible. The result, for each respondent, is a utility function $U_j(a_j)$ chosen for each attribute {a₁, a₂, . . . aₘ}. Each utility function translates each level of its attribute into a utility for that respondent. So, for example, a utility function will be established for the college applicant's evaluation of the college location attribute (with a utility value corresponding to each location A, B, and C—say 0.3, 0.2, and 0.4), the class size attribute (with a utility value corresponding to small, medium, and large class sizes—say 0.5, 0.2, 0.1), and so on.

As in conventional conjoint analysis methods, the utility functions are normalized to permit comparisons between the utility values of given levels of different attributes. However, in conventional methods, respondents are typically treated as a class and their responses are analyzed collectively. Here the context is typically different, and the responses of each party (and counterparty) are typically analyzed separately, so that for each party and each counterparty there is obtained a separate set of utility functions. Furthermore, conventional methods produce utility functions in a one-sided, or unilateral, fashion. For example, a producer conventionally obtains a set of utility functions describing the preferences of consumers. By contrast, the method of the embodiment of FIG. 2 produces a set of utility functions for the party and each potential counterparty, and continues with a bilateral analysis as discussed below. However, as described below, in some circumstances the preferences of a group may be evaluated collectively. Also, the responses of any individual to questions may be augmented and extrapolated on the basis of data previously obtained for similar individuals.

The set of utility functions associated with a respondent (be the respondent a party or counterparty) are sufficient to characterize the preferences of the respondent. For example, there can be determined the relative importance that the respondent places on each attribute by calculating, for that attribute, the range of the utility function over the interval of possible attribute levels. A higher range for an attribute's utility function indicates a greater relative importance for that attribute. As an example, consider the hypothetical in the paragraph before last; the respondent's range of utility values for the college location attribute was 0.2 (from a low of 0.2 to a high of 0.4); and the range for the class size attribute was 0.4 (from a low of 0.1 to a high of 0.5). Class size is therefore relatively more important for that respondent than college location. More generally, there may be derived from the utility functions $U_j(a_j)$ for a respondent, a range vector {Rⱼ} having a series of components R corresponding in each case to the range of the utility function $U_j(a_j)$ over levels of the attribute $a_j$.

From the utility functions of a respondent there can be similarly determined the level of each attribute giving rise to the greatest utility experienced by the respondent. In other words, from the utility functions can be derived the attribute levels most preferred by the respondent. One may therefore determine a value vector {Vⱼ} for each respondent, as shown in process 204. The components of the value vector {Vⱼ} represent the levels of each attribute {aⱼ} that maximize the respondent's utility function with respect to that attribute. In particular, if, for counterparty number two, three levels A, B, and C of attribute one (a₁) correspond to utility function values of 0.2, 0.3, and 0.4 respectively, then level C will be chosen as V₁, since it gives the maximum utility value for this attribute.

Given the seminal nature of the utility functions, the preference profile for each respondent, in this embodiment, is the

A108

US 8,069,073 B2

**9**

utility function vector $\{U_i(a_i)\}$ for each attribute $\{a_1, a_2, \ldots a_m\}$. In other embodiments, the preference profile may be composed of one or more of the value vector $\{V_i\}$ and the range vector $\{R_i\}$.

Once the utility functions are generated, the process of determining the counterparties having the closest fit with a party begins. As shown in FIG. **2**, there are two alternate embodiments of the method of FIG. **2**. In the first, called the aggregate value method, a list of counterparties having the closest fit is determined by following processes **204, 205, 206,** and **208**. In a second, alternative embodiment of the method of FIG. **2**, called the distance value method, the list may be generated by following processes **207** and **208** (instead of processes **204, 205, 206,** and **208**).

In process **205** of the aggregate value method, a vector is generated corresponding to a pairing of each counterparty with the party. These vectors are formed by evaluating the party's utility functions (from process **203**) at each counterparty's value vector levels (from process **204**)—that is, at the counterparty's utility-maximizing values. There is thus formed, for each counterparty paired with the party, a vector $\{U_i(a_i)|_{V_i}\}$, where the vertical bar notation indicates evaluation of the party's utility function for attribute $a_i$ at $a_i = V_i$, and $V_i$ is the counterparty's utility-maximizing value for attribute $a_i$.

In process **206** of the aggregate value method, there is computed an aggregate value for each vector $\{U_i(a_i)|_{V_i}\}$ by summing the components $U_i(a_i)|_{V_i}$ of the vector; i.e. by evaluating the sum

$$\sum_{i=1}^{m} U_i(a_i)\bigg|_{V_i}.$$

In process **208** of the aggregate value method, the counterparty that, when paired with the party, produces the greatest aggregate value is identified as having the closest fit of preferences to the party. Similarly counterparties yielding lower aggregate values when paired with the party are viewed as having a poorer fit of preferences to the party. By selecting a group of the highest ranking counterparties, there can be provided a list of counterparties having a relatively close fit of preferences with those of the party.

In the distance value version of the embodiment of FIG. **2**, a list of counterparties providing a relatively close fit of preferences is generated by using a distance measure between the utility functions generated in process **203** for the party and each counterparty. First, a utility function vector $\{U(a_i)\}$ is generated for the party and each counterparty as described in process **203** above. Then, in process **207**, for each possible counterparty that can be paired with the party, a distance value is generated by comparing the utility functions of the pair. For example, a linear distance value D may be computed using a distance measure as follows:

$$D = \sum_{i=1}^{m} \sum_{j=1}^{J_i} [\text{Abs}\{U_i(a_i)|_{L_j} - U_i'(a_i)|_{L_j}\}], \qquad \{\text{Equation 1}\}$$

where the distance value D is calculated for each possible counterparty paired with the party; and where Abs { } indicates the absolute value of the subtraction result in the brackets; m is the number of attributes $\{a_i\}$; $J_i$ is the number of levels of attribute $a_i$; $U_i(a_i)$ is the party's utility function for

**10**

attribute $a_i$; $U_i'(a_i)$ is the counterparty's utility function for attribute $a_i$; and the vertical bar notation indicates evaluation of the function at attribute level $L_j$.

In process **208** of the distance value method of FIG. **2**, the counterparty that, when paired with the party, produces the lowest distance value P is identified as having the closest fit of preferences with the party. Similarly counterparties yielding higher distance values when paired with the party are viewed as having a poorer fit of preferences with the party. By selecting a group of the lowest distance valued counterparties, there can be provided a list of counterparties having a relatively close fit of preferences with those of the party. While the illustration above uses a linear distance measure that is minimized, other distance measures may also be employed, including, for example, a least-squares approach. In such a way, the embodiment of FIG. **2** allows parties and counterparties to make decisions about potential transactions based on a bilateral evaluation of preferences.

While the embodiment of FIG. **2** has been described with reference to a list of counterparties being provided to a party, it should be understood that, given any two classes of parties denominated "parties" and "counterparties," the embodiment of FIG. **2** can equally be used to recommend a list of parties to a counterparty; this may be accomplished by simply following the described processes, but replacing the term "party" with "counterparty," and vice versa. Generally, it should be understood that embodiments of the invention are symmetrical with respect to two sides of a transaction, in that they may be used equally to recommend decisions to one side as to the other.

Furthermore, where embodiments are described in which, first, a preference profile is generated for persons on one side of a transaction, and then a preference profile is generated for persons on the other side of the transaction, it should be understood by those of ordinary skill in the art that the order of questioning the persons, and of generating the preference profiles, is not essential. Thus, where it is described to ask questions of persons on one side of a transaction first, and then of persons on the other, it should be understood that it is equally possible to reverse the order of questioning (by asking questions of the opposite side of the transaction first), or even to ask questions of both sides simultaneously.

In a further related embodiment, parties and counterparties are enabled to make decisions based on a multilateral evaluation of preferences. In such an embodiment, the method proceeds as described for FIG. **2**, except that questions are asked not only of parties and counterparties, but also of one or more co-evaluators. A co-evaluator may be any natural person or an entity, as with the parties and counterparties. The party, and any of the possible counterparties, may wish to include the input of a co-evaluator as an aid to decision-making. Thus, for example, a college applicant party may wish to have a guidance counselor or his parents evaluate the circumstances under which he performs best, or seems most content, in order to aid him in deciding which college to attend. Similarly, a college counterparty may wish to have input from alumni/ae, faculty, and current students to guide in selection of students to admit. In a merger, a corporation party may wish to have the members of its various departments, and even some of its customers and/or suppliers, act as co-evaluators, to assist in determining the degree of "culture fit" with a corporate counterparty with which it is merging.

In each case, the co-evaluator chosen has a useful perspective on the party or counterparty's preference profile. The question array, ranking, utility function, and value vector procedures are followed as in boxes **201** through **204**, except that in this multilateral embodiment they are performed for at

US 8,069,073 B2

11

least one co-evaluator, based on his or her own perception of the associated party's or counterparty's preferences, in addition to being performed by the parties and counterparties themselves.

Co-evaluators may fall into two exemplary categories, although they are not limited to these categories. In the first exemplary category, the co-evaluator provides input concerning the circumstances under which his or her associated party or counterparty is most content or satisfied. In this category, the co-evaluator can be said to provide a preference profile for his or her associated party or counterparty.

In the second exemplary category, the co-evaluator provides input concerning the circumstances under which his or her associated party or counterparty performs best. In this category, the co-evaluator can be said to provide a success profile for his or her associated party or counterparty.

Attributes for co-evaluators typically mirror those for parties and counterparties. For example, in the college-admissions example discussed in connection with FIG. 2, attributes for a guidance counselor co-evaluator could be: "Prospect does best in environments that . . ." or "Prospect is happier with products or services that . . ." Similarly, questions for a co-evaluator for a counterparty may be structured to elicit answers to the questions: "People who do well here typically like jobs that . . ." or "Users who are satisfied with this purchase typically prefer items that . . . ."

A co-evaluator for a party or counterparty need not be a single person; it could also be a group of people. For example, a corporate counterparty may wish to use the members of a given department as its co-evaluators in a transaction. In such a case, i.e. where a co-evaluator consists of a group of individuals, questions are asked of each member of the group of co-evaluators, and rankings are obtained from each. Then a single set of utility functions (one function for each attribute) is generated for the group of co-evaluators. This may be done by averaging utility functions for each member of the group; by weighting some members' utility functions more highly, in a weighted average of functions (with the optimal weighting determined based on the context of the transaction); or by allowing the counterparty (or party) associated with the co-evaluator to choose which group member's profile to use as the co-evaluator's profile.

Where there is a group co-evaluator, or where there is more than one co-evaluator for a single party or counterparty, it may also be useful to provide a visual display of each co-evaluator's preference profile to parties and counterparties. Such a visual display could take the form of a histogram, with a bar indicating the relative value of attributes; or the visual display could graphically display a utility function for each attribute, for each co-evaluator. Another useful visual display could be a scatterplot or distribution (characterized, for example, by a mean and standard deviation) of the preference profile results from more than one co-evaluator. By using such visual displays, parties and counterparties may be enabled to weigh the input of multiple co-evaluators in a comparative and qualitative fashion.

When a party or counterparty uses a co-evaluator, methods according to embodiments of the invention may require the party or counterparty's permission, before releasing a co-evaluator's preference profile to other respondents in the decision-making process.

Once a preference profile has been obtained for the party, each counterparty, and each co-evaluator, the next process in a multilateral embodiment of the invention is, as with the bilateral embodiments described above, to recommend a list of counterparties providing a relatively close fit of preferences. First it must be determined, for each party and coun-

12

terparty who used a co-evaluator, how to use the co-evaluator's preference profile in the analysis. In one embodiment, this is performed by the following algorithm:

1) Determine the closeness of fit of the party or counterparty's preference profile with that of its associated co-evaluator. This may be done using the aggregate value method or the distance value method (each described above for a bilateral embodiment).

2) If the profile of the co-evaluator is close enough to that of the party or counterparty, as judged against a pre-established standard, then the party or counterparty's own profile will be used for comparison with potential partners to the transaction.

3) If, however, the co-evaluator's preference profile differs sufficiently from that of its associated party or counterparty (as judged against the pre-established standard), then the associated party or counterparty is given a choice as to which preference profile to use for comparison with potential partners to the transaction. The party or counterparty may choose to use its own profile only, or that of the co-evaluator only, or (optionally, for an additional fee) to use each profile separately and obtain results using each.

Once it is determined which preference profile will be used for the party and each counterparty, a multilateral embodiment of the invention proceeds as described above for bilateral embodiments. The result of this multilateral embodiment, then, is to provide a list of counterparties to the proposed transaction who provide a relatively close fit of preferences with those of the party, in a way that takes into account the perspective of at least one co-evaluator.

Because decisions are recommended based on the preferences of more than one party to a transaction, embodiments of the invention are particularly advantageous for long-term, relational transactions. Examples have been provided above of utilization of embodiments in situations where parties and counterparties may lack any previous business relationship. However, such a circumstance is in no way a necessary foundation for application of embodiments of the present invention. For example, embodiments of the present invention may be employed for evaluation of existing relationships between employer and employee. Questions in such a circumstance may, for example, be directed to particular work conditions, such as scheduling of employee's work hours during the day, work rules and changes to physical facilities. In this manner, management and employees may usefully evaluate potential issues of importance in the work environment. As another example, embodiments of the present invention may be applied within corporations to determine where there is "gear grinding" within the organization (inefficient or counterproductive relationships), or areas of difficulty in "culture fit" between merged companies.

Similarly, embodiments of the present invention may be used in tandem with more traditional evaluation techniques. For example, potential employees may be identified using traditional techniques, and thereafter promising candidates along with human resources managers may be subjected to co-evaluation in accordance with an embodiment of the present invention.

It is equally possible to refine evaluation techniques in various embodiments herein. One method of refinement is to consider instances wherein a close fit has been predicted by an embodiment, but wherein experience later shows there to be a problem. (Or alternatively, a close fit has not been predicted, but nevertheless resulted.) When the reason for the outcome is uncovered, it may be due to an attribute that had not been previously identified, or due to an ineffective or badly worded question. In such cases, the questions posed to respondents

US 8,069,073 B2

13

may be modified to take into account a new attribute or to correct ineffective questions. The questions may then be used for new submissions to future respondents or can optionally be resubmitted to former respondents. Alternatively, or in addition, the problem may be attributable to improper analysis of the answers to the questions, and these matters can be adjusted by modifying, for example, the utility functions associated with the party or counterparty as appropriate, and re-performing the analysis.

FIG. 3 shows a block diagram of an embodiment of a system in accordance with the present invention. A first question and response module 302 obtains responses from each member of a first class of parties 301 to a first set of questions. The questions are designed to elicit revelation of preferences that can be used to estimate the closeness of each party's fit with potential counterparties to the transaction. The first question and response module then stores the party's responses in a first digital storage medium 303.

Similarly, a second question and response module 305 obtains responses from each member of a second class of counterparties 304 to a second set of questions. These questions are similarly, designed to elicit revelation of preferences that can be used to estimate the closeness of each counterparty's fit with potential parties to the transaction. The second question and response module then stores the counterparty's responses in a second digital storage medium 306.

A first profile processor 307 uses the responses stored in first storage medium 303 to derive a first preference profile for each party, and a second profile processor 308 uses the responses stored in second storage medium 308 to derive a second preference profile for each counterparty.

A closeness-of-fit analyzer 309 analyzes the preference profile generated for each party by first profile processor 307 in relation to the preference profiles generated by second profile processor 308. For each party, the result is an output ranked list 310 of counterparties providing a relatively close fit of preferences with that party, compared with the other potential counterparties. The closeness-of-fit analyzer communicates such a list to each party.

In embodiments of systems according to the invention, the first and second question and response modules 302 and 305, the first and second profile processors 307 and 308, and the closeness-of-fit analyzer 309 may be implemented as computer processes running on multiple computers in communication with each other (for example over a network, including the Internet), or as processes running on a single computer. Similarly, the first and second digital storage media 303 and 306 may be separate storage devices, or portions of a single digital storage medium.

In a preferred embodiment, the system of FIG. 3 is implemented as a host computer accessible over a network, such as the Internet. In particular, parties 301 and counterparties 304 may access the system using remote computers which are in communication with a host computer via Web pages of a web site on the World Wide Web. The host computer is then a web server, which runs computer processes that implement the first and second question and response modules 302 and 305, the first and second profile processor 307 and 308, and the closeness-of-fit analyzer 309. The server stores responses to questions in an associated content storage device (for example at least one hard disk drive), which serves as first and second storage media 303 and 306. The server may communicate with parties and counterparties using e-mail, or by making information available on a web site, or by other communication methods.

Further information concerning the Internet and E-mail (both of which terms are used throughout this specification) is

14

provided, for example, in Gralla, *How the Internet Works* (Ziff-Davis Press, 1996), which is hereby incorporated by reference; see especially pages 44-49.

In further embodiments of systems and methods according to the invention, communication with a server and information processing may be implemented using wireless devices.

FIGS. 4 and 5 illustrate the logical flow of a method according to an embodiment of the invention that may be implemented using a web server on the Internet. This embodiment also illustrates use of the processes described above in connection with the system of FIG. 3.

In box 401, a system, which may be a website server on the Internet, receives primary data from parties and counterparties, via guided templates for data entry. Each party or counterparty enters the site, registers basic information (for example name, address, and other contact information), and selects a decision area from a set of pre-set parameters. The pre-set decision areas may be, for example, college selection or employment searching. For college selection, the party could be a college applicant, and the counterparty may be a college looking for or decided which students to admit; for employment searching, the party may be a job candidate looking for a job, and the counterparty may be an employer looking for employees or deciding amongst candidates. After receiving the decision area choices, the system prompts the party or counterparty, via guided templates, for information on co-evaluators that he or she wishes to include in the decision-making process. The system also gives the party or counterparty the option of using data from only the co-evaluators in making the decision (with no input from the party or counterparty himself). Finally, the party or counterparty authorizes payment, and the system receives and verifies the payment method (for example, credit card payment).

Next, in box 402, the system prompts each party and counterparty, via guided templates, for supplemental data that might be useful later in the process of evaluation. For example, a job candidate party may be prompted for, and register, a formatted résumé. A college applicant party may be prompted for, and register, a summary of his academic history. In each case, the prompted supplemental data is potentially useful to a counterparty (e.g. an employer or a college) later in the process of evaluation (described below). Similarly, the system prompts counterparties for supplemental data that are potentially useful to parties later in the decision-making process. For example, if the counterparty is a company searching for job candidates, the company's supplemental data may be "leads" on housing opportunities, which would be attractive to job candidates who need to find housing near the company. Once the parties and counterparties have entered supplemental data, the system assigns a unique identifier to each user, including parties, counterparties, and any co-evaluators that they have named. The system also creates a file for each user, and associates each file with the corresponding unique identifier.

The system next, in box 403, disseminates a questionnaire form to each party and counterparty, along with the unique identifier assigned to each. (This process is omitted for a party or counterparty who has elected to have evaluation performed by a co-evaluator only, as described above in connection with box 401.) The system then administers the questionnaire forms to each party or counterparty. For example, the system may guide the party or counterparty through a series of questions formatted as templates on Web pages on a web site, through which the system receives each party's (or counterparty's) answers to the questions. The questions on the questionnaire form are designed to elicit the utility value which the respondent places on possible levels of each attribute, without

US 8,069,073 B2

15                                                              16

necessarily asking for preferences directly. For example, the questions may be structured to elicit from the parties answers to the questions: "I do best in environments that . . . " or "I'm happier with products or services that . . . " Similarly, the questions for counterparties may be structured to elicit answers to the questions: "People who do well here typically like jobs that . . . " or "Users who are satisfied with this purchase typically prefer items that . . . ."

As previously discussed, Tables 1-3 show examples of questions that may be used, in various embodiments of the invention, for eliciting preferences in the areas of college selection (Table 1), mutual fund selection (Table 2), and employment selection (Table 3).

In box **404**, the system disseminates a questionnaire form to each co-evaluator, and administers the form to the co-evaluator, in a fashion similar to that described for box **403**. (If no co-evaluators were named for a given party or counterparty, then this process is omitted). The questions for a co-evaluator are structured to elicit the co-evaluator's perspective on the associated party or counterparty's preferences, without necessarily asking for preferences directly. The questions may, for example, elicit input concerning the utility value which the associated party or counterparty places on possible levels of each attribute; or may elicit input concerning the circumstances under which the associated party or counterparty performs best. For example, questions for a co-evaluator for a party might be structured to elicit answers to the questions: "Prospect does best in environments that . . . " or "Prospect is happier with products or services that . . . ." Similarly, questions for a co-evaluator for a counterparty may be structured to elicit answers to the questions: "People who do well here typically like jobs that . . . " or "Users who are satisfied with this purchase typically prefer items that . . . ."

In box **405**, the system reviews for internal consistency the completed preference forms that it received from boxes **403** and **404**. For each form, when the extent of logical inconsistency exceeds a desired level, the system communicates the fact of inconsistency to the respondent who completed the form, and asks whether he or she wishes to fill out the form again. A stark example of such an internal inconsistency is where a respondent has answered three questions, in the same answer form, with the answers "I prefer A to B"; "I prefer B to C"; and "I prefer C to A." Checks of internal inconsistency are useful, for example, in detecting respondents who are attempting to "game the system," by providing answers that show preferences for given attributes, when in fact their preferences are otherwise; often, in such a case, the respondent inadvertently answers questions in an inconsistent fashion. If the inconsistent form was completed by a party or counterparty, then the party or counterparty is also given the option of allowing the process to continue using only input from co-evaluators. If a respondent who filled out an inconsistent form does not respond to a request to fill out the form again, then the process continues without that respondent's input.

Next, in box **406**, the system sends to each party such party's preference profile and profiles of any co-evaluators and to each counterparty such counterparty's preference profile and profiles of any of such counterparty's co-evaluators. The aggregated profile reveals to the party or counterparty the results of performing a forced-choice analysis, or other preference analysis (including conjoint analysis) using the party's answers to the preference form questions. Thus it may reveal to the party or counterparty the weight that he or she places on attributes that were analyzed, or the levels of each attribute that he most preferred, or the utility value that he or she places on possible levels of each attribute, as determined by the

preference analysis. Optionally, such information may be presented in a histogram or other graphical display, in order to visually display the results of the analysis. An example of such a histogram for a job applicant is shown in FIG. **6**; a corresponding histogram for a counterparty employer is shown in FIG. **7**; and a histogram showing a side-by-side comparison of the two is shown in FIG. **8**. Note that histograms may be used to display weights or values or both; they are used for values only where the values in question are quantitative (as opposed to categorical or yes/no) variables.

The party or counterparty is also given information about significant gaps between the results of his preference analysis and the results of his co-evaluators, either in weighting of attributes, or in most preferred attribute levels, or both. Such gaps may optionally be displayed by a side-by-side comparison of histograms, as is illustrated by FIG. **8**. Knowing these gaps may lead a party (or counterparty) to re-examine its conception of its own preferences; a large gap between the respondent's own perception of its preferences as compared with that of others may mean that the respondent was not truly aware of its own preferences. Accordingly, the party or counterparty (as the case may be) is given the choice of using its own preferences or those of one of its co-evaluators, as described further below.

As described below in connection with box **513**, it is possible to permit each party and counterparty to update its preference profile; when there is a decision to update, the process must accommodate the collection of new preference data to provide a new analysis that will differ from the original analysis if responses to the questionnaire form are different from the original responses. In presenting the option to update, the system sends the party or counterparty his original decision area choice, and gives him the opportunity to revise the choice (thereby returning to box **401**). The system asks the party or counterparty for authorization to proceed to the process of looking for relatively close fits amongst a pool of counterparties or parties (respectively). The system also gives the party or counterparty the option of repeating the preference form processes (thereby repeating boxes **403** through **405**), or of adding or dropping co-evaluators (thereby returning to boxes **402** and **404**-**406**). (The addition of a co-evaluator or the updating of the profile may optionally trigger the requirement of paying an extra fee.)

In box **407**, the system obtains authorization from each party and counterparty to release the results of the search for relatively close fits. Each party has three or more options, including: a) to receive the results, without the same information being sent to any counterparties; b) to receive the results, and to have the results sent to counterparties with name or other key identifying data on the party withheld; or c) to receive the results, and to have the results sent to counterparties with full information on the party. Each counterparty is given corresponding options for release to parties (including the option to withhold the counterparty's name or other key identifying data from the parties).

Next, in box **408**, the system generates, and communicates to each party and counterparty, a ranked list of relatively close fits for that party or counterparty amongst the pool of reciprocal parties, based on the use of a bilateral or multilateral preference methodology. This list may contain network addresses, web links or e-mail addresses, or other methods of contacting reciprocal parties on the list. Also, it may contain a listing of what information about the recipient has been sent to each of the reciprocal parties on the list, in accordance with the authorization received in box **407** (above).

In box **409**, the system facilitates action by parties and counterparties to identify and contact reciprocal parties. For example, the system may enable a party to contact a counter-

US 8,069,073 B2

17

party by using a web link on a web site, or by using a web link sent to the party as part of an e-mail; or the system may provide phone numbers or other contact information, as authorized in box 407 (above).

Continuing with box 510 in FIG. 5, the system next queries each party and counterparty as to what decisions it has made in the decision area for which the analysis was performed; for example, a party could be asked what job he or she accepted, or what product he or she selected; and a counterparty could be asked which job candidates it selected for employment. These decision inquiries are repeated at time intervals that are either chosen by the registrant in the primary data entry process of box 401, or are specified to the registrant during the primary data entry process, or are otherwise scheduled by the system.

In box 511, the system communicates a query to each party and counterparty as to its satisfaction with the decision that it made, after it has been informed that the party or counterparty has made the decision. This decision satisfaction inquiry is performed at a time interval after process 510 that is either chosen by the registrant in the primary data entry process of box 401, or pre-determined in the system.

Next, in box 512, the system, in one embodiment, performs a post-decision analysis. It analyzes key attributes that contributed to each party and counterparty's degree of satisfaction, by comparing each one's reported degree of satisfaction (from box 511) with the analyzed preference form results obtained in boxes 406 and 408. The system communicates to each party and counterparty its individual post-decision analysis, and provides each with a structured opportunity to respond to the analysis, e.g. by providing a set of web-page templates enabling the party or counterparty to comment on the key attributes identified in the post-decision analysis. Additionally, the system stores the results of the post-decision analysis, and the comments on it. Owing to the collection, in the course of practicing embodiments discussed in this description, of substantial quantities of data that tend to be of a personal nature, it is within the scope of various embodiments to preserve the confidentiality of such data and to disclose such data only under circumstances to which the affected individuals and organizations have given their consent.

Large discrepancies between a preference form analysis and a post-decision report may indicate that the respondent did not understand its own preferences well. Thus, such post-decision reports may help parties and counterparties to learn about themselves, and therefore to make better decisions in the future.

Results of post-decision analyses may be used to revise the system's method of preference form analysis, or to revise the questions which are asked in each decision area. For example, if it is discovered that some college applicant parties have decided to attend colleges with which they were unhappy, and some were unhappy based on attributes that the preference form did not elicit, then the preference form for the college choice decision area could be altered to incorporate the overlooked attributes.

As part of the post-decision analysis, the system may also provide a co-evaluator with a report on the party or counterparty's reported degree of satisfaction. For example, a college guidance counselor co-evaluator can be provided with a report on a college applicant party's (or a group of parties') degree of satisfaction, so that the counselor can modify his or her counseling in the future.

Note, however, that in some contexts it is preferable to guarantee that a party's post-decision report will be kept in confidence with respect to (at a minimum) the counterparty

18

with which the party entered a transaction (and vice versa for a counterparty's confidences). For example, it is preferable to guarantee confidentiality to an employee party who reports dissatisfaction with an employer counterparty in a post-decision report.

In box 513, the system invites each party and counterparty to update its preference profile. If the party or counterparty agrees, the process begins anew, beginning with box 401, above. For such updates, the process retains the data from the original analysis process, and updates it according to the new input which the party or counterparty provides. The pricing to users may be configured so that additional charges may be made for updates, as opposed to original analyses. A party or counterparty may also initiate the update process itself, without an invitation; this may, for example, be implemented by providing an update option for registrants on a web site. As part of an update, the system also allows a party or counterparty to add or delete co-evaluators. If the update option is not selected, the process proceeds to box 514.

In box 514, the system invites each party and counterparty to perform a new matching process for closeness of fit, based on its current preference profile. If the party or counterparty agrees to do so, the process begins anew at box 407, with the pricing changed accordingly.

Although this description has set forth the invention with reference to several preferred embodiments, one of ordinary skill in the art will understand that one may make various modifications without departing from the spirit and the scope of the invention, as set forth in the claims.

We claim:

1. A computer-implemented method for facilitating evaluation, in connection with the procurement or delivery of products or services, in a context of at least one of (i) a financial transaction and (ii) operation of an enterprise, such context involving a first class of parties in a first role and a second class of counterparties in a second role, the method comprising:

    in a first computer process, retrieving first preference data from a first digital storage medium, the first preference data including attribute levels derived from choices made by at least one of the parties in the first class;

    in a second computer process, retrieving second preference data from a second digital storage medium, the second preference data including attribute levels derived from choices made by at least one of the counterparties in the second class;

    in a third computer process, for a selected party, performing multilateral analyses of the selected party's preference data and the preference data of each of the counterparties, and computing a closeness-of-fit value based thereon; and

    in a fourth computer process, using the computed closeness-of-fit values to derive and provide a list matching the selected party and at least one of the counterparties.

2. A method according to claim 1, wherein the list is ranked according to closeness of fit.

3. A method according to claim 1, further comprising receiving co-evaluator choices made by a party co-evaluator or a counterparty co-evaluator, wherein the list matches the at least one party and the at least one counterparty according to a multilateral analysis of preference data determined using such co-evaluator choices.

4. A method according to claim 1, wherein the party choices reveal, with respect to each level of each of a first series of attributes, a utility value which indicates the value that the party places on the level of the attribute.

US 8,069,073 B2

19

**5**. A method according to claim **4**, wherein the party choices reveal the utility values without the utility values being provided explicitly.

**6**. A method according to claim **4**, wherein the counterparty choices reveal, with respect to each level of each of a second series of attributes that complements the first series of attributes, a utility value which indicates the value that the counterparty places on the level of the attribute.

**7**. A method according to claim **6**, wherein the counterparty choices reveal the utility values without the utility values being provided explicitly.

20

**8**. A method according to claim **1**, wherein at least one of the first preference data, second preference data, and the list is obtained from a remote server over a communication network.

**9**. A method according to claim **1**, wherein the party choices and the counterparty choices are provided to a remote server over a communication network.

* * * * *

# United States Court of Appeals
## for the Federal Circuit

*Lumen View Technology LLC v. Findthebest.com, Inc,* 2015-1275, -1325

## CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by WASSERBAUER LAW LLC, Attorneys for Appellant to print this document.  I am an employee of Counsel Press.

On **April 13, 2015** counsel has authorized me to electronically file the foregoing **Brief for Plaintiff-Appellant** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

Joseph S. Leventhal
Carolyn V. Juarez
The Leventhal Law Firm, Apc
600 W. Broadway, Suite 700
San Diego, CA 92101
619-359-3518
jleventhal@leventhallaw.com
cjuarez@leventhallaw.com

Paper copies will also be mailed to the above principal counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

April 13, 2015                                    /s/ Robyn Cocho
                                                 Counsel Press

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

  X    The brief contains <u>12,977</u> words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

_____ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

  X    The brief has been prepared in a proportionally spaced typeface using <u>MS Word 2013 </u>in a <u>14</u> point <u>Times New Roman </u>font or

_____ The brief has been prepared in a monospaced typeface using_____ _____in a ___ characters per inch_____ font.

<u>April 13, 2015    </u>　　　　　　　<u>/s/ Damian Wasserbauer　　　　</u>
　　　　　　　　　　　　　　　　Damian Wasserbauer (DW3507)

　　　　　　　　　　　　　　　　*Attorney for Plaintiff*
　　　　　　　　　　　　　　　　*Lumen View Technology LLC*